IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| Crystal L. Wickersham, | ) | Civil Action No. 9:13-cv-01192-SB |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Ford Motor Company, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| Crystal L. Wickersham, as Personal Representative of the Estate of John Harley Wickersham, Jr., | ) | Civil Action No. 9:14-cv-00459-SB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Ford Motor Company, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Crystal L. Wickersham, individually, and Crystal L. Wickersham, as Personal Representative of the Estate of John Harley Wickersham, Jr., (collectively "Plaintiff") submit this response in opposition to Defendant Ford Motor Company's ("Ford") motion for summary judgment (ECF # 33, 33-1).

This is a crashworthiness product liability action involving a defective airbag system in a 2010 Ford Escape. On February 3, 2011, the decedent, Mr. Wickersham, lost control of the vehicle while making a left turn and collided with a tree. The driver's airbag deployed late and, rather than protecting Wickersham, it caused severe, permanent injuries to his face, breaking numerous bones and eventually resulting in the loss of his left eye. Over a year later,

Wickersham committed suicide due to his inability to cope with the chronic pain caused by the accident.

For the reasons stated below, the Court should deny Ford's motion for summary judgment.[1]

## FACTUAL BACKGROUND[2]

Plaintiff and Mr. Wickersham were married for almost thirty years and had four children and two grandchildren. (Exh. 1, Pl. Depo. pp. 9-11, 13, 21). Plaintiff worked as a nurse, and Wickersham worked as a pharmacist and consultant. *Id.* at pp. 22, 44-45. Wickersham worked for Roper Hospital in Charleston, South Carolina, in some capacity from 1982 until his death in 2012. *Id.* at pp. 22-24. Wickersham lived a normal life. He spent time with friends. *Id.* at pp. 112-14. He took his wife to the movies. *Id.* at pp. 114-15. He took his children and his wife on vacations once or twice year. *Id.* at p. 115.

Ford argues that Wickersham's job situation and mental disorder allegedly contributed to his suicide to the exclusion of the extreme and unrelenting chronic pain he suffered as a result of the collision. (ECF # 33-1 pp. 9, 11). Therefore, Plaintiff includes in the facts section a detailed history of his work and health status to show the evidence supporting the inference that Wickersham's chronic pain from the collision was the significant factor in his uncontrollable impulse to commit suicide.

At the age of nineteen, Wickersham got a cataract in his right eye that resulted in the removal of the lens in that eye and only partial vision. (Exh. 1, Pl. Depo. p. 157 lns. 3-8, p. 158

---

[1] After conducting discovery in this case, Plaintiff withdraws the failure to warn claim because the evidence does not warrant pursuing the claim.

[2] Some facts specifically related to the alternative design issue are included in that argument section rather than the factual background.

lns. 2-4).    However, six months before the accident, technology improved enough so that Wickersham got a lens surgically put in his right eye. *Id.* at pp. 157-59.  He got a cataract in his left eye in the 1990s, and a lens put in that eye in the 1990s. *Id.* at p. 157.  He also wore corrective lenses in both eyes. *Id.* at p. 175 lns. 13-20.

Wickersham worked full-time at Roper from 1982 until sometime in 2003, when he chose to begin working as a consultant for Roper and took a full-time job at Palmetto Infusion, which later became InfuScience in 2008. (Exh. 1, Pl. Depo. pp. 23-25).    Around  2003, Wickersham's family practitioner, Dr. Richard Bolt, diagnosed him with bipolar disorder and referred him to a psychiatrist, Dr. Perry Trouche. *Id.* at pp. 131-32.  The bipolar diagnosis resulted from an episode of outgoing, energetic behavior followed by a period of depression that led Wickersham to see Dr. Bolt. *Id.* at pp. 136, 139.  He made no suicide attempts but told Plaintiff he had thoughts of suicide. *Id.* at p. 140 lns. 23-25, p. 149.

Dr. Trouche treated Wickersham from 2003 through 2005, and then again in January 2011. (Exh. 2, Trouche Depo. p. 34).  Wickersham had some suicidal ideation in 2003, when Dr. Trouche first began treatment, but this subsided shortly thereafter with treatment mainly consisting of changing various medications due to side effects. *Id.* at p. 21-22.  Dr. Trouche testified Wickersham always managed any suicidal ideation.  Wickersham "agreed if he felt suicidal he would let somebody know." *Id.* at p. 27 lns. 6-7.  Wickersham stopped seeing Dr. Trouche after June 2005. *Id.* at p. 33.  Dr. Bolt testified this is common.  "Once a patient is stable on medications from another physician, it's not uncommon for them to cut back on the frequency of visits that they're doing and to turn it over to me to write for the prescriptions." (Exh. 3, Bolt Depo. p. 30 lns. 5-15).

In June 2008, Wickersham resigned from InfuScience because he "wasn't happy there anymore" after the "management changed." (Exh. 1, Pl. Depo. p. 26 lns. 8-23). A few months later, Wickersham took a full-time job at Beaufort Memorial Hospital on a two-year contract. *Id.* at p. 27 lns. 5-22. During that time, the Wickershams rented an apartment in Beaufort and Wickersham worked the night shift for "7 days in a row, then he'd be off for 7 days" and return home to Charleston. *Id.* at 38 lns. 15-20. Plaintiff went to Beaufort with Wickersham during his seven days on and returned to Charleston with him during his seven days off. *Id.* During his seven days off from Beaufort Memorial, Wickersham performed forty hours of consulting work for Roper. *Id.* at p. 42. In December 2008, Wickersham's father died from a heart attack. *Id.* at p. 148 lns. 5-6.

In November 2010, at the end of his contract term with Beaufort Memorial, Wickersham worked on only an as-needed basis at Beaufort Memorial and tried to find a job closer to home in Charleston. (Exh. 1, Pl. Depo. at p. 28). He took a full-time job at the Medical University of South Carolina for a week in December 2010 but resigned because "he wasn't happy with the way the pharmacy was run." *Id.* at p. 29. After that, Wickersham worked on a contract and consulting basis for Roper and other medical practices, including Charleston ENT, auditing their "medication records, their narcotic records, making sure those were being documented properly." *Id.* at pp. 31-32. He also continued to work the night shift in the pharmacy at Beaufort Memorial until the time of the accident. *Id.* at p. 35 lns. 14-23.

In early January 2011, Wickersham sought treatment from Dr. Trouche for worsening depression and some suicidal ideation. (Exh. 2, Trouche Depo. p. 38). Dr. Trouche recommended hospitalization, which Wickersham declined. *Id.* at pp. 38-39. Dr. Trouche felt Wickersham "wasn't sure he could control his impulse to suicide", and prescribed a new

depression medication, Abilify. *Id.* at pp. 38-39, 63.  Six days later, after taking the new prescription, Wickersham had no suicidal ideation and felt better. *Id.* at pp. 45, 70-71.

The collision occurred on the night of February 3, 2011, while Wickersham drove home to Charleston after working a shift at Beaufort Memorial. (Exh. 1, Pl. Depo. p. 186). Wickersham lost control of the vehicle while making a left turn in a rain storm. (Exh. 4, Watts Depo. p. 71, 144; Exh. 5, Caruso Report p. 4).  The vehicle went through an intersection, over a curb, and hit a tree on the front passenger side. Exh. 5 at p. 4-5.  The driver's airbag deployed later than it should have and, as a result, caused serious facial injuries to Wickersham. (Exh. 6, Kennett Report pp. 23-24).  Wickersham was wearing his seatbelt. *Id.* at p. 5.

Beaufort Memorial told Plaintiff that Wickersham's injuries were too severe for them to treat, and transferred him to MUSC in Charleston. (Exh. 1, Pl. Depo. p. 188).  When Plaintiff got to the emergency room, Wickersham told her "You know, I thought that was it.  I thought I was done.  I'm lucky to be here." *Id.* at p. 190 lns. 8-9.  He told Plaintiff that he did not remember how the accident happened. *Id.* at pp. 206-07.

Wickersham suffered severe and permanent injuries.  His left eye ruptured in the accident, which caused the lens and iris to eject from his eye, leaving "just a black hole in his eye." (Exh. 1, Pl. Depo. p. 211 lns. 1-4).  He suffered a broken rib, a broken upper jaw, and broken cheek bones around his left eye that required surgery to wire his jaws together for six weeks. *Id.* at pp. 211 ln. 24 – 212 ln. 4; p. 214; p. 229 lns. 15-19.  His nose was also so damaged that he could not breathe through it, and the surgeons had to perform a tracheotomy to establish an oxygen pathway when they wired his jaw shut. *Id.* at p. 212-13; Exh. 7, photo.  The accident caused a skull fracture that required monitoring for brain fluid leakage. (Exh. 1, Pl. Depo. pp. 213-14).  One doctor described the number of broken bones in Wickersham's face as looking

"like someone stepped on an egg shell." *Id.* at p. 214 lns. 7-9.    Wickersham remained hospitalized at MUSC for ten days and underwent numerous surgeries. *Id.* at pp. 211-13.

After his discharge from the hospital, Wickersham underwent additional procedures and surgeries.    After the removal of his jaw wiring, and approximately two months after his discharge, the doctors performed a surgery to fix his nose so he could breathe and they could remove the tracheotomy. (Exh. 1, Pl. Depo. pp. 233 ln. 20 – 234 ln. 20).    During this time, Wickersham performed some audit consulting work but could not dispense medications. *Id.* at pp. 232 ln. 25 – 233 ln. 9.    Wickersham also underwent an additional surgery intended to repair the almost-detached retina in his left eye. *Id.* at p. 230 lns. 7-12.    The repair did not last and, after another surgery to insert a plate to hold up his eyeball, Wickersham lost his left eye in November 2011. *Id.* at pp. 230 ln. 13 – 231 ln. 7, pp. 244-45.    Wickersham "felt like he looked like a monster" and "was very self-conscious" about his disfigurement as a result of the accident. (Exh. 4, Watts Depo. p. 135 lns. 19-20).    He worried that his appearance scared his granddaughter. *Id.* at p. 144 lns. 12-14.

Plaintiff testified to the continuous, extreme pain Wickersham experienced as a result of his injuries. (Exh. 1, Pl. Depo. p. 232 lns. 23-24, p. 236 lns. 13-13-18, pp. 237 ln. 9 – 238 ln. 12). He saw pain specialists, took pain medication, and got a nerve block. *Id.* at pp. 236-38. However, nothing curbed the pain. *Id.* at p. 237 lns. 18-19, pp. 239 ln. 23 – 240 ln. 3. Wickersham could hardly talk without experiencing pain. (Exh. 8, Jacob Wickersham Depo. p. 39 lns. 5-13).    Plaintiff testified to financial problems they experienced as a result of the accident and Wickersham's extreme pain.    Prior to the accident, Wickersham "knew he could find work. After the accident he was – he was not able to work full-time." (Exh. 1, Pl. Depo. p. 240 lns. 9-23).    He worked for a few months after the accident but ultimately stopped "[b]ecause of the

pain." *Id.* at p. 240 lns. 21-24, p. 244 lns. 12-13, p. 255 lns. 8-20.  Plaintiff quit working to take care of Wickersham. (Exh. 8, Jacob Wickersham Depo. p. 53 lns. 5-6).  Dr. Bolt testified the accident "was a huge catastrophic blow to" Wickersham, including "loss of the left eye when he already didn't see well out of his right eye." (Exh. 3, Bolt Depo. p. 65 lns. 22-24).  It was "hard for [Dr. Bolt] to imagine John [Wickersham] being able to return to work" but, he noted, "John [Wickersham] loved his work.  I mean, he always wanted to work." *Id.* at p. 70 lns. 11-12, p. 71 lns. 10-11; Exh. 8, Jacob Wickersham Depo. pp. 39-40.

In September 2011, Dr. Tavel, a pain specialist treating Wickersham, referred him to Dr. Sheldon Levin for chronic pain management. (Exh. 9, Levin Depo. pp. 11-12, 20; Exh. 1, Pl. Depo. p. 236).  Dr. Levin is a neuropsychologist, which is a specialty within psychology that focuses on brain behavioral relationships. (Exh. 9, Levin Depo. p. 6 lns. 4-10, 8 lns. 13-14).  Dr. Levin uses brain sensors to decrease the perception of pain and teach the brain to regulate its perception of pain. *Id.* at pp. 37-40.   Dr. Levin testified "the accident certainly caused a significant degree of pain, far more than [Wickersham] was able to cope with." *Id.* at p. 19 lns. 11-15.   Wickersham told Dr. Levin he "could not chew without pain" and "experienced excruciating pain around his jaw and lip line, as well as headaches across the forehead and in the sinus areas." *Id.* at pp. 22 ln. 25 – 23 ln. 6.  Wickersham was forced to stop seeing Dr. Levin in October 2011 because he could no longer afford the treatments, due to his inability to work caused by the accident. *Id.* at p. 40.

In April 2012, a few months prior to his death, Wickersham was admitted to Roper Hospital for suicidal thoughts. (Exh. 1, Pl. Depo. p. 246).  During a doctor's visit, Wickersham told Plaintiff "you need to put me somewhere or I'm going to hurt myself." *Id.* at p. 247 lns. 16-18.  Plaintiff testified that the hospital "felt that the depression and suicidal thoughts were

coming from the pain medication, so they took him off of his pain medication. And the suicidal thoughts did get better, but he was still in a lot of pain." *Id.* at p. 248 lns. 6-10. When Roper discharged Wickersham, he was no longer suicidal. *Id.* at p. 248 lns. 15-18. After his discharge, Plaintiff regularly asked Wickersham if he had suicidal thoughts and said "he didn't have anything planned. He wasn't – wasn't on the verge of doing it." *Id.* at pp. 250 ln. 24 – 251 ln. 11.

On July 21, 2012, Wickersham committed suicide by overdosing on medication prescribed by an eye doctor for his pain. (Exh. 1, Pl. Depo. pp. 251 ln. 12 – 252 ln. 1). Plaintiff testified Wickersham "went and laid down and took – to take a nap, like he did many days. And he would usually go to sleep around noon and I would wake him up at 5." *Id.* at p. 252 lm. 25 – 253 ln. 3. She found him dead that afternoon. *Id.* at p. 252 lns. 2-3.

## STANDARD

"Summary judgment is proper only when there is no genuine issue of material fact." *Univ. Med. Assocs. of the Med. Univ. of S.C. v. UNUMProvident Corp.*, 333 F. Supp. 2d 479, 482 (D.S.C. 2004) (citing Fed. R. Civ. P. 56(c)). "The moving party has the burden of showing the absence of any genuine issue of material fact and that it is entitled to judgment as a matter of law." *Id.* at 482. "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (internal quotation marks omitted). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party *is to be believed* and all justifiable inferences must be drawn in the non-moving party's favor."

*Allen v. Greenville Hotel Partners, Inc.*, 405 F. Supp. 2d 653, 656 (D.S.C. 2005) (emphasis added) (citing *Anderson*, 477 U.S. at 255). "The facts must be viewed in the light most favorable to the non-moving party so that any doubt as to the existence of a genuine issue of material fact will be resolved in favor of denying the motion." *Fitts v. Witkowski*, 920 F. Supp. 679, 681 (D.S.C. 1996).

## ARGUMENT

Ford's argument as to the wrongful death action is an argument regarding proximate cause. Under South Carolina law, proximate cause is analyzed the same in a case involving suicide as it is in any other case. Viewing the evidence in the light most favorable to Plaintiff, it cannot be said that there is no foreseeable causal relationship between Wickersham's death and Ford's negligent conduct. Therefore, the Court should deny Ford's motion on this basis.

The Court should also deny Ford's motion as to evidence of feasible alternative design because Plaintiff's expert provides sufficient evidence of two feasible alternative designs that he successfully utilized while working for a division of General Motors. Finally, the Court should deny Ford's motion as to punitive damages because there is sufficient evidence of Ford's reckless and willful conduct.

## I.   SOUTH CAROLINA PERMITS RECOVERY FOR WRONGFUL DEATH BY SUICIDE AND PROXIMATE CAUSATION IS A DISPUTED ISSUE FOR THE JURY TO DETERMINE

The Court should deny Ford's motion as to the wrongful death action because a reasonable jury could conclude that the severe and permanent injuries from the collision proximately caused Wickersham's suicide. There are two issues regarding Plaintiff's wrongful death claim—(1) whether South Carolina law allows for recovery for wrongful death when a victim commits suicide, and (2) whether there is evidence from which a reasonable jury could conclude the chronic pain resulting from the accident substantially contributed to Wickersham's

suicide. As to the first issue, Ford can point to no case in which South Carolina courts have categorically proscribed recovery for wrongful death when a victim commits suicide. As to the second issue, the evidence as to the cause of Wickersham's suicide is a disagreement between experts that presents a genuine issue of material fact for the jury. Ford's expert testified that Wickersham's preexisting mental disorder is the most significant factor in his suicide, and Plaintiff's expert, along with Wickersham's treating physicians, testified the chronic pain that resulted from the collision is the most significant factor in his suicide. *Compare* Exh. 10, Payne Depo. p. 34, *with* Exh. 4, Watts Depo. pp. 96-98; Exh. 9, Levin pp. 18-20, 55; Exh. 3, Bolt p. 77-75, 77. Therefore, there is a disputed issue of material fact to submit to the jury, and the Court should deny Ford's motion for summary judgment as to the wrongful death claim.

### A. Under South Carolina Law, a Defendant is Liable for Suicide Where the Defendant Negligently Inflicts Personal Injuries that Induce an Uncontrollable Impulse of the Victim to Take His Own Life

Ford's argument regarding Wickersham's wrongful death claim is essentially that suicide is an intervening cause in every case that always exculpates a defendant from liability. (ECF # 33-1 pp. 7-8). This is an incorrect statement of the law. Rather, each case is evaluated in light of its particular facts to determine causation. *See Scott v. Greenville Pharmacy, Inc.*, 212 S.C. 485, 48 S.E.2d 324 (1948) ("Each case must be decided largely on the special facts belonging to it."). The majority position is that suicide *may* constitute an intervening force *except* "where the wrongful act produces such a rage or frenzy that the person injured by the defendant's wrongful act destroys himself during such rage or frenzy, or in response to an uncontrollable impulse." 11 A.L.R.2d 751, *2b. Stated another way, "[i]t has generally been held that where negligently inflicted personal injuries induce . . . uncontrollably impulsive behavior, as a result of which the tort victim commits suicide, the tortfeasor may be held liable for the death of the victim." 22A Am. Jur. 2d *Death* § 43. This general principle applies in South Carolina and is not refuted or

contradicted by any South Carolina law cited by Ford, including *Scott* and *Watson v. Adams*, 2015 U.S. Dist. LEXIS 41172, C/A No. 4:12-cv-13436-BHH (D.S.C. March 31, 2015). Rather, the issue is one of proximate cause for the jury to determine.

In *Scott*, the defendant pharmacy illegally sold the plaintiff's decedent a drug without a prescription to help the decedent sleep. 212 S.C. at 488, 48 S.E.2d at 325. The decedent became addicted to the drug and, while taking it, he committed suicide by hanging. *Id.* The Supreme Court denied recovery for wrongful death because it found the decedent acted voluntarily in continuing to purchase the drug and would not have had an action against the pharmacy if he survived. *Id.* at 491-93, 48 S.E.2d at 326-27. The Court specifically "confine[d] [itself] to the case made by this record" and did not adopt any categorical ban for wrongful death recovery in a case involving suicide. *Id.* at 492, 495, 48 S.E.2d at 327-28.

This case is easily distinguishable from *Scott*. First, Ford's defective vehicle caused Wickersham's permanent and debilitating injuries. In contrast to the decedent in *Scott*, who chose to take the drug that allegedly led to his suicide, Wickersham did not choose to drive a defective vehicle. Second, Wickersham would have had an action against Ford if he survived, and indeed Plaintiff has included claims for his personal injuries as part of this lawsuit. (ECF # 1-1, Cmplt. ¶ 11). In *Scott*, the Court found the decedent had no action at all against the defendant. Third, as will be discussed in further detail below, this case involves a physical injury caused by the Defendant prior to the suicide.

Ford also cites to the unpublished opinion in *Watson v. Adams* as support for its categorical ban argument. However, *Watson* acknowledges that a defendant may be liable in a situation such as the one Wickersham alleges here—"where a tortious act is found to have caused a mental condition in the decedent that proximately resulted in an uncontrollable impulse

to commit suicide, or prevented the decedent from realizing the nature of his act." 2015 U.S. Dist. Lexis 41172, *18 (internal quotation marks omitted). The Court noted that cases falling within this category "typically involve a physical injury that causes the decedent to have an irresistible impulse to commit suicide." *Id.* In *Watson*, the defendant police officers arrested the decedent, a fellow police officer, after an alleged false accusation of driving under the influence. *Id.* at *4-7. As a result, the decedent lost his job. *Id.* at *3. His wife left him because the loss of the decedent's job was "the last straw." *Id.* at *7. The decedent then shot himself while intoxicated and left a note stating he committed suicide "because of the loss of his wife and his career as a detective." *Id.* at *7. *Watson* is factually distinguishable from this case for numerous reasons. First, it did not include allegations "that Watson had an irresistible impulse to commit suicide as a result of an injury inflicted by the defendants." *Id.* at *24-25. Second, Watson clearly listed the two reasons for his suicide—"the loss of his wife and his career as a detective"—in a note. *Id.* at *7. Wickersham's note does not indicate a reason for his suicide. (ECF # 33-10). Third, Watson chose to become extremely intoxicated prior to killing himself. Wickersham was not intoxicated at the time of his death but, instead, could no longer endure the severe pain caused by the collision injuries.

Neither *Watson* nor *Scott*, nor any other South Carolina case cited by Ford, includes the factual pattern in this case—that the defendant's negligent act caused physical harm to the plaintiff prior to the act of suicide. *See Watson*, 2015 U.S. Dist. Lexis 41172 (granting summary judgment to defendant-law enforcement officers and agencies who wrongfully arrested and fired the decedent police officer, who committed suicide almost three months later); *Crolley v. Hutchins*, 300 S.C. 355, 387 S.E.2d 716 (Ct. App. 1989) (affirming summary judgment to a defendant bar tender that served alcohol to the plaintiff who, after being arrested for disorderly

conduct, attempted suicide in his jail cell); *Scott*, 212 S.C. at 488, 48 S.E.2d at 325 (granting summary judgment to defendant pharmacist where decedent voluntarily chose to continue taking an addictive prescription and hung himself). In cases where the defendant caused physical harm to the decedent prior to suicide, courts send the issue of proximate cause to the jury. *See, e.g.*, *Young v. Swiney*, 23 F. Supp. 3d 596 (D. Md. 2014) (denying summary judgment where defendant admitted liability for car accident that caused permanent and painful injuries to the decedent, who committed suicide over two years later); *R.D. v. W.H.*, 875 P.2d 26, 28 (Wyo. 1994) (denying defendant's motion to dismiss where plaintiff committed suicide after suffering years of sexual abuse by the defendant); *Bak v. Burlington N., Inc.*, 417 N.E.2d 148 (Ill. App. Ct. 1981) (reversing summary judgment for the defendant where plaintiff fell down deteriorating stairs on defendant's premises and overdosed almost ten months later); *Repinski v. Jubilee Oil Co.*, 405 N.E.2d 1383 (Ill. App. Ct. 1980) (reversing directed verdict for the defendant where the plaintiff suffered permanent injuries after tripping on its premises and unsuccessfully attempted suicide); *Exxon Corp. v. Brecheen*, 526 S.W.2d 519, 524 (Tex. 1975) (submitting proximate cause to the jury where defendant negligently sprayed decedent in the face with oil and he committed suicide thirty-three months later); *Orcutt v. Spokane Cnty.*, 364 P.2d 1102 (Wash. 1961) (allowing recovery where defendant county failed to fix a road washout and decedent suffered severe facial injuries in a car accident, followed by numerous attempts to commit suicide and a final overdose of sleeping pills twenty-one months after the accident).

This position is supported by section 455 of the *Restatement (Second) of Torts* (1979), which provides that a negligent tortfeasor may be liable for suicide resulting from a negligently inflicted injury.

> If the actor's negligent conduct so brings about the delirium or insanity of another as to make the actor liable for it, the actor is also liable for harm done by the other to himself while delirious or insane, if his delirium or insanity
>
> (a) prevents him from realizing the nature of his act and the certainty or risk of harm involved therein, or
>
> (b) makes it impossible for him to resist an impulse caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason.

*Restatement (Second) of Torts*, § 455. The Restatement is consistent with South Carolina law on foreseeability that "the plaintiff need not prove that the defendant should have contemplated **the particular event** which occurred." *Baggerly v. CSX Transp., Inc.*, 370 S.C. 362, 369, 635 S.E.2d 97, 101 (2006). Further, South Carolina workers' compensation law allows recovery for suicide where it is "impulsive or instinctive" rather than "deliberate." *Zeigler v. S.C. Law Enforcement Div.*, 250 S.C. 326, 331, 157 S.E.2d 598, 600 (1967) (interpreting statute prohibiting benefits "if the injury or death was occasioned . . . by the willful intention of the employee to injure or kill himself or another").

There is no authority to support Ford's argument that South Carolina categorically bans a wrongful death claim in a case involving suicide. The appropriate analysis is one of proximate cause. Therefore, the Court should deny Ford's motion on this basis and submit the issue of proximate cause to the jury, as discussed below.

**B. Wickersham's Suicide was a Reasonably Foreseeable Consequence of the Severe, Permanent Injuries that Occurred as a Result of Ford's Defective and Unreasonably Dangerous Vehicle**

It is foreseeable that users of a Ford vehicle may suffer from mental disorders.[3] A defendant-manufacturer takes the plaintiff as he finds him, and is liable for all injuries

---

[3] *See* Exhibit 11, Substance Abuse and Mental Health Services Administration, *Prevention of Substance Abuse and Mental Illness*, http://www.samhsa.gov/prevention ("In 2014, an estimated 9.8 million adults aged 18 and older in the United States had a serious mental illness . . . . Also

proximately caused by the breach of its duty of care. "[R]ecovery is not restricted to 'ordinary consumers' alone." *Vaughn v. Nissan Motor Corp. in U.S.A.*, 77 F.3d 736, 738 (4th Cir. 1996) (citing *Purvis v. Consol. Energy Prods. Co.*, 674 F.2d 217, 222 (4th Cir. 1982) ("[I]t is the nature of the risk that caused injury, rather than the nature of the parties, which is finally determinative"). If Ford "breached its objective duty of care, it must take its victim as it finds h[im]." *Vaughn*, 77 F.3d at 738; *see, e.g., Freyermuth v. Lufty*, 382 N.E.2d 1059, 1064-65 (Mass. 1978) (affirming verdict for plaintiff where the decedent previously suffered and recovered from a mental disorder and a doctor testified the car accident caused a recurrence of the disorder that led to suicide). Ford wants to escape liability for the foreseeable consequences of its conduct because the decedent suffered from a mental disorder prior to the accident. A person with a preexisting mental disorder is entitled to the same recovery as any other person, that is, recovery for all harm that is proximately caused by the defendant's conduct. Therefore, Ford's focus on the fact that Wickersham had a mental disorder at the time of the accident does not absolve it from liability but, rather, makes it liable for the foreseeable consequences of its conduct as to that particular victim.

It is foreseeable that someone with a mental disorder is at a higher risk for suicide following a traumatic collision that causes chronic pain. Plaintiff's psychiatric expert, Dr. Donna Watts, is board certified in psychiatry and forensic psychiatry. (Exh. 4, Watts Depo. p. 6 lns. 17-25, pp. 8 ln. 22 – 9 ln. 2). Dr. Watts has worked as a psychiatrist since 1994 in numerous capacities, including performing evaluations for competency to stand trial, forensic services, and treating patients in clinical settings. *Id.* at pp. 7-8.

---

15.7 million adults (aged 18 or older) and 2.8 million youth (aged 12 to 17) had a major depressive episode during the past year.").

Dr. Watts testified that the most significant risk factor for suicide is "Chronic Pain. Chronic unremitting pain, especially in elderly white males." *Id.* at pp. 31 ln. 22 – 33 ln. 1. "Pain is one of the number one causes that make people want to hurt themselves." *Id.* at p. 167 lns. 4-6. Ford's expert, Dr. Jennifer Payne, testified consistently with Dr. Watts. She stated that whether a mood disorder causes chronic pain or chronic pain causes a mood disorder "becomes a bit of the chicken or the egg for most patients." (Exh. 10, Payne Depo. p. 36 lns. 5-13). However, "the ***more typical presentation*** is someone who has a preexisting mood disorder, has some sort of injury or syndrome where they develop chronic pain, and, over time, they become depressed and worsens their pain." *Id.* at p. 36 lns. 16-20 (emphasis added). Therefore, it is foreseeable that someone with a mood disorder will suffer a severe injury from a collision in a Ford vehicle that causes severe, chronic pain and results in suicide.

### C. The Chronic Pain Caused by the Injuries Ford Inflicted on Wickersham Proximately Caused His Death

Viewing the evidence in a light most favorable to Plaintiff, a reasonable jury could find the chronic pain from the collision caused Wickersham's death. The presence in a decedent's life of an unpleasant event besides the defendant's injurious conduct does not exonerate the defendant from liability for the death. Ford attempts to muddy the waters by grasping at any remotely negative event in Wickersham's life and naming it as the cause of his suicide. (ECF # 33-1 pp. 9-10). However, Plaintiff is not required to prove that the chronic pain caused by Ford's negligence was the sole cause of Wickersham's suicide. *See, e.g.*, *State v. Martin*, 391 S.C. 508, 706 S.E.2d 40 (Ct. App. 2011) (finding proximate cause for plaintiff's death where she chose to forego further use of an artificial ventilator because the drunk driving collision caused the initial injuries); *Small v. Pioneer Mach.*, 329 S.C. 448, 464, 494 S.E.2d 835, 843 (Ct. App. 1997) ("The defendant's conduct can be a proximate cause if it was at least one of the direct,

concurring causes of the injury."); *Fuller v. Preis*, 322 N.E.2d 263, 268 (N.Y. 1974) (holding in a suicide-wrongful death action brought against a negligent driver that the jury "did not have to find that [the car accident] was the only cause" of the suicide). Rather, "if the actor's conduct is a substantial factor in the harm to another, the fact that he neither foresaw nor should have foreseen the extent of harm or the manner in which it occurred does not negative his liability." *Baggerly*, 370 S.C. at 369, 635 S.E.2d at 101.

"Proximate cause is normally a question of fact for determination by the jury, and may be proved by direct or circumstantial evidence." *Gause v. Smithers*, 403 S.C. 140, 150, 742 S.E.2d 644, 649 (2013) (internal quotation marks omitted). "Only in rare or exceptional cases may the issue of proximate cause be decided as a matter of law." *Id.* at 150, 742 S.E.2d at 649 (internal quotation marks omitted). "Plaintiff need not prove the defendant's negligence was the sole proximate cause of the injury." *Id.* "The defendant's conduct can be a proximate cause if it was at least *one of* the direct, concurring causes of the injury." *Small*, 329 S.C. at 464, 494 S.E.2d at 843 (emphasis added) (affirming the trial court's decision to send the issue of proximate cause to the jury where "more than one reasonable inference can be drawn from the testimony").

In this case, the expert medical testimony is that the chronic pain, which directly resulted from Ford's defective vehicle, substantially contributed to Wickersham's death. When Ford asked Dr. Watts if she intended to offer an opinion that any one factor in Wickersham's life caused him to commit suicide, she responded

> They were all contributory, I think. ***But*** I think what I would definitely say I think ***his pain***, we know from research and experience ***pain is usually the biggest*** – you can't ever assign and say, oh, this is responsible for 70 percent. The ***pain is a huge stressor*** when it actually comes to suicide. Unremitting pain. ***People kill themselves to stop hurting***.

(Exh. 4, Watts Depo. p. 96 lns. 17-24) (emphasis added). She specifically testified, "I think the pain is very significant here." *Id.* p. 98 lns. 9-10. Dr. Levin and Dr. Trouche also testified that

chronic pain is a significant factor in suicide. (Exh. 9, Levin Depo. p. 55 lns. 6-16; Exh. 2, Trouche Depo. p. 58 lns. 11-15). Dr. Levin said, "constant chronic, contractible pain, when it increases and there's no relief, people – that's –that's their option" (referring to suicide). (Exh. 9, Levin Depo. p. 55 lns. 14-16).

Dr. Watts explained that Wickersham lived for years with numerous risk factors for suicide but never attempted suicide. (Exh. 4, Watts Depo. p. 158 lns. 11-15). The chronic pain caused by the accident was the only risk factor Wickersham had not previously dealt with, and Dr. Watts found that "significant." *Id.* at p. 158 lns. 16-19. Dr. Watts also noted the significance of the fact that Wickersham never attempted suicide before he died. When Wickersham "had an episode of suicidal ideation, he got treated and it went away." (Watts Depo. p. 107 lns. 5-6). Prior to the accident, Wickersham "had never hurt himself no matter how bad it was. He sought help when he needed it. He knew to do that." *Id.* at p. 155 lns. 22-25; Exh. 14 Watts Report. Dr. Trouche explained the "dramatic difference" between suicidal ideation and suicide attempt. (Trouche Depo. pp. 66-67). "People can think of suicide and not act on it and be confident that they're not going to act on it . . . but it's not a concern so much for their safety." *Id.* at p. 67 lns. 8-12. If "they have actually attempted suicide, then that's a whole different thing and of more concern because it involves their safety." *Id.* at p. 67 lns. 14-16.

The presence of other factors does not negate Ford's liability. Rather, it makes the issue of proximate cause one for the jury to determine. When more than one potential cause or risk factor for a suicide is present in a case, Courts have held it is a jury issue as to whether the defendant's negligence substantially contributed to the decedent's death. *See Young*, 23 F. Supp. 3d at 602-03, 606-07, 624-25 (denying summary judgment where decedent suffered permanent injuries in car accident and committed suicide two years later, after losing his health insurance,

arguing with his family, and drinking alcohol); *Halko v. N.J. Transit Rail Operations, Inc.*, 677 F. Supp. 135, 138-39, 143 (S.D.N.Y. 1987) (denying motion for summary judgment where decedent suffered workplace harassment and painful burn injury, and, in a suicide tape, also discussed family difficulties); *Fuller*, 322 N.E.2d at 264-65, 268 (submitting proximate cause to the jury where decedent suffered severe injuries from car accident, committed suicide seven months later, and, in the interim, lost his medical practice, learned of his mother's cancer diagnosis, and his wife suffered partial paralysis).

In this case, both parties' experts testified they could not name the sole cause of Wickersham's suicide, but reached different conclusions as to the most significant contributing factor. Dr. Payne, Ford's expert, admitted she "cannot render an opinion one way or the other that [Wickersham] would or would not have attempted suicide without the injury." (Exh. 10, Payne Depo. p. 45 lns. 18-21, p. 80). She further testified "my opinion is that his mood disorder was the primary contributing factor, along with a multitude of other factors, *of which pain was one, that led to his suicide.*" *Id.* at p. 91 lns. 12-15 (emphasis added). This is a concession that the chronic pain resulting from the collision was a contributing factor to Wickersham's suicide. *See Small*, 329 S.C. at 464, 494 S.E.2d at 843 ("The defendant's conduct can be a proximate cause if it was at least *one of* the direct, concurring causes of the injury." (emphasis added)). This makes the issue of whether Ford's conduct is a proximate cause of Wickersham's suicide a disputed issue of material fact for the jury to determine.

Ford's argument as to the "additional factors" considered in *Watson* is misplaced. (ECF # 33-1 p. 8, 10-11). First, the duration of time in this case between the collision and the suicide, seventeen months, does not attenuate proximate cause. There are numerous cases with greater lengths of time between the injury and suicide that courts submitted to the jury. *See Young*, 23 F.

Supp. 3d at 601, 608 (denying defendant's motion for summary judgment where over two years passed between injury and suicide); *Brecheen*, 526 S.W.2d at 520 (submitting proximate cause to the jury where thirty-three months passed between injury and suicide); *Orcutt*, 364 P.2d at 1102-03 (reversing dismissal where twenty-one months passed between injury and suicide). That is simply one factor for the jury to consider.

Second, Ford's argument as to financial stressors supports Plaintiff's wrongful death action.[4] The cause of Wickersham's inability to work full time is the pain from the accident. (Exh. 4, Watts Depo. p. 116; Exh. 1, Pl. Depo. p. 240 lns. 21-24). The inability to work then resulted in a lack of money to pay for pain treatments and, therefore, resulted in worsening and continuing pain that Wickersham found unendurable. (Exh. 4, Watts Depo. p. 155). The "stressors" that Ford focuses on are traceable to the accident and directly related to the amount of physical pain Wickersham suffered at the time of his suicide. *See Matthews v. Porter*, 239 S.C. 620, 628, 124 S.E.2d 321, 325 (1962) ("To exculpate a negligent defendant, the intervening cause **must be one which breaks** the sequence or causal connection between the defendant's negligence and the injury alleged." (emphasis added)). Dr. Bolt described the accident as "catastrophic" and "a spiral that [Wickersham] just didn't pull out of." (Exh. 3, Bolt Depo. p. 77 ln. 17-18). Dr. Bolt, who regularly treated Wickersham for over a decade prior to the accident, testified "John [Wickersham] was **never the same after the accident**. . . . [Wickersham] had an

---

[4] As to Ford's allegation that "third parties" contributed to the suicide, it failed to bring in any additional parties to the lawsuit, and a plaintiff is the master of the complaint and may choose who to sue. *See, e.g.*, *Chavis v. Fid. Warranty Servs.*, 415 F. Supp. 2d 620, 627 (D.S.C. 2006) ("It is well established that the plaintiff is the master of his complaint.") (internal quotation marks omitted); *Chester v. S.C. Dep't of Pub. Safety*, 388 S.C. 343, 345, 698 S.E.2d 559, 560 (2010) ("It is well-settled that a plaintiff has the sole right to determine which co-tortfeasor(s) she will sue.").

underlying mood disorder that ***the accident only worsened***." *Id.* at p. 74 lns. 22-23, p. 75 lns. 6-7 (emphasis added).

Finally, the evidence supports a reasonable inference that, at the time Wickersham committed suicide, he acted under an uncontrollable impulse.  According to Dr. Watts, "Mr. Wickersham was unable to control his conduct and suicidal thoughts on the day of this death due to his diminished capacity caused by the collision." (Exh. 15, Dr. Watts Aff. ¶ 4).  Dr. Watts explained that, prior to dealing with the chronic pain from the collision, Wickersham was able to control his desires to commit suicide. *Id.* at ¶5.  However, the chronic pain from the collision diminished his capacity to the point that he was no longer able to control his impulse to commit suicide. *Id.* at ¶ 6.  There is other evidence to support the inference that Wickersham committed suicide as a result of an uncontrollable impulse.

First, the suicide was not premeditated.  Dr. Watts disagreed that leaving a note and committing suicide during nap time indicated premeditation. (Exh. 4, Watts Depo. pp. 160 ln. 17 – 161 ln. 1).  Rather, the suicide was uncontrollable.  "[H]e might have said in one minute I'm dying, let me write a note and then done it." (Watts Depo. p. 164 lns. 10-11, p. 161 lns. 3-7).  "A suicide note . . . does not preclude, as a matter of law, a finding that the writer was unable to control his suicidal act." *Young*, 23 F. Supp. 3d at 620 (internal quotation marks omitted) (noting "several . . . courts have declined to require that a suicidal impulse arise suddenly in order to qualify as 'irresistible.'").  Further, Plaintiff, with whom Wickersham previously discussed his suicidal ideations, said that he "didn't have any" plans to commit suicide on the day of his death. (Exh. 1, Pl. Depo. p. 252 lns. 16-19).

Second, for almost a decade prior to his suicide, Wickersham controlled and resisted all suicidal ideations.  Prior to his death, Wickersham never attempted suicide. (Exh. Pl. Depo. p.

152 lns. 5-7, p. 247 lns. 21-24; Exh. 15, Dr. Watts Aff. ¶ 5).  As part of her opinion that Wickersham's chronic pain significantly contributed to his suicide, Dr. Watts considered that "the best predictor of future behavior is past behavior" and, in the past, Wickersham sought help when he was sick. (Exh. 4, Watts Depo. p. 152).  She explained

> he had been functioning with that chronic bipolar disorder and depression.  He had been following directions generally, and he was doing what he needed to take care of himself.  And it wasn't until this additional stressor that it was too much for him to manage and that he had a gradual decline in functioning after that *because of chronic pain that certainly made his depression worse*.

*Id.* at pp. 152 ln. 25 – 153 ln. 8.  This is supported by the fact that Wickersham previously coped with a multi-month period without fulltime employment in 2008 followed by the death of his father a few months later but did not have suicidal ideations or a worsening of his depression that required treatment. *See* Exh. 1, Pl. Depo. pp. 26-27; Exh. 2, Trouche Depo p. 34 (noting gap in needed treatment from 2005 to 2011).  This supports Dr. Watts' opinion that something Wickersham never dealt with before, the excruciating pain he suffered from the collision, caused an uncontrollable desire to commit suicide. (Exh. 15, Dr. Watts Aff. ¶¶ 1, 4, 6).  Further, even a prior suicide attempt or plan, which is not present in this case, does not preclude a finding of uncontrollable impulse. *See R.D. v. W.H.*, 875 P.2d 26, 29-30 (Wyo. 1994) ("A person may be found to have acted under an irresistible impulse even though evidence exists which indicates that he previously attempted to commit suicide or that he planned his suicide.").

Third, testimony as to whether Wickersham understood that his action would result in his death does not preclude recovery.  "It is evident that a person may know that he is destroying himself while at the same time he is unable to control his physical acts. The suicide should not bar a claim notwithstanding it can be said that he knew the nature and consequences of his physical acts." *Exxon Corp. v. Brecheen*, 526 S.W.2d 519, 524 (Tex. 1975).  "In tort law, there is a recognition that one may retain the power to intend and yet be subject to an irresistible

impulse." *R.D.*, 875 P.2d at 29 (internal quotation marks omitted).  Dr. Watts explained: "That Mr. Wickersham may have understood the nature of his actions does not mean that he could control them." (Exh. 15, Dr. Watts Aff. ¶ 6).  The focus is on control, which as stated above, Wickersham maintained for over a decade prior to enduring the chronic pain from the collision.

There is evidence that Ford's negligence caused Wickersham's severe, permanent, and disfiguring injuries, that those injuries caused him chronic and extreme pain, and that the chronic pain caused him to have an uncontrollable impulse to take his own life.  Viewing the facts in the light most favorable to Plaintiff, there is sufficient evidence of proximate cause to send the issue to the jury.  Therefore, this Court should deny Ford's summary judgment motion as to the wrongful death cause of action.

## II.    PLAINTIFF'S EVIDENCE OF FEASIBLE ALTERNATIVE DESIGNS SATISFIES THE APPLICABLE STANDARD OF PROOF

The design defect in this case is that the control module for the airbag restraint system was not properly programmed to account for a crash of the type experienced by Mr. Wickersham.  Ford failed to conduct sufficient testing or take into account any crash event outside of the limited crash testing it conducted, resulting in an incomplete data set used to program the airbag system.  Plaintiff's engineering expert, Christopher Caruso, identified the specific source of the design defect—the calibration and algorithm information in the system—as well as specific alternative designs he previously used while performing calibration and algorithm work for a division of General Motors, including broader testing and consideration of other types of crash events to be used in the calibration and algorithms that control the airbag deployment.  Viewing the evidence in the light most favorable to Plaintiff, there is sufficient

evidence of feasible alternative designs, and the Court should deny Ford's motion on this basis.[5] Below is a factual background of the collision and the restraint system and control module at issue.

The front passenger side of Wickersham's vehicle collided with a tree. This type of crash event is described as an offset pole impact. (Exh. 5, Caruso Report p. 9). The seatbelt pretensioner activated at the initial tree impact, and the airbag deployed 146 milliseconds later, "when the impact reached [its] highest damage point or crush" into the vehicle. (Exh. 12, Caruso Depo. p. 81 lns. 7-13; Exh. 5, Caruso Report p. 13; Exh. 6, Kennett Report p. 5). Ford's own internal specifications provide for an airbag deployment time of no more than 74 milliseconds after the pretensioner activates. (Exh. 12, Caruso Depo. pp. 118-19). Ford's Rule 30(b)(6) witness and restraint system safety expert testified that, if Plaintiff's accident reconstruction is correct,[6] the approximately 150 millisecond gap between the pretensioner and the airbag deployment is "***not how the system is meant to work***." (Exh. 13, Krishnaswami Depo. p. 37 lns. 14-25) (emphasis added). Ford's 30(b)(6) expert testified a delay such as the one that occurred in this case "could result in an unsafe condition . . . may increase the risk of injury potential." *Id.* at p. 38 lns. 6-8.

Photos of the vehicle show that "most of th[e] damage is sheet metal and non-structural. This results in a visual indication of higher severity, but the severity actually felt by the occupants is quite low." (Exh. 5, Caruso Report p. 10). In this type of crash event, it is

---

[5] As explained below in the punitive damages section, Ford's argument as to punitive damages is a concession that there is an issue of material fact as to proof of a feasible alternative design. The Court may deny Ford's motion on this basis alone.

[6] Ford's accident reconstructionist claims the vehicle hit the curb, went airborne, hit the ground, and then hit the tree. Plaintiff's reconstructionist concluded that the vehicle hit the curb and then traveled approximately 40 feet in the grass before colliding with the tree. (Exh. 6, Kennett Report p. 2). This is a factual dispute between the parties' respective reconstruction experts.

particularly "important for the crash sensing system to quickly identify whether a crash is severe or not, and then, if needed, deploy the appropriate restraint systems." *Id.* This is because a pole impact "start[s] off very soft. They don't look like a severe event initially. But then once they start stacking up into key components, engine, engine cradle, things like that, it gets very severe very quickly." (Exh. 12, Caruso Depo. p. 35 lns. 20-24). The "long, late [airbag] deployment time allowed Mr. Wickersham to move forward into and to occupy the deployment zone of the airbag while it was inflating." (Exh. 6, Kennett Report pp. 5-6). The "injuries to Mr. Wickersham . . . are the product of injurious interaction between Mr. Wickersham and the substantially late-deployed airbag." *Id.* at p. 6.

Plaintiff's expert, Christopher Caruso, is an expert in automotive airbag design and crash sensing as well as interpretation of crash data download. (Exh. 12, Caruso Depo. p. 6 lns. 12-15). Caruso earned a Master of Science Degree in Engineering, a Master's Degree in Engineering, and a Bachelor of Science Degree in Electrical Engineering and Mechanical Engineering. (Exh. 5, Caruso Report p. 1). He worked with General Motors Corporation ("GM") for over 27 years on various vehicle safety systems *Id.* Caruso worked for the Delco Electronics division of GM developing airbag systems, crash sensor specifications, and event data recorders, and investigating crash test sensor issues. *Id.* at pp. 1-2. He also developed algorithms and crash sensing techniques for frontal crash detection, obtaining patent protection for six crash sensing algorithms for frontal and side airbag systems. *Id.* at p. 2. Ford's Rule 30(b)(6) witness testified Caruso "definitely has the background" and "does have experience in this area" to make him qualified in this case. (Exh. 13, Krishnaswami Depo. p. 41 lns. 1-9).

## A. The Restraint Control Module Design and Operation

The 2010 Ford Escape at issue contains a Restraint Control Module ("RCM") that operates as the primary airbag control unit. (Exh. 5, Caruso Report p. 5). It uses sensors to determine the crash severity and, ultimately, to determine whether to activate seatbelt pretensioners, deploy airbags, or both. *Id.* The RCM uses a multi-point crash sensing system. In a multi-point system,

> the RCM data is supplemented by external satellite sensors. In the case of this Ford vehicle, there are two satellite sensors in the front impact. There are additional satellite sensors for side impact. But for our purposes, for a frontal impact pole, there are two crush zone satellite sensors providing input data to the RCM.

(Exh. 12, Caruso Depo. p. 149 lns. 6-22).[7] The RCM includes an event data recorder or "black box" that records five seconds of pre-crash information and 250 milliseconds of the actual crash event. (Exh. 5, Caruso Report p. 7).

The RCM is essentially a computer system that plugs data into an algorithm to determine whether a crash event necessitates seatbelt pretensioner, airbag deployment, or both. The success of the module in protecting vehicle occupants depends on the breadth of the available algorithms. The RCM and its algorithms in this case were developed by Autoliv, a restraint system manufacturer. Autoliv created the algorithms based on calibration report data provided to it by Ford. (Exh. 5, Caruso Report p. 148). Ford comes up with the data through crash testing. Ford claims it does not have the algorithms used in its vehicle because Autoliv claims them as proprietary. Therefore, Plaintiff does not have the actual algorithms used in the RCM.

---

[7] Ford quotes a sentence from Caruso's expert report in which he states the "dual front crash sensor coupled to RCM design is still a reasonable approach." (ECF # 33-1 pp. 22-23). This is not a statement that the entire RCM design is reasonable. Rather, as Caruso explains "[t]he culprit in this defective performance was not specifically the sensor design or position, but instead, the algorithm and calibration which made the system overly sensitive to a non-deployment tree impact crash and led to the late deployment of the driver airbag." (Exh. 5, Caruso Report p. 18).

In this case, Caruso testified Ford did not provide sufficient calibration data to enable Autoliv to create an algorithm that would appropriately respond to a crash of the type Wickersham experienced. Specifically, Ford conducted only center pole crash testing at only two speeds—12 miles per hour and 29 miles per hour. (Exh. 12, Caruso Depo. p. 106 lns. 6-8). It provided no other computer simulation or testing for other speeds or offset pole crashes. *Id.* at p. 106. Ford provided to Autoliv this data limited to two speeds to create algorithms for a RCM with five thresholds for deployment, including low-powered and full-powered airbags for belted and unbelted occupants. *Id.* at pp. 105-06, 155. As Caruso put it, "where are all the crash tests to fill in those gaps?" for offset pole impact crashes and speeds below 12 miles per hour and between 12 and 29 miles per hour. *Id.* at p. 106 lns. 4-5. While working at Delco, Caruso regularly conducted pole crash testing for at least four speeds and, eventually, for more than four speeds. *Id.* at pp. 31-32.

Ford's testing also never sought to identify any non-deployment pole impact scenarios, "only deployment tests." (Exh. 5, Caruso Report p. 16). "Thus, in the subject crash, Ford has no basis for understanding whether this crash is a deployment event." *Id.* The data Ford provided to Autoliv for algorithm design failed to take into account these "foreseeable, real world collision" scenarios. *Id.* at p. 20. As Caruso explained, "You can't test everything. . . But you need to understand that if you're only going to run the center poles [crash testing], what are offset poles going to look like? Are they going to be more severe, less severe, longer time duration, shorter time duration?" (Exh. 12, Caruso Depo. pp. 103-04). Ford "could have used computer simulations to create all of the in-between data points." *Id.* at pp. 112-13.

**B. The Reasonable Alternative Designs**

Caruso's forensic report and testimony contain sufficient evidence of reasonable alternative designs to satisfy the requirements stated in *Branham v. Ford Motor Co.*, 390 S.C. 203, 701 S.E.2d 5 (2010).[8]   Under the Supreme Court's opinion in *Branham*, the required "evidence of a reasonable alternative design" is (1) the plaintiff "point[s] to a design flaw in the product and show[s] how his alternative design would have prevented the product from being unreasonably dangerous" and (2) "include[s] consideration of the cost, safety and functionality associated with the alternative design." 390 S.C. at 225, 701 S.E.2d at 16.  A design defect may be proven by circumstantial evidence. *See Graves v. CAS Med. Sys.*, 401 S.C. 63, 79, 735 S.E.2d 650, 658 (2012) ("We take this opportunity to correct the circuit court's erroneous holding that a plaintiff cannot use circumstantial evidence to prove a design defect claim.").

As an initial matter, Plaintiff's airbag design expert considered and ruled out other potential causes of the airbag malfunction such as prior collision or system alteration. (Exh. 5, Caruso Report pp. 14, 19- 23).   Based on his extensive experience with airbags, the only explanation of the type of malfunction that occurred in this crash is a defect in the design of the RCM. *Id.* pp. 15-16.  In simple terms, according to Caruso, the RCM is not properly programed to account for the type of crash event that occurred in this case.  The alternative design is a properly programed RCM.  The way to achieve a properly programed RCM is to conduct additional crash testing and/or computer simulations to use in calibrating the system and developing the algorithms used to program the RCM.  Because Ford has not provided Plaintiff with the specific programing data used in the subject vehicle, her expert cannot provide specific algorithms needed to correct the defective performance.  If Ford would provide the programing data, Caruso could provide the level of specificity that Ford argues is required to meet Plaintiff's

---

[8] Plaintiff alternatively argues below that the Supreme Court's decision in *Branham* is unconstitutional.

burden of proof.  On one hand Ford says that it cannot provide the program for Plaintiff to analyze, while on the other it seeks summary judgment because Plaintiff has not provided specific algorithms that can only be developed after analyzing this data.  Nowhere does Ford argue that the alternative programing is not feasible.

As to the first *Branham* requirement to prove a defect, Plaintiff pointed to design flaws in the vehicle.  Caruso testified that Ford, in utilizing a five threshold restraint system, provided Autoliv with calibration data for only two speeds and provided no data regarding offset pole impact crashes.  "They're effectively expecting Autoliv to calibrate . . . five different thresholds. But they're only providing two data points." (Exh. 12, Caruso Depo. p. 261 lns. 21-24).  This resulted in a design defect in the calibration and algorithm, which is "part of the design", because Ford failed to provide data for or take into account offset pole impacts and pole impacts in general at more than two speeds.  *Id.* at p. 157, 154; Exh. 5, Caruso Report p. 23.  The design defect resulted in the system misreading the collision and deploying the airbag at a dangerously late time that could only ever harm the occupant.

Caruso has extensive experience in the calibration and algorithm of airbag restraint systems.  He obtained numerous "patents relate[d] to the algorithms and calibrations within those devices." (Exh. 12, Caruso Depo. p. 47 lns. 21-22).  He ruled out other potential causes of the late airbag deployment, including system malfunction and product repairs or modification. (Exh. 5, Caruso Report pp. 14, 19, 23).  "[H]aving designed these same systems for nearly 21 years (1986 to 2006), [Caruso's] experience has shown that late deployments typically are the result of the RCM portion of the system.  The RCM algorithm . . . must 'predict' the ultimate severity of the ongoing collision event.  If this prediction is erroneous, then airbags may deploy unnecessarily and defectively." *Id.* at pp. 15-16.  In his expert opinion, the inadvertent airbag

deployment "was caused by a defect in the RCM and ECS algorithm and calibration, due to the lack of consideration of offset low speed pole impacts during testing and development." *Id.* at p. 23.

One of Caruso's alternative designs is a restraint system with proper algorithms developed using complete calibration data. (Exh. 12, Caruso Depo. pp. 37, 112-15, 118-23, 261; Exh. 5, Caruso Report pp. 18-19). He testified the data "to fill in the gaps" may come from actual crash testing, computer simulation, or analyzing the performance deviations between the data points Ford provided to Autoliv. (Exh. 12, Caruso Depo. p. 112-13, p. 225 lns. 3-10, p. 232, lns. 8-18, p. 261 ln. 24 – 262 ln. 2; Exh. 5, Caruso Report pp. 18-19). The additional tests are feasible. Caruso testified GM actually ran the tests he points to and stated "I think even Ford ran them in some vehicles." (Exh. 12, Caruso Depo. pp. 263 ln 24 – 264 ln. 3, p. 243).

Ford criticizes this design as "conceptual" because Caruso has not created actual calibration and algorithm data in this case. Ford misses the point. In his professional career, Caruso conducted the testing he says Ford should have conducted to create the calibration data necessary for the design of algorithms in a safe RCM. (Exh. 12, Caruso Depo. pp. 142-43, 243, 263-64). He also testified that GM calibrated vehicles using the design principles he recommends as an alternative design. *Id.* at pp. 236-37. Further, the calibration and algorithms he developed and designed "works in these types of conditions because of the way it was designed." *Id.* at p. 239 lns. 5-6. While "each calibration has to be done for each individual vehicle", "the underlying principles would be the same" for the design of the calibration data and algorithm. *Id.* at p. 236 ln. 21 – 237 ln. 3. Therefore, he does not have to conduct testing on the subject vehicle to render an opinion that additional testing and/or design taking into consideration the missing data points would result in a safer algorithm design. "Since this testing

and analysis was performed as an integral part of my responsibilities at GM and Delco Electronics, further testing on the subject vehicle is not necessary, where, as in this case, it can be shown that the O[riginal] E[quipment] M[anufacturer] test procedures and methods were inadequate to properly develop a robust and safe occupant restraints system." (Exh. 5, Caruso Report p. 8); *see Restatement (Third) of Torts* § 2, cmt. f ("[Q]ualified expert testimony on the issue suffices, even though the expert produced no prototype, if it reasonably supports the conclusion that a reasonable alternative design could have been practically adopted at the time of sale.").

Even if Caruso went to the extreme and unnecessary expense of conducting crash testing and formulating the algorithms, Ford would still complain that, without knowing the algorithm actually used, it is insufficient proof. Ford wants to impose a heightened burden of proof on the Plaintiff when its Rule 30(b)(6) witness admitted that Ford had no data as to whether and when the airbag should have deployed in a crash like the one Wickersham experienced. (Exh. 13, Krishnaswami Depo. p. 21 lns. 8-22, p. 30 lns. 5-13, p. 67). Caruso testified "If I knew what the exact design was, I could tell you exactly how to fix it." (Exh. 12, Caruso Depo. p. 239 lns. 1-2). The fact that Ford cannot produce part of the design at issue does not negate the fact that its calibrations were not designed to and did not include any information taking into account offset frontal pole impact and, therefore, the design is defective.

Caruso also identified another alternative design that would have prevented an airbag injury in a crash event like this one, which had a long crash duration due to the soft nature of a pole impact. He testified that the calibration and algorithm could have included an increased threshold for airbag deployment. (Exh. 12, Caruso Depo. pp. 137-39, 110-11). He explained that, in a crash where the seatbelt pretensioners activated but the airbag has not deployed within

approximately 50 milliseconds, the algorithm should recognize that lengthy duration and increase the mile-per-hour threshold necessary to deploy the airbag. *Id.* at p. 111. Caruso testified that he used this algorithm design at Delco. *Id.* at pp. 110-11, 138 lns. 20-24. Ford's 30(b)(6), expert witness testified Ford was aware of and agreed with that increased threshold algorithm design but did not know whether it was incorporated into the 2010 Ford Escape. (Exh. 13, Krishnaswami Depo. pp. 41-43). For this alternative design, Caruso pointed to a design flaw in the product—failure to increase the airbag deployment threshold for a higher duration crash event. He further testified to his personal use of an alternative design that incorporated such an algorithm that would have "prevented a deployment of the airbag" "by raising thresholds later in time." (Exh. 12, Caruso Depo. p. 111 lns. 19-23, pp. 137-39). He testified that every GM vehicle designed since 1999 "incorporates the same basic principles of cutoff . . . increasing thresholds." *Id.* at pp. 138 ln. 23 – 139 ln. 6.

Plaintiff also presented expert testimony showing how the alternative design would have prevented the product from being unreasonably dangerous. Caruso testified that, before he left Delco, he "extensively" tested "alternative designs that would have performed differently in this accident." (Exh. 12, Caruso Depo. p. 142 lns. 17-21). Caruso criticized Ford's calibration of the frontal crash sensors and explained that the calibrations he developed for GM would not have a delayed deployment.

> If they're [the crash sensors] properly located in the crush zone, a GM system, a Delco system, the front sensors would not have been able to discriminate. They would have been able to safe[9] it. . . . They would have provided information, but

---

[9] "Safing . . . means that another point in the vehicle that has a sensor is going to make a determination of whether or not it's in agreement with the primary sensor. . . . It's simply going to say, am I in a remote part of the vehicle also experiencing a crash of any level?" (Exh. 12, Caruso Depo. p. 153 lns. 3-10).

not enough to say deploy the airbags for a belted stage 1. . . . They should have been calibrated to a much higher level.

If they were calibrated low enough that even the furthest remote one commanded a deployment, this system is way too sensitive to something. . . . They're doing something in this algorithm and calibration that should never have happened in my opinion.

(Caruso Depo. pp. 199 ln. 5 – 200 ln. 3). This is evidence of a second alternative design.

As to the second *Branham* requirement, there is evidence showing consideration of the cost, safety and functionality associated with the alternative designs.[10] Caruso testified Ford could have accounted for the missing data without additional crash testing, running only computer simulations or simply using engineering logic to recognize that the thresholds need to account for the missing data points. (Exh. 12, Caruso Depo. p. 112-13, p. 225 lns. 3-10, p. 232, lns. 8-18). Therefore, the cost associated with the alternative design is minimal. Additional crash testing was certainly feasible and cost effective as is proven by the litigation testing that Ford performed for this case on a 2010 Ford Escape. (Exh. 13, Krishnaswami Depo. p. 43). Further, based on Caruso's performance of the alternative testing and engineering analysis, and use of the proposed alternative designs at GM, there is evidence showing the safety and functionality of the designs. (Exh. 12, Caruso Depo. pp. 31-32, 110-11, 138-39 142-43, 243, 263-64).

Viewing the evidence in the light most favorable to Plaintiff, there is sufficient evidence of feasible alternative designs, and the Court should deny Ford's motion on this basis.

## C. **The Supreme Court's Adoption of the Restatement (Third) of Torts in** *Branham* **is an Unconstitutional Intrusion into the Legislature's Power**

---

[10] *See Sipes v. GMC*, 946 S.E.2d 143 (Tex. App. 1997) (finding defendants are "not entitled to summary judgment on the issue of a design defect" where they "offered no proof, however, to negate conclusively either their capacity to develop a safer alternative design or to negate that a safer alternative design would have prevented or significantly reduced the risk of [plaintiff]'s injury").

While Plaintiff argues the evidence satisfies the requirements of *Branham v. Ford Motor Co.*, 390 S.C. 203, 701 S.E.2d 5 (2010), she also alternatively argues that the Supreme Court's adoption of the risk-utility test for design defect cases is an unconstitutional intrusion into the powers reserved for the legislative branch. The Supreme Court exceeded its constitutional limits by issuing a judicial decision that directly and expressly contradicts a statute enacted by the South Carolina General Assembly. The two-Justice dissent in *Branham* recognized the unconstitutionality of the Court's decision. 390 S.C. at 244, 701 S.E.2d at 27. Section 15-73-30 of the South Carolina Code states: "Comments to § 402A of the Restatement of Torts, Second, are incorporated herein by reference thereto as the legislative intent of this chapter." In *Branham*, the Supreme Court infringed upon the powers of the Legislature by "adopt[ing]" the risk-utility test for design defects as stated in the *Restatement (Third) of Torts* and proscribing proof of a design defect by the consumer expectations test, which is expressly allowed by the Comments to § 402(A) of the *Restatement (Second) of Torts*. 308 S.C. at 220-22, 701 S.E.2d at 14-15.

The separation of powers doctrine states "[i]n the government of this State, the legislative, executive, and judicial powers of the government shall be forever separate and distinct from each other, and no person or persons exercising the functions of one of said departments shall assume or discharge the duties of any other." S.C. Const. Ann. Art. I, § 8. "At its simplest, the constitutional division of powers can be described as the legislative department makes the laws; the executive department carries the laws into effect, and the judicial department interprets and declares the laws." *Hampton v. Haley*, 403 S.C. 395, 403, 743 S.E.2d 258, 262 (2013) (internal quotation marks omitted). "In our division of powers, the General Assembly has plenary power over all legislative matters unless limited by some constitutional provision.

Included within the legislative power is the sole prerogative to make policy decisions; to exercise discretion as to what the law will be." *Id.* at 403, 743 S.E.2d at 262 (internal citation omitted). "Thus, while non-legislative bodies may make policy determinations when properly delegated such power by the legislature, absent such a delegation, policymaking is an intrusion upon the legislative power." *Id.* at 404, 743 S.E.2d at 262.

Section 15-73-30 expressly incorporates "by reference" the comments to § 402A. The Supreme Court does not have the power or authority to change the express language of a statute. *See Keyserling v. Beasley*, 322 S.C. 83, 86, 470 S.E.2d 100, 101 (1996) ("We do not sit as a superlegislature to second guess the wisdom or folly of decisions of the General Assembly. As we must, we follow the law and decisions heretofore set forth in this state."). Further, it is apparent that our Courts still follow the comments to § 402A of the Restatement. Since the *Branham* opinion was filed, our state and federal courts have cited the comments to the *Restatement (Second) of Torts* § 402A as controlling and instructive. *See, e.g., Sparkman v. A.W. Chesterton Co.*, C/A No. 2:12-cv-02957-DCN, 2014 U.S. Dist. LEXIS 177560, 16 n.1 (Dec. 29, 2014) (citing § 402A for strict liability law and stating "The South Carolina legislature has adopted the comments to 402A as legislative intent"); *Miles v. DESA Heating LLC*, No. 4:10-00521-JMC; 2012 U.S. Dist. LEXIS 45433, *10-11 (D.S.C. Mar. 28, 2012) (citing to the comments in a discussion of warning defects); *Sauls v. Wyeth Pharms., Inc.*, 846 F. Supp. 2d 499 (D.S.C. 2012) (citing the comments and stating § 402A "was expressly incorporated into the legislative intent of the South Carolina Defective Products Act, S.C. Code Ann. § 15-73-10, and South Carolina courts consistently have relied upon it and its commentary in the development of products liability case law"); *Lawing v. Univar, USA, Inc.*, 2015 S.C. Lexis 398 *17 (S.C. Sup.

Ct. Dec. 2, 2015) ("[T]he General Assembly expressly adopted the comments to section 402A of the Restatement of Torts (Second) . . . . as the expression of legislative intent for that section.").

The Supreme Court's rejection of the consumer expectations test and mandate that only the risk utility test may be used to proof a design defect usurps the constitutional authority of the South Carolina General Assembly. The comments to the *Restatement (Second) of Torts* are the controlling law that apply to this case and provide for the use of the consumer expectations test to determine product defect, as opposed to the risk utility test which is derived from the *Restatement (Third) of Torts*.

## III.    THERE IS EVIDENCE TO SUPPORT AN AWARD OF PUNITIVE DAMAGES

Viewing the evidence in the light most favorable to Plaintiff, there is clear and convincing evidence from which a reasonable jury could find Ford acted recklessly in failing to account for foreseeable collisions in its RCM design.  This is supported by numerous pieces of evidence, including Ford's Rule 30(b)(6) witness's admission that Ford knew about a design that raised the airbag deployment threshold for a longer duration event and the fact that GM accounted for offset frontal pole impacts in designing testing and calibration reports for at least a decade prior to the release of the 2010 Ford Escape.  Further, Ford ignores the fact that the delayed deployment violated its internal specifications.  Therefore, the Court should deny Ford's motion for summary judgment as to punitive damages.

### A.    <u>Plaintiff Can Present Sufficient Proof of Ford's Reckless Conduct</u>

"Under South Carolina law, punitive damages may be awarded to punish tortfeasors who have acted in a reckless, willful, or wanton manner." *Duncan v. Ford Motor Co.*, 385 S.C. 119, 138, 682 S.E.2d 877, 886 (Ct. App. 2009) (internal quotation marks omitted).  "A tort is characterized as reckless, willful or wanton if it was committed in such a manner or under such

circumstances that a person of ordinary reason and prudence would have been conscious of it as an invasion of the plaintiff's rights." *Taylor v. Medenica*, 324 S.C. 200, 221, 479 S.E.2d 35, 46 (1996). "A conscious failure to exercise due care constitutes willfulness." *Id.* at 221, 479 S.E.2d at 46. "In any civil action where punitive damages are claimed, the plaintiff has the burden of proving such damages by clear and convincing evidence." S.C. Code Ann. § 15-33-135.

Plaintiff first addresses the evidence supporting an award of punitive damages and then addresses Ford's arguments. Ford readily admitted that, if Plaintiff's reconstruction of the crash is correct, the late airbag deployment is an unsafe defect. (Exh. 13, Krishnaswami Depo. p. 37 lns. 20-25, p. 38 lns. 1-7). The late airbag deployment also violated Ford's internal specifications for a single crash event stated in the calibration report it provided to Autoliv. (Exh. 13, Krishnaswami Depo. p. 27 lns. 19-25). The calibration report listed a 74 millisecond delay as the longest allowed time between the seatbelt pretensioner activation and the airbag deployment. (Exh. 12, Caruso Depo. pp. 116-18). In this case, the airbag deployed 146 milliseconds after the pretensioner activated. (Exh. 5, Caruso Report p. 13). Further, Ford admitted that in a single crash event, "the airbag should deploy well before 150 milliseconds of the pretensioner." (Exh. 13, Krishnaswami Depo. p. 27 lns. 19-25).

GM used the alternative designs proposed by Caruso for a decade prior to the release of the 2010 Ford Escape. (Exh. 12, Caruso Depo. pp. 138, 199, 243, 263); *contra Jimenez v. DaimlerChrysler Corp.*, 269 F.3d 439, 450 (4th Cir. 2001) (reversing a jury verdict awarding punitive damages where the record lacked evidence that the defendant "or any engineer in the industry recognized during the [manufacturing] time period that [the design at issue] could create a safety problem"). In stark contrast to this common practice of another automaker, Ford admitted it has no knowledge as to when an airbag should deploy in an offset pole impact crash

outside the frame rail. (Exh. 13, Krishnaswami Depo. p. 21 lns. 8-22). Ford's Rule 30(b)(6) witness testified it "would have to do numerous more similar repeatable tests in order to come to even a range of what that would be." *Id.* at p. 21 lns. 12-14.

Ford makes two arguments—(1) compliance with federal standards precludes recovery of punitive damages and (2) a dispute between experts as to whether the product is defective precludes punitive damages. Neither of these positions is supported by the law, and the second position concedes Ford's summary judgment argument as to proof of design defect.

First, compliance with federal safety and testing regulations does not preclude punitive damages. *See* 49 U.S.C. § 30103(e) ("Compliance with a motor vehicle safety standard prescribed under this chapter [49 USCS §§ 30101 et seq.] does not exempt a person from liability at common law." (bracketed text in original)); *Campbell v. Duke Energy Carolinas, LLC*, 2013 U.S. Dist. LEXIS 78998, *4-5, C/A No. 6:11-03496-TMC (D.S.C. June 5, 2013) ("[W]hile compliance with the N[ational]E[lectric]S[afety]C[ode] would certainly evidence a lack of negligence on Duke's part, whether Duke breached its duty of care, and the extent and nature of that duty, depends on the totality of the circumstances."). Caruso's testimony is directly on point—he testified the vehicle complied with federal standards but "[t]his is all about due care." (Exh. 12, Caruso Depo. p. 275 lns. 22-24). Because there were "no specific federal requirements around pole impacts" at the time of the 2010 Ford Escape's manufacture, compliance with any federal safety standard is not dispositive of Ford's conduct as it relates to airbag deployment for offset pole impact collisions. (Exh. 12, Caruso Depo. p. 36 lns. 7-14). Further, the offset pole impact outside the frame rail is "beyond the scope" of a test Ford referred to by the Insurance Institute for Highway Safety (IIHS). *Id.* at p. 256 lns. 7-13. Specifically, "it

doesn't correlate to our crash." *Id.* at p. 256 ln. 19.  Therefore, Ford's passage of those tests is neither relevant to nor dispositive of punitive damages in this case.

The cases cited by Ford do not support its argument.  In *Stonehecker v. General Motors Corp.*, 587 F.2d 151 (4th Cir. 1978), the Court addressed "the question of whether or not to admit a claimed compliance with the regulation as evidence of due care." *Id.* at 156.  In a separate section of the opinion, the Court addressed whether the plaintiff's experts exceeded the scope of their expertise in testifying about the bases for punitive damages. *Id.* at 158.  The Court did not discuss the relation, if any, between evidence of compliance with a regulation and punitive damages.  Rather, it held only that evidence of compliance with an applicable regulation may be admissible as *evidence of* due care. *Id.* at 156-57.  In *Reed v. Tiffin Motor Homes, Inc.*, 697 F.2d 1192 (4th Cir. 1982), the Court stated only that "whether or not [defendant] followed industry standards and complied with the state of the art while designing the motor home *is probative* on the issue of wantonness, willfulness and maliciousness of their acts." *Id.* at p. 1198. It did not state that compliance is *dispositive* of whether a plaintiff may recovery punitive damages.  Therefore, *Reed* supports Plaintiff's position that punitive damages is not proper for summary judgment.

Second, a "reasonable" disagreement between experts "on the existence of a defect" does not preclude recovery of punitive damages. (ECF # 33-1 p. 17).  If that were the case, every defendant could avoid liability for punitive damages simply by hiring an expert.  As an initial matter, this argument concedes Ford's argument as to summary judgment on the issue of proof of a design defect.  Ford argues that reasonable minds can differ on whether a design defect exists in this case. (ECF # 33-1 p. 17-18).  This is a concession that there is a genuine issue of material fact.  Therefore, the issue is not proper for summary judgment and should be submitted to the

jury. *See Univ. Med. Assocs. of the Med. Univ. of S.C. v. UNUMProvident Corp.*, 333 F. Supp. 2d 479, 482 (D.S.C. 2004) ("Summary judgment is proper only when there is no genuine issue of material fact."(citing Fed. R. Civ. P. 56(c))).

As Ford concedes, the issue of whether there is a design defect is a jury issue. Whether punitive damages are appropriate is determined by whether Ford "acted in a reckless, willful, or wanton manner." *Duncan*, 385 S.C. at 138, 682 S.E.2d at 886. As explained above, there is evidence to support a finding that Ford acted recklessly and willfully in choosing to leave a gap in the data it provided to Autoliv and to exclude analysis and consideration of offset pole impact accidents. Therefore, the fact that the parties' experts disagree as to whether there is a design defect does not preclude a jury from finding a defect and that such defect is the result of reckless, willful, or wanton conduct. Viewing the evidence in a light most favorable to Plaintiff, and drawing all justifiable inferences in her favor, the Court should deny Ford's motion as to punitive damages.

## B. <u>An Award of Punitive Damages Would Not Violate Due Process or the Constitutional Vagueness Doctrine</u>

Ford's argument as to a due process violation is repetitive of its prior argument—that punitive damages should not be awarded when it complied with government regulations. Ford knew that compliance with government regulations does not insulate it from punitive damages. *Durham v. County of Maui*, 692 F. Supp. 2d 1256, 1262 (D. Haw. 2010) (denying ***Ford's*** motion for summary judgment as to punitive damages based on alleged compliance with government regulations because "courts have found that a defendant's compliance with government regulations and/or industry standards is ***relevant, but not conclusive, to*** punitive damages" (emphasis added)). This is especially true when there is no government regulation applicable to the design defect at issue in this case. (Exh. 12, Caruso Depo. p. 36 lns. 7-14; p. 256 lns. 7-13,

19). Ford received fair notice of the conduct that would subject it to punishment because it is presumed to know the law, including the law of punitive damages related to reckless conduct.

Further, "South Carolina authorizes a jury to award punitive damages even when the wrongdoer does not actually realize that he is invading the rights of another, provided the act is committed in such a manner that a person of ordinary prudence would say that it was a reckless disregard of another's rights . . . ." *Atlas Food Sys. & Servs. v. Crane Nat'l Vendors*, 99 F.3d 587, 599 (4th Cir. 1996) (internal quotation marks omitted). Contrary to Ford's assertion, punitive damages may be awarded in the absence of a knowing or willful violation of another's rights. *Id.* The alternative designs discussed above existed for over a decade prior to Ford's manufacture of the 2010 Escape. It is for the jury to determine whether Ford's failure to conduct additional testing (actual or computer) and consider collisions at other speeds for offset pole impacts is reckless conduct. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 493 (2008) ("Reckless conduct is not intentional or malicious, nor is it necessarily callous toward the risk of harming others, as opposed to unheedful of it."). The Court should deny Ford's motion on this basis.

## C. The Request for Punitive Damages Does Not Violate Ford's Right to a Particularized Standard or Fair Notice

Ford's argument regarding a particularized standard or fair notice is also repetitive of the prior argument that it should not be liable for punitive damages because the parties' experts disagree as to whether there is a design defect. This is incorrect. First, while Ford's argument concedes that Plaintiff's experts' opinions are reasonable, Plaintiff argues that Ford's expert's opinions are not reasonable. Second, as explained above, Ford's Rule 30(b)(6) witness testified that, if Plaintiff's accident reconstructionist is correct as to how the collision occurred, then the airbag should not have deployed and the deployment that occurred was unsafe and violated its

own internal specifications. (Exh. 13, Krishnaswami Depo. p. 37 lns. 14-25, p. 38 lns. 6-8, p. 27 lns. 19-25).  For purposes of summary judgment, Plaintiff's "evidence . . . is to be believed." *Allen v. Greenville Hotel Partners, Inc.*, 405 F. Supp. 2d 653, 656 (D.S.C. 2005).  Taking Plaintiff's accident reconstructionist's version of the collision as true, Ford admitted there is an unsafe defect in the vehicle.  Therefore, there is no dispute, reasonable or otherwise, as to defectiveness.

Ford's argument assumes a finding by the Court that the disagreement is reasonable and an inference that such a finding means Ford did not act recklessly.  This usurps the jury's role in determining whether a defendant's conduct warrants punitive damages.  In addition to admitting a defect that fails to comply with Ford's specifications (if the jury finds Plaintiff's accident reconstruction is correct), there is additional evidence from which a jury could find that the disagreement is not reasonable.  Ford admitted that it did not have any test results or data to show how the airbag should have deployed in a collision such as the one Mr. Wickersham experienced. (Exh. 13, Krishnaswami Depo. p. 21 lns. 8-22, p. 30 lns. 5-13, p. 67).  Ford admitted that it was aware of RCM algorithm designs that included higher deployment thresholds but did not use one in the 2010 Ford Escape. *See Fairchild v. S.C. DOT*, 385 S.C. 344, 353-354, 683 S.E.2d 818, 823 (Ct. App. 2009) ("A jury may award punitive damages even when the wrongdoer does not actually realize that he is invading the rights of another, provided the act is committed in such a manner that a person of ordinary prudence would say that it was a reckless disregard of another's rights." (internal quotation marks omitted)).  Viewing the evidence and inferences in a light most favorable to Plaintiff, there is evidence of Ford's recklessness and wantonness.  The design decisions made by Ford ignored foreseeable collisions

and existing industry standards in airbag deployment design.  Therefore, the Court should deny Ford's motion on this basis.

## CONCLUSION

Viewing the evidence in a light most favorable to Plaintiff and drawing all inferences in her favor, the Court should deny Ford's motion for summary judgment as to the wrongful death claim, proof of a feasible alternative design, and punitive damages.

Don C. Gibson, Esq.
Gibson Law Firm
Dgibsonlaw2@aol.com
5422 Rivers Ave.
North Charleston, SC 29406
Phone: (843) 744-1887
Fax: (843) 744-5320

~and~

PETERS, MURDAUGH, PARKER, ELTZROTH
& DETRICK, P.A.

By:  s/Ronnie L. Crosby
Ronnie L. Crosby
Fed ID #6311
rcrosby@pmped.com
Austin H. Crosby
Fed ID #11536
acrosby@pmped.com
101 Mulberry Street East
PO Box 457
Hampton, SC 29924
Phone: (803) 943-2111
Fax: (803) 943-3943
**ATTORNEYS FOR PLAINTIFF**

December 29, 2015
Hampton, South Carolina