**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION**

| | | |
|---|---|---|
| CRYSTAL L WICKERSHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 9:13-cv-1192-DCN |
| vs. | ) | |
| | ) | |
| FORD MOTOR COMPANY , | ) | |
| | ) | |
| Defendant. | ) | |
| —————————————————— | ) | |
| CRYSTAL L WICKERSHAM, as Personal | ) | |
| Representative of the Estate of John Harley | ) | |
| Wickersham, Jr., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 9:14-cv-0459-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| FORD MOTOR COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| —————————————————— | ) | |

The following matter is before the court on defendant Ford Motor Company's ("Ford") motion for summary judgment. For the following reasons, the court grants in part and denies in part Ford's motion.

## I.  BACKGROUND[1]

On February 3, 2011, decedent John Harley Wickersham, Jr. ("Wickersham") was involved in a single car accident while driving a 2010 Ford Escape. Wickersham suffered numerous permanent injuries from the crash, which produced continuous, extreme pain. Wickersham committed suicide on July 21, 2012. Plaintiff alleges that Wickersham's suicide was caused by the pain he suffered as a result of the accident.

---

[1] The following facts are presented in the light most favorable to the plaintiff and are not meant to represent conclusive findings.

1

Wickersham had a history of mental illness. In 2003, long before the accident, Wickersham was diagnosed with bipolar disorder by his family practitioner, Dr. Richard Bolt, who referred him to a psychiatrist, Dr. Perry Trouche. Wickersham made no suicide attempts at or near the time of this diagnosis, but did tell his wife, plaintiff Crystal L. Wickersham ("plaintiff"), and Dr. Trouche that he had suicidal thoughts. Pl.'s Response Ex. 1, Pl. Depo. 140:23–25; Pl.'s Response Ex. 2, Trouche Depo. 21:11–13. These suicidal thoughts eventually subsided and Wickersham agreed to report any future suicidal ideation. Trouche Depo. 22:25, 27:6–12. Wickersham saw Dr. Trouche from October 2003 until June 2005. Id. at 21:7–10, 33:4–18. Years later, in January of 2011, Wickersham again sought treatment from Dr. Trouche for worsening depression and suicidal ideation. Trouche Depo. 38:2–13. Dr. Trouche recommended hospitalization, which Wickersham declined. Id. at 39:7–23. Dr. Trouche prescribed a new depression medication, and Wicksersham felt better after six days. Id. at 70:7–71:21.

Wickersham worked as a pharmacist and consultant. His career began in the pharmacy department at Roper Hospital in 1982. Pl. Depo. 22:20–25. Around 2003, Wickersham left his full-time position at Roper Hospital to work for InfuScience. Id. at 24:19–25:19. In 2008, Wickersham left InfuScience and took a full-time position at Beaufort Memorial Hospital on a two-year contract. Id. at 26:8–23, 27:16–28:1. During that time, Wickersham would work in Beaufort for seven days and then return to Charleston for seven days. Id. at 38:15–20. While in Charleston, Wickersham continued to perform consulting work for Roper Hospital. Id. at 42. When his contract with Beaufort Memorial ended, Wickersham worked on an "as needed" basis at Beaufort Memorial in addition to his consulting work for Roper Hospital. Id. at 28:2–25.

Wickersham briefly took a position at the Medical University of South Carolina, but left after a week due to disagreements with some of the Medical University's policies.  Id. at 29:2–5, 30:6–7.  After that, Wickersham looked for full-time work in the Charleston area, but could not find any.  Id. at 30:20–23.  Wickersham then continued to work on a contract and consulting basis for Roper Hospital, Beaufort Memorial, and other medical practices until the time of the accident.  Id. at 31–32.

The accident occurred on the night of February 3, 2011.  While attempting to make a left turn, Wickersham's car went through an intersection and hit a tree on the front passenger side.  Wickersham was taken to the Medical University of South Carolina for treatment.  Wickersham suffered a variety of injuries in the accident, including a broken rib, a broken upper jaw, broken cheek bones around his left eye, a fractured skull, and a ruptured left eye.  Pl.'s Depo. 211–14.  Wickersham required numerous surgeries and treatments during his initial hospitalization and in the months that followed.  Id. at 230:7–12, 233:20–234:20.  Most significantly, Wickersham experienced extreme pain as a result of his injuries, which drove him to seek relief from pain specialists, pain medication, and a nerve block.  Id. at 236–238.  Unfortunately, these treatments were largely ineffective.  Id. at 237:18–19, 239:23–240:1.  The pain not only affected Wickersham's body, but also his ability to work, and consequently, his family's finances.  Id. at 240: 9–24.  Wickersham eventually lost his left eye in November 2011, which resulted in further emotional trauma.  Id. at 230:13–231:7, 244:16–25.

In April 2012, Wickersham was admitted to Roper Hospital for suicidal thoughts.  Id. at 246:12–20.  At the time, Wickersham told plaintiff that "[she] need[ed] to put [him] somewhere or [he was] going to hurt [himself]."  Id. at 247:16–18.  The Roper Hospital

staff felt that Wickersham's pain medications were causing his suicidal thoughts, so they took him off of the pain medications, which relieved Wickersham of his suicidal thoughts, and he was released from the hospital.  Id. at 248:6–10, 15–17.  The pain, however, did not subside, and Wickersham suffered withdrawals from his pain medications.  Id. at 248:10, 19–24.

After Wickersham was released from the hospital, plaintiff regularly asked him whether he had any suicidal thoughts.  Id. at 250:24–251:11.  Wickersham told plaintiff that he occasionally had such thoughts, but he was not on the verge of committing suicide.  Id.  On July 21, 2012, however, Wickersham committed suicide by overdosing on prescription pain medication.

Plaintiff filed two actions, one individually and one as personal representative of Wickersham's estate, bringing claims for negligence, strict liability, and breach of warranty.  Plaintiff contends that Wickersham's injuries and eventual suicide were caused by a defective airbag restraint system in the 2010 Ford Escape, which deployed the airbag too late.  Pl.'s Response 23–24.  On November 24, 2015, Ford filed the instant motion for summary judgment.  On December 29, 2015, plaintiff filed a response, and on January 8, 2016, Ford filed a reply.  The court held a hearing on the matter on May 12, 2016, and the matter is now ripe for the court's review.

## II.  STANDARD

Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "By its very terms, this standard provides that the mere existence of some

alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, it may discharge its burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The non-movant must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor. Anderson, 477 U.S. at 255.

### III.  DISCUSSION

Ford seeks summary judgment on three grounds, arguing that:  (i) plaintiff cannot recover under any theory of liability because plaintiff cannot show the existence of a feasible alternative design; (ii) suicide necessarily constitutes an independent act which breaks the causal chain between the defendant's actions and the decedent's death, thereby

precluding any wrongful death action; and (iii) plaintiff cannot recover punitive damages because there is no evidence that Ford acted recklessly, willfully, or wantonly, and any award of punitive damages would violate Ford's due process rights.[2]  The court addresses each argument in turn.

### A.      Feasible Alternative Design

Ford first argues that plaintiff has failed to present evidence of a feasible alternative design.  Under South Carolina law, "the exclusive test in a products liability design case is the risk-utility test with its requirement of showing a feasible alternative design."  Branham v. Ford Motor Co., 701 S.E.2d 5, 14 (S.C. 2010).  To satisfy the alternative design requirement, a plaintiff must "show how his alternative design would have prevented the product from being unreasonably dangerous."  Id. at 16.  "This presentation of an alternative design must include consideration of the costs, safety and functionality associated with the alternative design."  Id.

Plaintiff contends that Wickersham's injuries were caused by the 146-millisecond delay between the vehicle's initial impact with the pole, which activated the seatbelt pretensioners and the deployment of the airbag.  Pl.'s Resp. Ex. 5, Caruso Report 13; Pl.'s Resp. Ex. 12, Caruso Depo. 81:7–13.  This delay allowed Wickersham to "move forward into . . . the deployment zone of the airbag while it was inflating," causing an impact between his body and the airbag.  Pl.'s Resp. Ex. 6, Kennet Report 5–6.  The airbag system and seatbelt pretensioners are controlled by the Restraint Control Module ("RCM").  The RCM receives crash data from sensors located in the vehicle and processes that data through an algorithm, which then determines whether to activate the

---

[2]      Ford also argues that there is no evidence supporting plaintiff's failure to warn claim, which plaintiff concedes.  Pl.'s Response 2 n.1.

seatbelt pretensioners, deploy the airbags, or both. Caruso Report 5. This algorithm is developed and calibrated using crash testing data. Plaintiff's engineering expert, Christopher Caruso ("Caruso"), contends that the 2010 Ford Escape's RCM was defective because its algorithm was not calibrated to account for the type of crash Wickersham experienced—namely, an offset pole crash. Id. 17–18. Caruso further opines that this defect could have been avoided had Ford conducted more thorough testing and calibrated the RCM algorithm to account for such a crash. Caruso Report 18–19. Though plaintiff seems to suggest that the RCM algorithm could have been better calibrated in a number of different ways, Caruso specifically states that Ford could have programmed the RCM to raise the mile-per-hour threshold for airbag deployment in low speed crashes in which the airbag has not deployed more than 50 milliseconds after activating the seatbelt pretensioners (hereinafter, the "raised threshold approach").[3] Caruso Dep. 110:16–111:23, 137:13–138:17.

Ford argues that plaintiff's proposals do not count as legitimate alternative designs because they are purely "conceptual," and thus, plaintiff has provided no analysis of the "'costs, safety and functionality associated with the alternative design' as required by Branham." Def.'s Mot. 26 (quoting Branham, 701 S.E.2d at 16)); Def.'s Reply 10. Ford highlights the fact that if the RCM were better calibrated for the sort of crash

---

[3]    Plaintiff, at times, characterizes its alternative design theory in terms of more testing or a more complete data set. Pl.'s Resp. 23. This appears to have caused a considerable amount of confusion on the issue. Nevertheless, the "raised threshold" approach described above provides at least one example of how additional testing would have been used to produce a differently calibrated RCM. The court does not mean to suggest that plaintiff's case is bound to this theory. If there are other examples of how the RCM could have been recalibrated to avoid the accident— for instance, lowering the airbag threshold in low speed crashes so that the airbag deploys before the driver enters the deployment zone—plaintiff may advance those theories as well. At this point, however, the court focuses on the raised threshold theory because it was the theory most thoroughly discussed by the parties.

presented in this case, it would impact the timing of airbag deployment in other crash

scenarios, which may reduce the overall safety of the vehicle.  Def.'s Reply 11.

However, Caruso's testimony clearly indicates that other manufacturers have utilized the

raised threshold approach in the past.  See Caruso Depo. 137:19–138:24 (explaining that

designs created by Delco—Caruso's former employer—incorporated such a system and

would not have deployed the airbag if used in this case).  The fact that this approach was

used in the past certainly suggests that it is feasible from a cost, safety, and functional

perspective.

To the extent Ford argues that plaintiff can only prevail if it provides an actual

algorithm that Ford could have used in the 2010 Escape, Ford seeks to impose an

evidentiary burden well above any sensible interpretation of Branham.  The Branham

court relied on the Restatement (Third) of Torts in adopting the risk-utility test for design

defects.  See Branham, 701 S.E.2d at 14 ("The third edition [of the Restatement of Torts]

effectively moved away from the consumer expectations test for design defects, and

towards a risk-utility test.  We believe the Legislature's foresight in looking to the

American Law Institute for guidance in this area is instructive.").  In applying the

alternative design requirement of the risk-utility test, the Restatement (Third) of Torts

> does not [] require the plaintiff to produce a prototype in order to make out
> a prima facie case.  Thus, qualified expert testimony on the issue suffices,
> even though the expert has produced no prototype, if it reasonably
> supports the conclusion that a reasonable alternative design could have
> been practically adopted at the time of sale.

Restatement (Third) of Torts: Prod. Liab. § 2, cmt. d (Am. Law Inst. 1998).

The fact that other manufacturers successfully implemented the raised threshold

approach provides more than a reasonable basis for concluding that Ford could have done

the same here.  Other courts in this district have adopted a similar analysis in applying

South Carolina law.  See, e.g., Quinton v. Toyota Motor Corp., No. 1:10-cv-02187, 2013 WL 1680555, at *3 (D.S.C. Apr. 17, 2013) (denying summary judgment on the basis of documentary evidence and deposition testimony suggesting the existence of a feasible alternative design, with no mention of such a design ever having been produced); Little v. Brown & Williamson Tobacco Corp., 243 F. Supp. 2d 480, 496 (D.S.C. 2001) (denying summary judgment where plaintiff "provided an affidavit by Dr. Farone suggesting numerous technologies which in his opinion could have been utilized by Defendants to provide a safer cigarette since the early 1960's at the latest").

Ford highlights the case of Holland ex rel. Knox v. Morbark, Inc., in which the South Carolina Court of Appeals stated that "a conceptual design is insufficient to establish a reasonable alternative design."  754 S.E.2d 714, 720 (S.C. Ct. App. 2014).  In that case, the plaintiff's expert opined that an alternative system for locking the hood of a wood chipper could have prevented the plaintiff's injuries.  Id.  However, the expert "was unaware of anyone . . . in the industry that had performed a feasibility analysis for an alternative design," and his design was considered "conceptual," in that he never prepared an actual design that for the system he proposed.  Id.

The Holland case is distinguishable from the case at hand for at least two reasons.  First, as discussed above, there is evidence that the raised threshold approach has been implemented by other manufacturers in the industry.  Caruso Depo. 137:19–138:24.  Thus, unlike in Holland, plaintiff has presented more than a purely speculative assertion of feasibility.  Second, Ford's attempt to apply Holland to Caruso's proposal depends on a semantic dispute over the term "design."  Ford clearly regards the RCM algorithm as the "design," and because Caruso cannot present the actual algorithm that would be used

for a 2010 Escape, Ford argues that plaintiff has only set forth a strategy for producing an alternative design, but has not produced the "design" itself.  While the algorithm might be considered the design in some sense, the court thinks that the algorithm is better understood as the product, or at least, a component thereof.  The algorithm is used to perform a function—namely, manage the airbag deployment and activation of the seatbelt pretensioners.  It is a system of information, much like a physical product may be a system of tubes, iron, wires, etc.  When viewed in this light, it becomes clear that a plaintiff seeking to introduce an alternative design of the algorithm need not produce the actual algorithm, as this would constitute the production of a prototype, which is clearly not required in other instances.  <u>See</u> Restatement (Third) of Torts: Prod. Liab. § 2, cmt. d (Am. Law Inst. 1998) ("[Q]ualified expert testimony on the issue suffices, even though the expert has produced no prototype.").  Where, as here, the plaintiff is able to identify a specific design approach that has been implemented elsewhere in the industry and has specifically explained how that approach would be implemented into the algorithm at issue, the plaintiff has presented sufficient evidence of a feasible alternative design to survive summary judgment.

Therefore, the court denies Ford's motion to the extent it depends on plaintiff's failure to present a feasible alternative design.

### B.     Suicide Precludes Wrongful Death Recovery

Ford next argues that plaintiff cannot recover on her wrongful death claim because Wickersham's suicide precludes any showing of proximate cause as a matter of law.  Def.'s Mot 6–9.  Plaintiff argues that Wickersham's suicide falls within a

recognized exception to the general rule that suicide precludes any showing of proximate cause.  Pl.'s Resp. 10–23.

To prevail on a wrongful death claim in South Carolina, a plaintiff must establish causation.  Land v. Green Tree Servicing, LLC, No. 8:14-cv-1165, 2015 WL 6247450, at *4 (D.S.C. Oct. 13, 2015) ("[T]he plaintiff in a wrongful death action must establish that the wrongful act or negligence of the defendant caused the death of the decedent.  The standard tort principles that apply to causation in negligence cases apply to any action for wrongful death regardless of the basis of the underlying cause of action.").  Though the cases addressing this issue are few and far between, South Carolina courts do appear to hold that, as a general rule, suicide constitutes an independent act of the decedent, that extinguishes the line of causation connecting a defendant's actions to the decedent's death.  See Scott v. Greenville Pharmacy, 48 S.E.2d 324, 328 (S.C. 1948) ("The voluntary willful act of suicide of an injured person, who knows the purpose and physical effect of his act, is generally held to be such a new and independent agency as does not come within and complete a line of causation from the injury to the death so as to render the one responsible for the injury civilly liable for the death." (emphasis added)); see also Watson v. Adams, No. 4:12-cv-03436, 2015 WL 1486869, at *6 (D.S.C. Mar. 31, 2015) ("Where an action is brought under a wrongful death statute the general rule is that suicide constitutes an intervening force which breaks the line of causation from the wrongful act to the death . . . ." (quoting 11 A.L.R.2d 751 (1950))).

Nevertheless, South Carolina does appear to recognize that, in some instances, a decedent's suicide will not preclude a wrongful death action.  In Scott v. Greenville Pharmacy, the only case in which the Supreme Court of South Carolina explored the

11

subject, a plaintiff-executrix brought a wrongful death action against a pharmacy that allegedly sold the decedent barbiturates in violation of state law.  48 S.E.2d at 325.  The decedent developed an addiction, and eventually, "[w]hile under the influence of the drug, or while suffering from moroseness, caused by its habitual use, [the decedent] committed suicide by hanging."  Id.  In addressing the issue of causation, the court stated that an intervening act will not insulate the original wrongdoer from liability if "the intervening act and the injury resulting therefrom are of such character that the author of the primary negligence should have reasonably foreseen and anticipated them in the light of attendant circumstances."  Id. at 328 (quoting Locklear v. Se. Stages, 8 S.E.2d 321, 325 (S.C. 1940)).  Though the court ultimately held that, under the facts presented, it could not find "that the unlawful sale of the barbiturate capsules brought about a condition of suicidal mania as the natural and probable consequence of the sale, or that this result should have been reasonably foreseen by the respondent," id., it is significant that the court did not find that the "general" rule disposed of the need for case-specific analysis.  See id. ("Can it be reasonably said that [the decedent's] tragic end was a natural and probable consequence of the sale to him of the barbiturate capsules, and should it have been foreseen in the normal course of events?  Each case must be decided largely on the special facts belonging to it.").  The court placed a great deal of emphasis on the fact that the decedent acted on his own in purchasing the drug and these purchases were the pharmacy's only connection to the case.  Id. at 327.  The court even recognized that the case did not present a situation where the decedent "was no longer a free agent[,] incapable of controlling his own conduct, and bent upon suicide," suggesting that a claim might lie in such circumstances.  Id. at 328.

Over forty years later, the South Carolina Court of Appeals relied on the <u>Scott</u> decision to grant summary judgment in favor of a bartender who allegedly sold alcohol to an intoxicated patron in violation of state law. <u>Crolley v. Hutchins</u>, 387 S.E.2d 716, 717 (S.C. Ct. App. 1989). After being arrested and taken to the county jail, the patron attempted suicide. <u>Id.</u> The patron then brought a negligence claim against the bartender, seeking recovery for injuries suffered in the suicide attempt. <u>Id.</u> The <u>Crolley</u> court, like the <u>Scott</u> court, analyzed the foreseeability of the plaintiff's injuries and made no mention of any categorical rule precluding causation in suicide cases. <u>Id.</u> at 718 ("In this case, Crolley's attempted suicide was [] too remote from the alleged statutory violation to establish proximate causation. One does not expect a person to attempt suicide as a natural and probable result of being served a drink while intoxicated.").

Most recently, another court in this district addressed the issue in <u>Watson v. Adams</u> and concluded as follows:

> South Carolina law reflects the majority rule. 'Where an action is brought under a wrongful death statute the general rule is that suicide constitutes an intervening force which breaks the line of causation from the wrongful act to the death and therefore the wrongful act does not render defendant civilly liable[.]'

<u>Watson</u>, 2015 WL 1486869, at *6 (quoting 11 A.L.R.2d 751). In the <u>Watson</u> case, the personal representative of the decedent's estate sought to hold three police officers liable for essentially arresting the decedent under false pretenses after this arrest led to the decedent's termination from his job, the dissolution of the decedent's marriage, and eventually, the decedent's suicide. <u>Id.</u> at *1–2. The <u>Watson</u> court recognized certain exceptions to the general rule stated above—most notably, the exception for suicides caused by an uncontrollable impulse—but found that the case did not fall within any such exceptions. <u>Id.</u> at *6. Thus, the court concluded the decedent's suicide was an

13

intervening factor that cut the causal chain linking the plaintiff's injury to the officers' conduct. Id. at *8. The court went on to note that the three-month gap between the decedent's arrest and his eventual suicide, the influence of outside decision makers on the decedent's decision to commit suicide, and the decedent's intoxication at the time of his suicide all reduced the causal connection between the suicide and the defendants' wrongful conduct. Id. at *9–10.

Each of these cases is most sensibly read to provide that, under normal circumstances, a decedent's suicide will constitute an intervening event which defeats any showing of causation. However, each court also seemed to recognize that this general rule cannot be applied in every case. Though the general rule may establish a default position that no proximate cause exists in suicide cases, the court still finds occasion in this case to apply the aforementioned "uncontrollable impulse" exception. See id. at *6 ("The first exception involves cases where a tortious act is found to have caused a mental condition in the decedent that proximately resulted in an uncontrollable impulse to commit suicide, or prevented the decedent from realizing the nature of his act." (quoting McLaughlin v. Sullivan, 461 A.2d 123, 124 (N.H. 1983))).

While Ford argues that the uncontrollable impulse exception has not been recognized in South Carolina, Def.'s Reply 4, the court disagrees. First, the Supreme Court of South Carolina suggested in Scott that a plaintiff might recover where "[the decedent is] no longer a free agent incapable of controlling his own conduct, and [is] bent upon suicide." 48 S.E.2d at 328. This language is quite clearly compatible with the "uncontrollable impulse" exception. Moreover, the Watson court strongly indicated that the exception exists under South Carolina law by explicitly finding that it did not apply in

14

that case.  See Watson, 2015 WL 1486869, at *8 (finding that, "in the absence of

evidence that Watson . . . suffered an injury at [the defendants'] hands that created an

irresistible impulse to commit suicide, he does not fall within any of the exceptions to the

rule").  Though the Watson court did state that "[a]s far as [it could] tell, South Carolina

Courts have never permitted a recovery on this basis," id. at *6, this statement came after

the court emphasized that the exception was very narrow and rarely applied.  Id.  Thus,

the statement was simply indicating that South Carolina courts had never found an

occasion to apply the exception, not that it did not exist under South Carolina law.

Ford next argues that, even if the uncontrollable impulse exception exists, the

requisite "impulse" must be caused by some form of "insanity."  Def.'s Reply 3–5.  Ford

cites an American Jurisprudence formulation of the rule, as well as the Restatement

(Second) of Torts § 455, which appear to impose such a requirement.  22A Am. Jur. 2d

Death § 42 (2016); Restatement (Second) of Torts § 455 (Am. Law Inst. 1965).

Specifically, the American Jurisprudence article states the following:

> Liability is imposed upon a defendant for another's suicide when the
> defendant's negligent conduct causes the insanity of another and . . . the
> insanity makes it impossible to resist an uncontrollable impulse that
> deprives the person of the capacity to govern the person's own conduct in
> a reasonable manner.

22A Am. Jur. 2d Death § 42 (emphasis added).  Similarly, the Restatement (Second) of

Torts states that an actor may be liable for negligent conduct which

> brings about the delirium or insanity of another as to make the actor liable
> for it, the actor is also liable for harm done by the other to himself while
> delirious or insane, if his delirium or insanity[:]
>
> . . .
>
> (b) makes it impossible for him to resist an impulse caused by his insanity
> which deprives him of his capacity to govern his conduct in accordance
> with reason.

Restatement (Second) of Torts § 455 (emphasis added).

Notably, however, courts applying South Carolina law have not given any indication that any such a requirement exists. The <u>Watson</u> court's formulation of the rule speaks in general terms of a "mental condition" that causes an "irresistible impulse," without any mention of "delirium" or "insanity." 2015 WL 1486869, at *6. The <u>Watson</u> court's only mention of "delirium" comes in a quote from <u>Daniels v. New York, N.H. & H.R. Co.</u>, a case well over century old, which states that "liability of a defendant for a death by suicide exists only when the death is the result of an uncontrollable impulse, <u>or</u> is accomplished in delirium or frenzy caused by the collision . . . ." 67 N.E. 424, 426 (Mass. 1903) (emphasis added). Not only does this quotation consider a state of "delirium or frenzy" to be separate from an "uncontrollable impulse," <u>id.</u>, but the <u>Watson</u> court only uses the quote to support its observation that uncontrollable impulse cases are "very rare and typically involve a physical injury that causes the decedent to have an irresistible impulse to commit suicide."[4] 2015 WL 1486869, at *6.

The <u>Scott</u> decision provides even less support for Ford's posited "insanity" requirement. Like the <u>Watson</u> court, the <u>Scott</u> court discussed the uncontrollable impulse concept in general terms without any mention of insanity or delirium. <u>Scott</u>, 48 S.E.2d at 328 ("[T]he allegations of the complaint, on the most liberal construction, fall far short of presenting the case of one who was no longer a free agent incapable of controlling his own conduct, and bent upon suicide."). Unlike the <u>Watson</u> court, the <u>Scott</u> court made no

---

[4]     Notably, the <u>Watson</u> court cites to an American Law Reports article to set forth its formulation of the general rule that suicide constitutes a break in the chain of causation. <u>See</u> <u>Watson</u>, 2015 WL 1486869, at *6 (citing 11 A.L.R.2d 751). This article also recognizes cases involving an "uncontrollable impulse" as separate from cases involving a state of "delirium or frenzy." 11 A.L.R.2d 751 § 5 (recognizing an exception to general rule "where the suicide was not the result of an uncontrollable impulse <u>or</u> accomplished in delirium or frenzy" (emphasis added)).

mention of "delirium" or "insanity" at all, much less a "delirium" or "insanity" requirement that is subsumed into the uncontrollable impulse exception. Thus, Ford's insanity theory has little support from authorities applying South Carolina law.

Moreover, cases applying the uncontrollable impulse exception have been far from uniform in imposing the insanity requirement. For instance, Ford notes two cases applying Maryland law that might be read to equate "insanity" with "psychosis." See Young v. Swiney, 23 F. Supp. 3d 596, 617–24 (D. Md. 2014) (denying defendant's motion for summary judgment on wrongful death claims where plaintiff's expert opined that decedent's suicide "was directly and proximately caused by the psychosis he sustained as a result of the automobile accident"); Sindler v. Litman, 887 A.2d 97, 114–15 (Md. Ct. Spec. App. 2005) (affirming grant of summary judgment in favor of defendant on wrongful death claim where plaintiff's expert noted that "there was no evidence of psychosis" and opined that decedent "exhibited organic brain syndrome that caused depression" but "did not opine that [decedent] was insane or otherwise was in a mental state such that she . . . had an uncontrollable impulse"). Even if the court were to adopt this narrow reading of Young and Sindler,[5] other courts have found a wide variety of mental conditions sufficient to satisfy the uncontrollable impulse exception, including:

---

[5]     The court notes that this narrow reading is by no means the only available interpretation. First, the Sindler court recognized that the uncontrollable impulse exception can apply when the decedent "[is] insane or otherwise [] in a mental state such that she . . . [has] an uncontrollable impulse." 887 A.2d at 115 (emphasis added). Moreover, the "psychosis" at issue in Young was only diagnosed after the decedent committed suicide and was linked to a timeline of events which "caused [the decedent's] psychotic suicidal condition and set the stage for the suicide." 23 F. Supp. 3d at 617–19. The Young court further noted that the fact that this suicidal impulse arose over time did not preclude it from being "irresistible." Id. at 620. When viewed within this context, the "psychosis" at issue in Young appears to have been brought on by the various stresses in the decedent's life, not unlike the "uncontrollable impulse" alleged here. See Schwartz-Watts Depo. 152:9–153:18 (suggesting that pain from the accident and related stress from depression led to Wickersham's suicide).

(i) schizophrenia, <u>Exxon Corp. v. Brecheen</u>, 526 S.W.2d 519, 522 (Tex. 1975); (ii) an

"adjustment disorder, which [plaintiff's expert] define[d] as 'an emotional reaction to life

events . . . [that results] in maladaptive behavior' such as suicide" and is notably distinct

from "clinical depression, psychosis, or hallucinations," <u>Walsh v. Tehachapi Unified Sch.</u>

<u>Dist.</u>, 997 F. Supp. 2d 1071, 1080–81 (E.D. Cal. 2014); or (iii) simply an unspecified

"disordered mental state" caused by "a very probable injury to the frontal lobes of [the

decedent's] brain," <u>Orcutt v. Spokane Cty.</u>, 364 P.2d 1102, 1107 (Wash. 1961).

More importantly, a number of courts have recognized the entire concept of

"insanity" or "delirium" tends to place too much emphasis on a decedent's particular

mental state, and too little emphasis on the more important question of whether the

defendant's actions can be considered the proximate cause of the decedent's suicide.  As

California's First District Court of Appeal stated in <u>Tate v. Canonica</u>:

> Some cases speak of 'insanity,' and of 'delirium or frenzy,' and take the
> view that if the decedent knew what he was doing, the suicide is an
> independent intervening cause.  We think, in the light of modern
> knowledge as to mental illness, that this view is too narrow.  It should not
> make any difference that the decedent 'knew what he was doing'.  If
> defendant is to avoid liability, the decedent's act must be voluntary, not in
> that sense but in the sense that he could, in spite of his mental illness, have
> decided against suicide and refrained from killing himself.

5 Cal. Rptr. 28, 40 (Cal. Dist. Ct. App. 1960).  More recently, the Supreme Court of

Missouri observed that "[t]he more recent trend [and better rule] is to place less emphasis

on the mental state and more on the causal connection."[6]  <u>Kivland v. Columbia</u>

---

[6]    Notably, the <u>Kivland</u> court saw fit to do away with the "general rule" and "uncontrollable impulse" exception entirely and simply evaluate each case under an ordinary proximate cause analysis.  <u>Kivland</u>, 331 S.W.3d at 309 ("As demonstrated by its varied interpretations, the irresistible impulse test is unclear.  The better rule, therefore, is to focus on what Missouri cases actually require in wrongful death cases:  whether the decedent's death was 'a direct result' of defendant's negligence.").  The court finds this approach to be rather persuasive and notes that

Orthopaedic Grp., LLP, 331 S.W.3d 299, 308 (Mo. 2011) (second alteration in original)

(quoting Halko v. N.J. Transit Rail Operations, Inc., 677 F. Supp. 135, 142 (S.D.N.Y.

1987)).  The Kivland court further found that "[m]odern psychiatry supports the idea that

suicide sometimes is a foreseeable result of traumatic injuries."  Id. at 308 (citing Allen

C. Schlinsog, Jr., The Suicidal Decedent: Culpable Wrongdoer, or Wrongfully

Deceased?, 24 J. Marshall L. Rev. 463, 479 (1991)).  This shift away from the question of

"insanity" and toward the question of "control" explains the why a number of courts have

liberally construed the uncontrollable impulse exception to apply in cases where the

decedent understood, or even intended, his actions.  See, e.g., R.D. v. W.H., 875 P.2d 26,

29 (Wyo. 1994) (denying motion to dismiss, despite long duration between defendant's

harmful acts and decedent's suicide and indications that decedent planned her suicide,

and explaining that "[w]hen the decedent acts under the conditions expounded in [the

Restatement (Second)] § 455, he is not acting with volition, and his suicide, therefore,

does not breach the chain of causation."); Fuller v. Preis, 322 N.E.2d 263, 268 (N.Y.

1974) (explaining that "[i]n tort law, . . . there is recognition that one may retain the

power to intend, to know, and yet to have an irresistible impulse to act and therefore be

---

there is some support for such an approach in Scott, where the Supreme Court of South Carolina
stated the following:

> The test, [] by which the negligent conduct of the original wrongdoer is to be
> insulated as a matter of law by the independent negligent act of another, is
> whether the intervening act and the injury resulting therefrom are of such
> character that the author of the primary negligence should have reasonably
> foreseen and anticipated them in the light of attendant circumstances.

48 S.E.2d at 328.
    Nevertheless, the court recognizes that Scott can also be read to set forth the general rule
framework outlined above.  See Watson, 2015 WL 1486869, at *6 (reading Scott to reflect the
majority rule).  In light of the Watson decision, the court declines to hold that the general rule is
completely inapplicable and an ordinary proximate cause analysis applies.

incapable of voluntary conduct," and that "[a]n irresistible impulse does not necessarily mean a 'sudden' impulse").

The court finds this approach persuasive. As the New York Court of Appeals recognized in 1974, "[a] suicide is a strange act and no rationalistic approach can fit the act into neat categories of rationality or irrationality." Fuller, 322 N.E.2d at 268. As society's understanding of suicide progresses, so must the law. The court recognizes it is in no position to evaluate what mental conditions qualify as "insanity," to the extent that term is either meaningful or appropriate. Instead, the court will simply look to whether the decedent had the ability to control his conduct, and if not, whether his uncontrollable impulse was proximately caused by the defendant's negligence.[7] Not only does the court regard this approach as superior to the outdated "insanity" requirement, it also finds it to be more consistent with the language in Scott distinguishing cases in which "[the decedent is] no longer a free agent incapable of controlling his own conduct, and bent upon suicide." Scott, 48 S.E.2d at 328.

Here, plaintiff has offered an affidavit from her psychiatric expert, Dr. Donna Schwartz-Watts, in which Dr. Schwatrz-Watts opines that the accident diminished Wickersham's ability to control his impulses and that Wickersham's suicide occurred because of this lack of control. Pl.'s Resp. Ex. 15, Schwartz-Watts Aff. ¶¶ 1, 2, 4. Ford objects to plaintiff's reliance on Dr. Schwatz-Watts's affidavit, arguing that it offers previously undisclosed opinions in violation of Federal Rule of Civil Procedure 26(b)(4) and constitutes a "sham affidavit" because it contradicts Dr. Schwartz-Watts's prior testimony. Def.'s Reply 8. Ford specifically argues that Dr. Schwartz-Watts stated she

---

[7]    Even if the court were inclined to assess Wickersham's mental condition, there is evidence that the pain from the accident caused a "decline in functioning . . . that certainly made his depression worse." Scwartz-Watts Depo. 153:14–9.

did not know whether Wickersham's decision to commit suicide was impulsive and refused to opine as to whether it was impulsive or not.[8]  Def.'s Reply 7 (citing Pl.'s Resp. Ex. 4, Schwartz-Watts Depo. at 164:6–17).

A party "cannot create a dispute about a fact that is contained in deposition testimony by referring to a subsequent affidavit of the deponent contradicting the deponent's prior testimony, for 'it is well established that a genuine issue of fact is not created where the only issue of fact is to determine which of the two conflicting versions of a party's testimony is correct.'"  In re Family Dollar FLSA Litig., 637 F.3d 508, 512 (4th Cir. 2011) (quoting Erwin v. United States, 591 F.3d 313, 325 n.7 (4th Cir. 2010)). "'[F]or the [sham-affidavit] rule . . . to apply, there must be a bona fide inconsistency' between an affiant's averments and his deposition testimony."  Kinser v. United Methodist Agency for the Retarded--W. N.C., Inc., 613 F. App'x 209, 210–11 (4th Cir. 2015) (alterations in original) (quoting Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 n.7 (4th Cir. 2001)).

The testimony at issue reads as follows:

Q.  [The suicide] wasn't an impulsive decision?

A.  I don't know.

Q.  Okay.

A.  It depends on how long an impulse is.  You know, he might have said

---

[8]    Ford also argues that the affidavit is inconsistent with Dr. Scwartz-Watts's prior testimony because she testified that Wickersham was not "insane" and that his bipolar disorder was not worsened by the accident.  Def.'s Reply 7.  However, the affidavit does not specifically address either topic and is only "inconsistent" with the prior testimony if one believes that an uncontrollable impulse must be connected to some specific form of "insanity."  Given the court's determination that the uncontrollable impulse exception does not depend on a finding of "insanity" or any other specific mental disorder, the court does not find the affidavit to be inconsistent at all in this regard, and even if it were, such inconsistencies would be entirely irrelevant.

in one minute, I'm dying, let me write a note and then done it. We don't know. We won't know.

Q. You won't offer an opinion on that either way?

A. No.

Q. Either way?

A. No.

Q. Okay. The impulse and—you know, the impulsive behavior that he had, it wasn't caused from the accident? I mean, I guess what I asked you earlier about the accident not causing his mood disorder. His mood disorder is kind of what causes his compulsive behavior.

A. I would—I don't have any evidence to indicate the contrary. I would have been concerned, because anytime you have an airbag injury enough to enucleate your eye, you would be concerned. But I didn't see any evidence anywhere where he had any neuropsychological testing or anything. I certainly would have recommended—had he come to me post-accident, I probably would have referred him. But I don't have any evidence that that's the case.

Q. And I'm afraid you may have misunderstood where my—or maybe I didn't ask the right question. Just—and we talked about the impulsive [] behavior during manic episodes as well as the bipolar—

A. Yes.

Q. —making poor decisions or things like that. Those—you know, he had that—to the extend he acted impulsively during those times, that would be the same as after the accident or during those same kind of manic episodes?

A. Oh, I see what you're saying. I don't think there was any history that his mania was worsened after the accident.

Schwatz-Watts Depo. 164:6–165:22. When the testimony is read in full, it shows that Dr.

Schwartz-Watts's understood the word "impulse" to describe the time it took

Wickersham to decide to commit suicide. See id. at 164:9 ("It depends how long an

impulse is."). Dr. Schwartz-Watts also used this definition earlier in the deposition. See

id. at 161:5–7 ("When I say plan, I think of an impulsive act which is very quick, no, no,

just doing something impulsively." (emphasis added)).  After establishing this definition of "impulse," Dr. Schwartz-Watts was asked:  "[T]he impulsive behavior that [Wickersham] had, it wasn't caused from the accident?"  Id. at 164:19–20.  However, before allowing Dr. Schwartz-Watts to answer, Ford's counsel then referred to a previous question about whether Wickersham's "mood disorder" was caused by the accident and stated that the mood disorder "is kind of what causes [Wickersham's] compulsive behavior."  Id. at 164:20–23.  Thus, when Dr. Schwartz-Watts eventually stated that she had no evidence to indicate "the contrary," id. at 164:24–25, it was unclear what she was referring to—the question about the cause of Wickersham's impulsive behavior, a previous question about the cause of Wickersham's mood disorder, or the assertion that the mood disorder caused Wickersham's "compulsive behavior."  Id. at 164:20–25.  Indeed, Ford's counsel even recognized this question was confusing, and after the confusion was removed, Dr. Schwartz-Watts simply stated that there is no "history"— which the court takes to mean evidence—"that [Wickersham's] mania was worsened after the accident."  Id. at 165:20–22.

     As explained above, the court holds that Wickersham's suicidal "impulse" need not have been brought on by his bipolar disorder, or any other specific mental condition, for it to be considered "uncontrollable" within the meaning of the exception.  See Kivland, 331 S.W.3d at 308 ("[T]he more recent trend [and better rule] is to place less emphasis on the mental state and more on the causal connection." (alterations in original) (quoting Halko, 677 F. Supp. at 142); R.D., 875 P.2d at 29 ("In order for the suicide to be an intervening cause, it must have been committed voluntarily.  When the decedent acts under the conditions expounded in [the Restatement (Second)] § 455, he is not acting

23

with volition, and his suicide, therefore, does not breach the chain of causation."). Moreover, an uncontrollable impulse need not be a "'sudden' impulse." <u>Fuller</u>, 322 N.E.2d at 268; <u>see also</u> <u>Young</u>, 23 F. Supp. 3d at 620 ("[S]everal other courts have declined to require that a suicidal impulse arise suddenly in order to qualify as 'irresistible.'"). Given the variety of ways in which a person's will may be overcome, the court thinks the best definition of an uncontrollable impulse was the one offered by the plaintiff in <u>Orcutt v. Spokane Cty.</u>, who described an uncontrollable impulse as "a force arising within a person, of such violence that that person could not control that force." 364 P.2d at 1107.

It is clear that Dr. Schwartz-Watts's deposition testimony regarding "impulsive"—i.e. quick—decisions and their connection to Wickersham's mood disorder did not preclude the possibility that Wickersham's mind was overtaken by the type of force recognized under the uncontrollable impulse exception. Thus, Dr. Schwartz-Watts's deposition testimony and her subsequently filed affidavit did not create a bona fide inconsistency. When read in the light most favorable to plaintiff, portions of Dr. Schwartz-Watts's testimony actually support her affidavit's conclusion that "[Wickersham] was unable to control his conduct and suicidal thoughts on the day of his death due to his diminished capacity caused by the collision." Schwartz-Watts Aff. ¶ 4. For instance, Dr. Schwartz-Watts testified that the accident caused a significant decrease "in all levels of Wickersham's functioning," Schwartz-Watts Depo. 98:4–10, and highlighted the fact that, in previous instances, Wickersham had been able to manage his suicidal ideations. <u>Id.</u> at 107:6–11, 152:9–153:18. Therefore, the court finds that Dr. Schwartz-Watts's affidavit may be considered in connection with the instant motion, and

that this affidavit, as well as Dr. Scwartz-Watts's deposition testimony, create a genuine issue of material fact as to whether Wickersham's suicide was caused by an uncontrollable impulse.

Accordingly, the court denies Ford's motion for summary judgment as it relates to the issue of proximate cause.

### C.     Punitive Damages

Ford next argues that plaintiff cannot recover punitive damages because there is no evidence that Ford acted with the requisite mental state and any recovery of punitive damages would violate Ford's due process rights.  Def.'s Mot. 13.  Plaintiff argues that, when the evidence is viewed in the light most favorable to her, there is evidence that Ford recklessly failed to account for the type of collision at issue in this case in designing the 2010 Ford Escape's RCM.  Pl.'s Resp. 36.

Punitive damages are available when "the defendant's conduct was so reckless, willful, wanton, or malicious that the defendant should be punished and deterred by requiring him or her to pay money to the plaintiff."  Clark v. Cantrell, 529 S.E.2d 528, 534 (S.C. 2000).  "A tort is characterized as reckless, willful or wanton if it was committed in such a manner or under such circumstances that a person of ordinary reason and prudence would have been conscious of it as an invasion of the plaintiff's rights." Taylor v. Medenica, 479 S.E.2d 35, 46 (S.C. 1996).  "In any civil action where punitive damages are claimed, the plaintiff has the burden of proving such damages by clear and convincing evidence."  S.C. Code Ann. § 15-33-135.

Plaintiff contends that the record contains evidence of Ford's culpable mental state based on deposition testimony from Caruso and Ford's own expert, Ram

25

Krishnaswami ("Krishnaswami"), indicating Ford was aware that a delay of nearly 150 milliseconds between the activation of the seatbelt pretensioners and airbag deployment was unsafe, and it knew other manufacturers conducted tests and calibrated their RCM systems to avoid such delays.  Pl.'s Response 37.  Krishnaswami conceded that if Wickersham's accident occurred as plaintiff's expert opined, then the late airbag deployment increased the risk of injury to Wickersham.  Pl.'s Response Ex. 13, Krishnaswami Depo. 37:14–38:17.  In fact, Krishnaswami indicated that, under such circumstances, a 150 millisecond delay in airbag deployment would go against Ford's own specifications in the calibration report it provided to the developer of the RCM algorithm.  Id. at 27:19–25; see also Caruso Depo. 114:18–118:15 (reviewing and explaining portions of calibration report).  Krishnaswami further admitted that Ford was aware that other manufacturers used an algorithm which raised the airbag deployment threshold as the time between activation of the seatbelt pretensioners and a potential airbag deployment grew.  Id. at 41:10–43:10.  Krishnaswami even indicated that this raised threshold approach was commonly used.  Id. at 42:3–25.

Ford contends that this evidence is insufficient to support punitive damages because it merely goes to the existence of a defect, not a culpable mental state.  Def.'s Reply 13–14.  Ford supports this proposition by citing a section in Branham distinguishing strict-liability claims, which do not require proof of a "fault-based element," from negligence claims, which do.  Branham, 701 S.E.2d at 9.  This simply shows that under one form of liability the defendant's mental state is never relevant.  It does not support Ford's apparent theory that when evidence of the defendant's mental state is relevant to the initial question of liability—i.e. in a negligent design case such as

26

this one—the plaintiff cannot use the same evidence to recover punitive damages.  Ford's assertion that "in South Carolina, 'exemplary damages should not be awarded for mere gross negligence," <u>Stonehocker v. Gen. Motors Corp.</u>, 587 F.2d 151, 158 (4th Cir. 1978), fares no better.  This language distinguishes the degree of mental culpability required for each showing, but it does not say that the same evidence cannot be used to make each showing.  Thus, the fact that Krishnaswami or Caruso's testimony may be used to show the existence of a defect does not have any bearing on whether such testimony may also be used to show that Ford was willful or reckless with respect to that defect.

Ford also argues that this case presents, at most, a reasonable disagreement about the existence of a defect, and that where reasonable minds may disagree on the existence of a defect, punitive damages are unavailable.[9]  Def.'s Mot. 16–18.  Plaintiff contends that if this sort of argument were recognized, then "every defendant could avoid liability for punitive damages simply by hiring an expert."  Pl.'s Response 39–40.  This point is well taken.  Few would doubt that a manufacturer who believed it was subjecting consumers or third parties to unreasonable risks should avoid liability solely because another <u>might</u> conclude that such risks were not unreasonable.

Moreover, the cases Ford cites do not clearly support the categorical approach it proposes.  The Eleventh Circuit opinion in <u>Ivy v. Ford Motor Co.</u>, 646 F.3d 769, 777 (11th Cir. 2011), provides the most support for Ford's position.  In that case, the Eleventh Circuit stated that, under Georgia law, "the case law suggests that the wanton and willful standard is not satisfied where there is a bona fide dispute as to the propriety of the

---

[9]    Ford also notes that the court can look to its compliance with industry standards to find that punitive damages are not warranted.  Def.'s Mot 14–15.  While the court has no doubt that compliance with industry standards is probative of Ford's mental state, the court fails to see how it is dispositive of the issue.

defendant's actions."  Id. at 776–77.  However, the Ivy court also saw fit to distinguish its previous decision in Watkins v. Ford Motor Co., 190 F.3d 1213 (11th Cir. 1999), in which there was evidence the defendant knew of the alleged defect and selected the most inexpensive means of addressing it.  Ivy, 646 F.3d at 775 (citing Watkins, 190 F.3d at 1217).  This distinction suggests that the defendant's own assessment of the risks is a component of "propriety of the defendant's actions," and therefore affects whether a "bona fide dispute" over the reasonableness of a design may preclude a finding of "wanton[ness] or willful[ness]."  Id. at 776–77.  Ford also cites Satcher v. Honda Motor Co., 52 F.3d 1311 (5th Cir. 1995).  However, in that case, the only evidence that a defect even existed came from plaintiff's experts.  Id. at 1316–17.  Unlike in this case, there was no evidence in Satcher that the defendant was aware that other manufacturers were employing an alternative design to address the alleged defect.  See id. at 1317 (noting that "the industry as a whole categorically rejects the need for leg guards").  Similarly in Riley v. Ford Motor Co., 2011 WL 2938107, at *6 (S.D. Miss. July 19, 2011), "the only evidence to support [the] [p]laintiffs' claim for punitive damages [was] the testimony that Ford knew the buckle stalk would bend if enough pressure was applied to it."

Of course, this court is not governed by Eleventh or Fifth Circuit law, so even if these courts did hold that punitive damages were categorically unavailable where there is a "reasonable dispute" over the existence of a defect, these holdings would not be controlling.  Ford cites two cases applying South Carolina law in discussing this issue, Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485 (4th Cir. 2005), and this court's decision in Doe v. Nw. Mut. Life Ins. Co., No. 2:10-cv-2961, 2012 WL 2405510, at *1 (D.S.C. June 26, 2012).  In both cases, the courts analyzed the availability of punitive

damages in bad faith claims against an insurer, which is hardly analogous to the case at hand. See Myrick, 395 F.3d at 493 ("If the insured proves the insurer's conduct was willful or in reckless disregard of his rights under the contract, the insured also may recover punitive damages, but if there is a reasonable ground for contesting a claim, there is no bad faith."); Doe, 2012 WL 2405510, at *9 ("The court has granted summary judgment on plaintiff's negligence claim, therefore plaintiff's punitive damages request hinges on her claim for bad faith.").  More importantly, Myrick and Doe do not support the proposition Ford attempts to advance—that a reasonable dispute over the propriety of the defendant's actions prohibits any finding of willful or reckless disregard of the plaintiff's rights.  Def.'s Mot. 17–18.  Ford's argument involves two "reasonableness" inquiries which must be considered separately.  Plaintiff's negligence claim—like a bad faith claim in an insurance case—first requires a finding that Ford acted "unreasonably" in designing the RCM.  See Madden v. Cox, 328 S.E.2d 108, 112 (S.C. Ct. App. 1985) ("Liability for negligence requires . . . proof that the manufacturer breached its duty to exercise reasonable care to adopt a safe design.").  Ford's argument deals with cases in which there is reasonable disagreement about whether any defect existed—that is, a reasonable disagreement about whether the design was reasonable.  To the extent they are relevant, the insurance cases cited in Ford's brief stand for the proposition that punitive damages are unavailable where the defendant acted reasonably.  Doe, 2012 WL 2405510, at *9 ("If an insured can demonstrate bad faith or unreasonable action by the insurer . . . he can recover consequential damages in a tort action. . . . Further, if he can demonstrate the insurer's actions were willful or in reckless disregard of the insured's rights, he can recover punitive damages." (quoting Nichols v. State Farm Mut. Auto. Ins.

Co., 306 S.E.2d 616, 619 (S.C. 1983)).  This goes to whether any defect exists at all, not

the derivative question of whether there is a reasonable argument that a defect does or

does not exist.  All these cases state is that if the insurer had a reasonable basis for

refusing coverage, there is no bad faith claim, and consequently, no basis for punitive

damages.  This is the equivalent of saying that if Ford's RCM design was not defective,

then there is no basis for punitive damages.  This is of course true, but it has nothing to

do with whether a reasonable dispute over the existence of a defect somehow precludes

any showing of willfulness or recklessness on the part of the defendant.

Ultimately, the cases cited by Ford are simply insufficient to support the

application of a per se bar against punitive damages in cases where there is a genuine

dispute as to the existence of a defect.  The few cases that provide support for this

approach are from courts outside of this circuit.  Even those cases contain some

indication that the court must account for evidence addressing the defendant's mental

state.  Meanwhile, the cases applying South Carolina law simply provide no support for

Ford's position.

The court finds the Southern District of West Virginia's treatment of this issue in

In re C.R. Bard, 2013 WL 2432871, at *9 (S.D.W. Va. June 4, 2013), more illuminating.

In that case, the court held that "[t]he mere fact that there may be a genuine dispute of

material fact as to whether the [] products were defectively designed does not compel the

conclusion that the plaintiffs are not entitled to punitive damages."  Id.  This approach is

consistent with the Fourth Circuit's decision in Harris v. Norfolk S. Ry. Co., 784 F.3d

954, 970 (4th Cir. 2015)—another decision cited by Ford—in which the court found no

evidence to support a plaintiff's punitive damages claims under West Virginia law where

the defendant "was hardly indifferent to the existence of [] defects of the type at issue here."  The court noted that there was no evidence the defendant realized the alleged mistake that led to the defect.  Id.  The Bard court—and, indirectly, the Harris court—both recognized that when there is evidence a defendant consciously disregarded an unreasonable risk, the question of punitive damages may go to the jury.  This view is consistent with South Carolina's rule that punitive damages are available when the defendant's conduct is "reckless, willful, wanton, or malicious."  Clark, 529 S.E.2d at 534.

Here, there is evidence that Ford understood the risks posed by a delayed airbag deployment and was aware of the raised threshold approach in designing the RCM algorithm.  Though Krishnaswami appears to believe the raised threshold approach was used in the 2010 Ford Escape, he is admittedly unable to confirm that belief, Krishnaswami Depo. at 42:3–25, and Caruso has offered his own testimony disputing it.[10] Caruso Report 13; Caruso Depo. 81:7–13.  If the airbag deployment was as late as Caruso believes, that would certainly suggest that the RCM algorithm did not employ the raised threshold approach and that Ford ignored or knowingly accepted the risks posed by a late airbag deployment in certain crashes.  Thus, the court finds that plaintiff has presented evidence that Ford was "reckless, willful, wanton, or malicious," and therefore, liable for punitive damages under South Carolina law.

---

[10]    Ford points out that many of Caruso's statements suggest that Ford was barely negligent and certainly not aware that it was subjecting drivers and passengers to unreasonable risks when it designed the RCM system.  Def.'s Mot. 15–16 (listing statements from Caruso's deposition).  The court has no doubt that plaintiff will have to answer for these statements at trial, but the court does not find that these statements completely undermine any showing of willfulness or recklessness on Ford's part.  Importantly, the court notes that much of the evidence concerning Ford's awareness of the risks comes from Ford's own witness, Krishnaswami, not Caruso.

However, this does not end the punitive damages inquiry. Ford also contends that if it is possible to impose punitive damages in this case, then the law providing for such damages is unconstitutionally vague and violates Ford's due process rights. Def.'s Mot. 18–21. To support this contention, Ford adds a new twist to its previous argument—that a reasonable disagreement over the existence of a defect precludes the imposition of punitive damages—by arguing that any standard that would allow for such recovery fails to provide sufficient notice of the prohibited conduct. Id. at 21. In essence, Ford argues that it in cases where a defendant "lacks notice" that its conduct is unsafe, it is unfair to punish the defendant. Id.

Ford's argument confuses the issue. In a negligence case, whether a defendant was "on notice" that its conduct was unsafe is precisely what determines whether a defect exists—i.e., whether the conduct was prohibited at all. That is the question of reasonableness or ordinary care. The question of punitive damages then turns on a defendant's actual awareness and understanding of that risk—more specifically, the defendant's awareness of whether the risk was unreasonable. See Taylor, 479 S.E.2d at 46 ("A conscious failure to exercise due care constitutes willfulness." (emphasis added)). Adopting Ford's phrasing of the issue in terms of notice, one might say the availability of punitive damages turns on whether the "notice" of unreasonableness was "actual" or "constructive." Thus, the inquiries are very different: one addresses what a defendant should know and the other addresses what the defendant did know.[11] Accordingly, the

---

[11] In some instances, the inquiry may be more complicated, such as where "the wrongdoer does not actually realize that he is invading the rights of another, [but] the act is committed in such a manner that a person of ordinary prudence would say that it was a reckless disregard of another's rights." Atlas Food Sys. & Servs. v. Crane Nat'l Vendors, 99 F.3d 587, 599 (4th Cir. 1996). However, these complications do not appear present on the current record, and the court declines to speculate on the constitutional merits of hypothetical cases.

standard is clear: a defendant may not knowingly allow, or consciously disregard, unreasonable risks.  This inquiry is only indirectly informed by possible disputes over the reasonableness of a given risk.

Therefore, the court finds that South Carolina's punitive damages law is not unconstitutionally vague and denies Ford's motion for summary judgment on the issue of punitive damages.

## IV.   CONCLUSION

For the foregoing reasons, the court **GRANTS** Ford's motion with respect to plaintiff's failure to warn claim, and **DENIES** the remainder of Ford's motion for summary judgment.

**AND IT IS SO ORDERED**.

**DAVID C. NORTON
UNITED STATES DISTRICT JUDGE**

**July 9, 2016
Charleston, South Carolina**