**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**BEAUFORT DIVISION**

| | | |
|---|---|---|
| CRYSTAL L. WICKERSHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 9:13-cv-1192-DCN |
| | ) | |
| FORD MOTOR COMPANY , | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| CRYSTAL L. WICKERSHAM, as Personal | ) | |
| Representative of the Estate of John Harley | ) | |
| Wickersham, Jr., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 9:14-cv-0459-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| FORD MOTOR COMPANY , | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

The following matter is before the court on defendant Ford Motor Company's ("Ford") motion in limine to exclude causation opinions by plaintiff Crystal L. Wickersham's ("plaintiff") expert, Dr. Judith Skoner ("Skoner").  ECF No. 87.[1]  The court denied Ford's motion at a pre-trial hearing on August 10, 2016, and denied Ford's related motion for a mistrial on August 16, 2016.  ECF Nos. 115, 118.  This order further explains the reasoning underlying the court's rulings.[2]

_____

[1] All ECF Number citations refer to the ECF Number listed under Case Number 9:13-cv-1192.

[2] Because this order is meant to supplement the court's ruling on Ford's motion in limine, it addresses the matter from the court's perspective at the time it made its initial ruling.  Therefore, while the trial has now concluded, this order will discuss the matter as though the trial had not yet begun.

# I.  BACKGROUND

On February 3, 2011, John Harley Wickerhsam, Jr. ("Wickersham") was involved in a single car accident while driving a 2010 Ford Escape.  Wickersham suffered numerous permanent injuries from the crash, which led to continuous, extreme pain. Wickersham committed suicide on July 21, 2012.  Plaintiff alleges that the 2010 Ford Escape was equipped with a defective crash sensor system, which improperly deployed the vehicle's airbag, causing Wickersham's injuries and eventual suicide.

Plaintiff plans to offer Skoner, Wickersham's treating otolaryngologist,[3] as an expert in this case.  Skoner performed a series of surgeries to treat Wickersham's facial injuries in the months following the accident and continued to follow up with him until December 2011.  Def.'s Mot. 3.  During Skoner's May 21, 2015, deposition, she offered opinions on the cause of Wickersham's facial injuries.  Id.; Pl.'s Resp. 3.  Specifically, Skoner opined that Wickersham's injuries were consistent with, and most likely caused by, an impact with the vehicle's airbag.  Pl.'s Resp. Ex. 1, Skoner Dep. 65:11–18, 66:20–67:1.  Ford objected to this testimony at the time of Skoner's deposition.  Id. at 52:5, 52:24.

On July 22, 2016, Ford moved, pursuant to Federal Rule of Civil Procedure 26(a)(2), Federal Rules of Evidence 702 and 703, and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), to exclude Skoner's causation opinions and testimony. Plaintiff filed a response on August 5, 2016.  The court denied this motion at a hearing on August 10, 2016.  The court now offers this written order to clarify the reasoning underlying that decision.

---

[3] "Otolaryngology comprises the pathology of the head and neck, excluding the (eye) globes, brain, and spine."  Def.'s Mot. 3.

## II.  STANDARDS

### A.     Motion in Limine

 The purpose of a motion in limine is to obtain a preliminary ruling on the admissibility of a particular evidentiary matter.  Luce v. United States, 469 U.S. 38, 40 n.2 (1984).  A court will exclude evidence on a motion in limine only if the evidence is "clearly inadmissible for any purpose."  Hall v. Sterling Park Dist., 2012 WL 1050302, at *2 (N.D. Ill. Mar. 28, 2012).

### B.     Daubert and Rule 702

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

District courts serve as gatekeepers for expert testimony.  The court has a "special obligation" to ensure that expert testimony is relevant and reliable.  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999).

Under Daubert, the court must address two questions:  first, whether the expert's testimony is based on "scientific knowledge"; and second, whether the testimony "will assist the trier of fact to understand or determine a fact in issue."  509 U.S. at 592.  The first question is answered by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid."  Id. at 592–93.  Several factors should be

considered when determining the reliability of a particular scientific theory or technique:
whether it (1) can be and has been tested; (2) has been subjected to peer review and
publication; (3) has a known or potential rate of error; and (4) has attained general
acceptance in the pertinent scientific community.  See id. at 593–94.  In considering these
factors, the focus "must be solely on principles and methodology, not on the conclusions
that they generate."  Id. at 595.  These factors are not exclusive; what factors are relevant
to the analysis "depends upon the particular circumstances of the particular case at issue."
Kumho Tire, 526 U.S. at 150.

The second inquiry "goes primarily to relevance."  Daubert, 509 U.S. at 591.
Relevance is determined by ascertaining whether the testimony is sufficiently tied to the
facts of the case such that it will aid the jury in resolving a factual dispute.  Id. at 593.  "A
review of the caselaw after Daubert shows that the rejection of expert testimony is the
exception rather than the rule."  Fed. R. Evid. 702 advisory committee's note to 2000
amendments.  "Daubert did not work a 'seachange over federal evidence law,' and 'the
trial court's role as gatekeeper is not intended to serve as a replacement for the adversary
system.'"  Id. (quoting United States v. 14.38 Acres of Land Situated in Leflore Cnty., 80
F.3d 1074, 1078 (5th Cir.1996)).

### III.  DISCUSSION

Ford contends that Skoner's causation opinions should be excluded because
(1) plaintiff failed to disclose Skoner as an expert witness, or provide a report or
summary of her opinions, (2) Skoner is not qualified to opine on the cause of
Wickersham's injuries, (3) any such opinions would not be based on sufficient facts or
data reasonably relied on by experts in the field, (4) any such opinions would be

unreliable under <u>Daubert</u>, and (5) offering any such opinions would be cumulative. Def.'s Mot. 2.  The court addresses each argument in turn.

### A.     Failure to Disclose Under Rule 26(a)(2)(B)

Ford first argues that plaintiff failed to disclose Skoner as an expert and provide an expert report as required by Federal Rule of Civil Procedure 26(a)(2)(B).  Def.'s Mot. 5.  Plaintiff contends that she was not required to disclose Skoner as an expert or provide an expert report because Skoner was Wickersham's treating physician.  Pl.'s Resp. 4–5.

Treating physicians generally do not have to comply with the requirements of Rule 26(a)(2)(B).  <u>See, e.g.</u>, <u>Perkins v. United States</u>, 626 F. Supp. 2d 587, 590 (E.D. Va. 2009) ("In general, a treating physician is not a specially retained expert.").  However, "[w]hen the treating physician goes beyond the observations and opinions obtained by treating the individual and expresses opinions acquired or developed in anticipation of trial, then the treating physician steps into the shoes of an expert who may need to provide a Rule 26(a)(2)(B) report."  <u>Indem. Ins. Co. of N. Am. v. Am. Eurocopter LLC</u>, 227 F.R.D. 421, 423–24 (M.D.N.C. 2005).  Some courts have suggested that a treating physician may not venture into areas of "classic expert opinion regarding causation and prognosis" without providing a Rule 26(a)(2)(B) disclosures.  <u>See Nat'l R.R. Passenger Corp. v. Ry. Express, LLC</u>, 268 F.R.D. 211, 216 (D. Md. 2010) ("[A] party may not circumvent the requirements of Rule 26 by employing a witness, like a treating physician who treated an injured party, to provide testimony extending into classic expert opinion regarding causation and prognosis."); <u>Indem. Ins. Co. of N. Am.</u>, 227 F.R.D. at 424 ("[I]f a treating physician forms an opinion of the causation of an injury during the ordinary treatment of the patient, then the physician may express this opinion without disclosing a

written report.").  Other courts—including many in the Fourth Circuit—have ruled that "if [a] treating physician's testimony is based on his or her treatment of a party, then no Rule 26(a)(2)(B) report is required."  See Marr v. Abercrombie & Fitch Stores, Inc., if , at *3 (E.D.N.C. June 19, 2015) (collecting cases).

The court finds the latter approach superior, as it appears to have more support in this circuit and accords with the advisory committee's notes to Rule 26, which recognize that "[a] treating physician . . . can be deposed or called to testify at trial without any requirement for a written report."  Fed. R. Civ. P. 26(a)(2) advisory committee's note to 1993 amendments; Drennen v. United States, 375 F. App'x 299, 307 (4th Cir. 2010) ("As a treating physician, Dr. Wolfe was not retained or specially employed to provide expert testimony in this case.  The note accompanying the 1993 amendments to Rule 26 confirms that this is the proper interpretation of Rule 26."); see also Kobe v. Haley, No. 3:11-cv-1146, 2013 WL 4067921, at *3 (D.S.C. Aug. 12, 2013) ("[I]f a physician's opinion regarding causation or any other matter was formed and based on observations made during the course of treatment, then no Subsection B report is required." (quoting Kondragunta, 2013 WL 1189493, at *12)).

In this case, nothing suggests Skoner arrived at her opinion through anything other than the ordinary course of treatment.  Ford argues that Skoner has admitted that her opinions fall beyond her treatment of Wickersham, Def.'s Mot. 6, but this argument twists the rule.  The fact that an opinion is "beyond" a physician's treatment, inasmuch as it is not an opinion the physician is required to make in the course of treatment, does not mean it was not based on observations made during the course of treatment.  Kobe, 2013 WL 4067921, at *3.  An opinion is "based on" treatment where the physician acquires the

information used in forming the opinion through treatment.  Skoner testified that her opinion is based on the nature of Wickersham's injuries and the information he provided about the accident.  Skoner Dep. 63:2–67:1.  All of this information was acquired during the normal course of treatment.  Therefore, the court finds that plaintiff was not required to provide Rule 26(a)(2)(B) disclosures for Skoner.

### B.    Failure to Provide Summary Under Rule 26(a)(2)(C)

Ford next argues that, regardless of whether Rule 26(a)(2)(B) applies, plaintiff was at least required to provide a "summary of the facts and opinions to which the witness is expected to testify" under Rule 26(a)(2)(C).  Def.'s Mot. 5.  Plaintiff does not dispute this requirement and admits she did not provide any such summary.  Pl.'s Resp. 5.  However, plaintiff argues that she substantially complied with Rule 26(a)(2)(C) because she learned of Skoner's causation opinions at the same time Ford did, at Skoner's deposition on May 21, 2015.  Id. at 5–8.  During that deposition, plaintiff sought to have Skoner admitted as an expert, to which Ford had no objection, and went on to question her on the newly offered causation opinions.  Skoner Dep. 8:3–7, 50:16–21, 69:24–70:25.

"Rule 37(c)(1) provides that '[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial . . . any witness or information not so disclosed.'"  S. States Rack And Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 595 (4th Cir. 2003) (quoting Fed. R. Civ. P. 37(c)(1)).  This language clearly recognizes the possibility that

such failure might be excused when it is "substantial[ly] justif[ied]." Id. The court has wide discretion in making this determination. Id.

> [I]n exercising its broad discretion to determine whether a nondisclosure of evidence is substantially justified or harmless for purposes of a Rule 37(c)(1) exclusion analysis, a district court should be guided by the following factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

Id. at 597.

Applying these factors to Skoner's proposed testimony, Ford has little reason to be surprised since it learned of Skoner's causation opinions, and plaintiff's intention to present testimony on those opinions, on May 21, 2015—well over a year before trial— and could certainly have cured any surprise in the time since. See Def.'s Mot. 2 (explaining that, "[b]ased on her deposition testimony, Ford anticipates that Dr. Skoner will offer certain expert testimony, including causation opinions"). Moreover, plaintiff appears to have a reasonable explanation for failing to disclose the Skoner's causation opinions—namely, she was unaware they even existed. Pl.'s Resp. 5. Finally, Ford has presented nothing to suggest that allowing Skoner's testimony would disrupt the trial. Though the importance of causation evidence might suggest Skoner's opinions should have been disclosed in a formal, Rule 26(a)(2)(C) summary, the court finds that the other four factors outweigh this importance.[4] Therefore, the court declines to exclude Skoner's testimony based on plaintiff's failure to comply with Rule 26(a)(2)(C).

---

[4] The Southern States court recognized that the "importance of the evidence" factor is somewhat ambiguous because it "must be viewed from the perspective of both parties." Southern States, 318 F.3d at 598 (quoting S. States Rack & Fixture, Inc. v. Sherwin-Williams Co., 212 F.R.D. 489, 494 (D.S.C. 2001)). While the party seeking to exclude important evidence would likely argue that the importance of the evidence makes

### C.     Qualifications under Rule 702

Ford next contends that Skoner's qualifications as an otolaryngologist do not qualify her to testify about the mechanism that caused Wickersham's injuries. Def.'s Mot. 8–9.

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

"[A] witness['s] qualifications to render an expert opinion are [] liberally judged by Rule 702.  Inasmuch as the rule uses the disjunctive, a person may qualify to render expert testimony in any one of the five ways listed:  knowledge, skill, experience, training, or education."  Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir. 1993).  "Accordingly, a challenge based on lack of qualifications alone must demonstrate that 'the purported expert [has] neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered.'"  SAS Inst., Inc. v. World Programming Ltd., 125 F. Supp. 3d 579, 586 (E.D.N.C. 2015) (quoting Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 799 (4th Cir. 1989)).  "If, again in the disjunctive, the

---

it especially crucial to disclose such evidence in a timely manner, the party seeking to admit such evidence doubtlessly views the importance of the evidence as a factor that justifies overlooking disclosure requirements.  Thus, it is not even clear that this factor weighs in favor of exclusion.

proposed testimony will recount or employ 'scientific, technical, or other specialized knowledge,' it is a proper subject." <u>Kopf</u>, 993 F.2d at 377.

Ford highlights certain testimony from Skoner's deposition where she admits she lacks expertise in determining the specific cause of facial injuries. Def.'s Mot. 9. Because Skoner has "no background in biomechanics, occupant kinematics, human tolerances, injury causation, accident reconstruction, vehicle dynamics, physics, or engineering," Ford argues she is unqualified to testify on the issue of causation. <u>Id.</u> Meanwhile, plaintiff highlights portions of the same testimony in which Skoner explains that the specific types of injuries Wickersham suffered are consistent with airbag injuries she has encountered in her past experience and studied in the relevant medical literature. Pl.'s Resp. 9–10. This testimony reveals that Skoner's causation opinion is not based on her application of biomechanics, accident reconstruction, or any other engineering-based field of knowledge. Instead, Skoner's causation opinion is derived from her understanding of the precise injuries Wickersham suffered, together with her experience and the medical literature associating such injuries with bilateral, frontal impact mechanisms, such as airbags. Skoner Dep. 26:7–11 (stating that Le Fort fractures are, in Skoner's experience, caused by frontal impacts); 50:22–51:14 (explaining that in Skoner's experience and the relevant medical literature, midface, bilateral fractures are associated with airbags); 55:17–23 (noting experience treating facial trauma and facial fractures caused by airbags); 63:2–23 (explaining that Wickersham's injuries would require an impact from something "that would be big enough and sort of uniform enough to hit both sides of the face simultaneously").

Although Skoner does not possess the engineering-based knowledge Ford's experts used to determine the cause of Wickersham's injuries, she is unquestionably qualified as an expert in the medical field and, more specifically, in diagnosing the specific types of injuries Wickersham suffered. These are unquestionably areas of "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702. It is also clear that Skoner's testimony "recount[s] or employ[s]" such knowledge, Kopf, 993 F.2d at 377. This is all that is required to be "qualified" under Rule 702.[5] Id. Therefore, the court finds that Skoner is qualified to offer her causation opinion testimony.

### D.     Reliability Under Rule 702

Ford next argues that Skoner's opinions are not reliable under Rule 702.[6] Def.'s Mot. 10–14. Ford relies primarily on Perkins, 626 F. Supp. 2d 587, and Bowers v. Norfolk S. Corp., 537 F. Supp. 2d 1343, 1365 (M.D. Ga. 2007), aff'd, 300 F. App'x 700

---

[5] Much of Ford's argument on this issue rests on the assumption that one cannot determine the cause of Wickersham's injuries using the type of medical knowledge Skoner employed in her analysis. The court thinks this argument is most squarely addressed under the issue of "reliability," not qualification. There is no real question that if Skoner's medicine-based methodology is reliable, then she is qualified to apply it.

[6] Ford also cites Rule 703 to argue that Skoner's opinions were not based on materials "that are 'reasonably relied upon by experts in the particular field.'" Def.'s Mot. 10–11 (quoting Fed. R. Evid. 703). This argument appears to echo many of Ford's concerns with the underlying reliability of Skoner's methodology. However, to the extent it is meant as an independent argument, it must also fail. "Rule 703 provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" Daubert, 509 U.S. at 595 (quoting Fed. R. Evid. 703). Though Skoner may not have considered the detailed physics of the accident or conducted an examination of the vehicle, these are not exercises an otolaryngologist would normally conduct. Having determined that Skoner's expertise in otolaryngology qualified her to provide an opinion in this case, otolaryngology is the "relevant field" that must be considered under Rule 703. See Montefiore Med. Ctr. v. Am. Prot. Ins. Co., 226 F. Supp. 2d 470, 475 (S.D.N.Y. 2002) (finding expert's testimony admissible where he relied on "sources of information [that] appear to be of the type reasonably relied upon by experts in his field") (emphasis added).

(11th Cir. 2008), to argue that Skoner (1) developed her opinions for the purposes of this litigation, (2) made no attempt to investigate alternative causes, (2) formed her opinion using a "vague and imprecise" theory, and (5) impermissibly relied on Wickersham's account of the accident in forming her causation opinion. Id. at 13.

Pursuant to Rule 702 and Daubert, the court is tasked with the "gatekeeping role" of ensuring that all expert evidence is sufficiently reliable and relevant. Daubert, 509 U.S. at 597; Kumho Tire, 526 U.S. at 147 (holding that Daubert's gatekeeping requirement applies to all expert testimony). The court's inquiry into an expert's reliability "is 'a flexible one' focusing on the 'principles and methodology' employed by the expert, not on the conclusions reached." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999) (quoting Daubert, 509 U.S. at 594–95). As noted above, Daubert identified four factors a court may consider in assessing the reliability of an expert's testimony. These factors are:

> (1) whether the expert's theory or technique can be, and has been, tested;
> (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error when the technique or theory is applied; (4) whether the theory or technique enjoys "general acceptance" in the relevant community

Daubert, 509 U.S. at 593–94. However these factors are not exclusive. Courts "ha[ve] broad latitude to consider whatever factors bearing on validity that the court finds to be useful; the particular factors will depend upon the unique circumstances of the expert testimony involved." Westberry, 178 F.3d at 261. To this end, courts have often considered certain additional factors, such as whether the expert's analysis leaves unexplained analytical gaps and whether the expert has reasonably accounted for alternative explanations. See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1996); Claar v. Burlington N. R.R. Co., 29 F.3d 499, 502–03 (9th Cir.1994).

In assessing Skoner's reliability, the court first observes that her methodology bears strong resemblance to a technique known as "differential diagnosis."

> Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated. A reliable differential diagnosis typically, though not invariably, is performed after "physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests," and generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely.

Westberry, 178 F.3d at 262. The Fourth Circuit has recognized that differential diagnosis "has widespread acceptance in the medical community, has been subject to peer review, and does not frequently lead to incorrect results." Id. (In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 758 (3d Cir. 1994)). Therefore, "a reliable differential diagnosis provides a valid foundation for an expert opinion." Id. at 263.

Skoner's methodology utilized the same basic principles as a differential diagnosis, inasmuch as she evaluated potential causal mechanisms in terms of their likelihood to produce the particular injuries Wickersham suffered. See Skoner Dep. 65:11–18 (stating that, based on the available information, her experience, and the available literature, Wickersham's injuries were "very consistent" with an airbag impact); see also Skoner Dep. 51:25–52:20 (explaining that an impact with the gearshift lever would be unlikely to produce the sort of severe bilateral injuries Wickersham suffered); Skoner Dep. 64:20–23 (explaining that Wickersham did not have injuries to the mandible that—in her experience—typically accompany a dashboard or steering wheel impact). Still, Skoner did not engage in a formal differential diagnosis. She did not attempt to catalogue every component of Wickersham's vehicle that might possibly have caused his

13

injuries.  Skoner Dep. 63:25–64:3.  It is also not clear whether she reviewed

Wickersham's entire medical history or conducted any clinical or laboratory tests.

However, given the particular circumstances of this case, these departures from the

idealized differential diagnosis do not render Skoner's methodology unreliable.

It is important to recognize that this is not a case where the universe of possible

causes is particularly large.  There is no question that Wickersham's injuries were caused

by an impact he sustained during the accident.  Because this much is established, the jury

will only need to consider potential causal mechanisms located inside of Wickersham's

vehicle.  Indeed, Ford has only identified one mechanism other than the airbag that could

have caused Wickersham's injuries—the gearshift lever.  See ECF No. 26-3, Scott Report

17–18 (opining that Wickersham's injuries were caused by "[t]he gearshift lever

impact[ing] the left side of [his] head" and later "mov[ing] further into his face").  Thus,

in the particular circumstances of this case, the jury will be tasked with a choice between

plaintiff's airbag theory and Ford's gearshift lever theory.  Id.  The court must analyze

each of Ford's arguments within this context.  Kumho Tire, 526 U.S. at 150.

Ford first relies on the Bowers decision to argue that Skoner's causation opinions

are unreliable because they were formed in the context of this litigation.  Def.'s Mot. 12–

13.  The Bowers court excluded the causation testimony of a treating physician after

determining that the proposed testimony "did not form his causation opinions

independent of the litigation."  Bowers, 537 F. Supp. 2d at 1364.  It is true that Skoner's

causation opinions were, in some sense, formed for the purposes of this litigation,

inasmuch as she did not need to form such an opinion to treat Wickersham.  Skoner Dep.

53:9–13.  However, Skoner possessed most, if not all, of the information she used to

14

develop her causation opinions at the time of Wickersham's treatment, well before this litigation arose. Skoner Dep. 63:2–67:1 (illustrating that opinion based on nature of Wickersham's injuries, Skoner's knowledge and experience, Skoner's review of medical literature, and Wickersham's account of the accident). She may well have actually formed her opinions at that time and simply not discussed them. The court thinks this point significantly distinguishes this case from Bowers. In Bowers, the physician-expert not only treated the plaintiff after the litigation had already commenced, but was "hand-selected" by plaintiff's counsel. 537 F. Supp. 2d at 1364. The Bowers court specifically noted that this was the most significant factor it considered in finding that the expert's causation opinion "lack[ed] an independent basis." Id. Thus, while this case may be somewhat analogous to Bowers, the court finds the analogy rather weak.

Ford next argues that Skoner "made no attempt to investigate other potential causes of Wickersham's injuries."[7] Def.'s Mot. 13. Again, the court finds the law governing the use of differential diagnoses instructive. The Forth Circuit has explained that

---

[7] Ford also argues that Skoner "lacks specific information about the motor vehicle accident that [is] important in correlating Wickersham's injuries to a specific component." Def.'s Mot. 13. Ford highlights the fact that Skoner

> has not done any testing and has no knowledge of the specifics of the accident, such as speed, force, or velocity[,] has no knowledge of Wickersham's movement in the vehicle during [the] accident[, and] did not inspect the subject vehicle to look for any witness marks [or] . . . conduct any surrogate work with an exemplar vehicle.

Id. at 11. As described above, Skoner's analysis relied on an assessment of each mechanism's ability to cause Wickersham's injuries, not physical evidence from the vehicle itself or a recreation of the accident event. Thus, while much of the information Ford identifies might have been helpful in differentiating between possible causes, it was not essential to Skoner's analysis. Again, the crucial question is whether that analysis was reliable. If it was, the Skoner's failure to utilize this information is inconsequential.

[a] medical expert's opinion based upon differential diagnosis normally should not be excluded because the expert has failed to rule out every possible alternative cause of a plaintiff's illness. In such cases, the alternative causes suggested by a defendant normally affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony. However, a "differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation." Thus, if an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony.

Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 202 (4th Cir. 2001 (quoting Westberry, 178 F.3d at 265).

Skoner concedes that she did not "analyze[] other potential mechanisms inside a vehicle" that could have caused Wickersham's injuries. Skoner Dep. 63:25–64:3. However, a closer review of Skoner's testimony reveals that even if she did not "analyze" or "investigate" such mechanisms, her methodology most certainly accounted for them. During her deposition, she addressed various alternative causal theories—including Ford's gearshift lever theory—and in each instance, provided an explanation for why Wickersham's injuries were inconsistent with such theories. Skoner Dep. 51:25–52:20 (explaining that impact with gear shift would be unlikely to produce severe bilateral injuries such as Wickersham's); Skoner Dep. 64:20–23 (explaining that Wickersham did not have injuries to the mandible that, in her experience, typically accompany a dashboard or steering wheel impact). Importantly, these explanations were based on her expert knowledge and experience, not her "categorical[] dismiss[al]" of conflicting evidence. Cf. Perkins, 626 F. Supp. 2d at 594 (excluding expert testimony of treating physician who "categorically dismissed" or ignored evidence of pre-exisinting conditions and did not explain how he ruled out such an "obvious alternative explanation" for plaintiff's injuries). Thus, Skoner has succeeded in offering an explanation for why

Ford's proffered alternative causes were not the true cause of Wickersham's injuries. This is sufficient under Cooper, 259 F.3d at 202, especially given the limited universe of possible causes presented in this case.

Ford next argues that Skoner offers a "vague and imprecise" opinion that "airbags cause bilateral facial injuries." Def.'s Mot. 13. Ford bases this argument on language from Bowers, where the court excluded a treating physician's causation opinion because it was based on the "vague and imprecise" premise that "vibration can cause injury." 537 F. Supp. 2d at 1365. Two points distinguish Bowers on this issue.

First, the court notes that Skoner's "theory"—as Ford characterizes it—is not nearly as "vague and imprecise" as the theory addressed in Bowers. In Bowers, the court addressed an expert's theory that "vibration can cause injury." Id. This theory does not specify any particular source of vibration or type of injury. Id. Even if one accepts Ford's characterization of Skoner's testimony as "airbags cause bilateral facial injuries," this theory still identifies a particular source and type of injury. Def.'s Mot. 13. Significantly, these specifications are crucial to Skoner's conclusion because they help explain why the airbag, and not some other mechanism, caused Wickersham's injuries. Thus, Skoner's testimony would not reach the level of "imprecision" at issue in Bowers, even if it were otherwise comparable.

Second, the "vague and imprecise" argument in Bowers was directed at the reasoning underlying the expert's opinion, not the opinion itself. See id. ("Dr. Miller's opinions are based on the premise that vibration can cause injury.") (emphasis added). The Bowers court found that the expert's rationale simply did not provide enough support for the expert's ultimate conclusion. See id. (finding that expert "unjustifiably

17

extrapolated from an accepted premise to an unfounded conclusion." (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments)). In contrast, Ford's argument appears to attack Skoner's actual conclusion. See Def.'s Mot. 13 ("Dr. Skoner's causation opinion: 'airbags cause bilateral facial injuries' is vague and imprecise.").

To the extent Ford is attacking the rationale underlying Skoner's opinion, Ford has not challenged Skoner's assertion that the relevant medical literature and her own experience indicate that airbag impacts cause the sorts of injuries Wickersham suffered. Though Ford bemoans Skoner's inability to "quantify" her opinion by specifying the precise "magnitude or direction" of the forces that caused Wickersham's injuries,[8] Def.'s Mot. 13, this argument incorrectly assumes that an expert must be able to identify the source of a plaintiff's injuries with numerical precision. There is nothing in Daubert that requires an expert to rely on a "quantifiable theory."[9] Cf. Daubert, 509 U.S. at 594 ("The inquiry envisioned by Rule 702 is, we emphasize, a flexible one."). Here, Skoner's opinion relies on a qualitative assessment of Wickersham's injuries and her knowledge of the types of injuries that would be caused by airbag impacts and other components inside the vehicle. Skoner Dep. 65:11–18, 51:25–52:20, 64:20–23. Because this qualitative

---

[8] The court notes that Skoner did offer an opinion on the direction of the force that caused Wickersham's injuries, though she did not "quantify" that direction. Skoner Dep. 52:1–20.

[9] Ford's "quantifiable theory" requirement has been expressly rejected in toxic exposure cases, in which courts recognize that "precise information concerning the exposure necessary to cause specific harm to humans and exact details pertaining to the plaintiff's exposure are beneficial, [but] such evidence is not always available, or necessary," to establish causation. Westberry, 178 F.3d at 264. Though this is not a toxic exposure case and the reasons for rejecting such a quantification requirement in such cases do necessarily not apply here, the court finds that such cases at least demonstrate that quantification is not an essential element of reliability under Daubert.

assessment rationally explained Skoner's conclusion, the court finds that it was not unduly "vague and imprecise."

Ford last argues that Skoner's opinions are unreliable because they are based on Wickersham's own account of the accident. Def.'s Mot. 10, 13. Ford relies on the Perkins and Bowers decisions to argue that such reliance demonstrates the absence of the "intellectual rigor" Skoner would use in her actual practice. Id. at 13 ("In the course of her medical practice, she would never diagnose a patient based only on a patient's narrative without further evaluation or testing to independently confirm a patient's self-reported diagnosis."). Plaintiff argues that Skoner relied on a whole host of information ordinarily used by physicians in her field. See Pl.'s Resp. 15 (noting that Skoner's "methodology included conducting a physical examination, medical testing such as x-rays and CT scans, consideration of the patient's medical history and injury account, and consideration of medical literature, journals, and her medical knowledge and experience").

The court finds that Ford overstates Skoner's reliance on Wickersham's account of the accident. There are certainly portions of Skoner's deposition that suggest she placed some reliance on Wickersham's account in reaching her conclusion. See Skoner Dep. 62:16–23 (explaining that Skoner did not receive any information about the accident other than what Wickersham told her); 65:11–13 ("I think [Wickersham's injury is] consistent with the airbag. And I think, given what he hold me, I would say it most likely is [the airbag] . . . ."). However, Skoner cannot be said to have "simply [taken] [Wickersham's] word for what happened and adopted that explanation as his own opinion on causation." Perkins, 626 F. Supp. 2d at 593 (quoting Bowers, 537 F. Supp. 2d at

1357).  Skoner first noted that Wickersham was "lucid" when he gave his description and, more importantly, she took Wickersham's description into account because it was consistent with her other findings.  Skoner Dep. 66:20–25 (explaining that, based on experience and the relevant medical literature, Wickersham's injuries were "certainly" consistent with airbag injuries, "[a]nd since [Wickersham] was lucid and told [Skoner] what happened," she opined that the airbag probably did cause his injuries).  Thus, Wickersham's personal account of the accident was not a crucial part of Skoner's opinion.  At most, it was used to corroborate Skoner's medical and experience based evidence.  The court does not find this use of Wickersham's statements so unreliable as to warrant exclusion of Skoner's testimony under <u>Daubert</u>.

Ultimately, Skoner employed well-established medical principles to assess Wickersham's injuries and utilized her knowledge of such injuries to conclude that they were consistent with an airbag impact.  Though Skoner's methodology may have lacked some of the formality of a true "differential diagnosis," the court finds that the particular circumstances of this case considerably narrow the "analytical gap" she must traverse to conclude that Wickersham's injuries were most likely caused by an airbag impact.  Therefore, the court finds Skoner's causation opinions to be reliable under <u>Daubert</u>.

E.    **Cumulative Under Rule 403**

Finally, Ford contends that Skoner's testimony would be cumulative under Rule 403 because plaintiff already plans to offer the expert testimony of Kelly Kennett ("Kennett") on the issue of causation.  Def.'s Mot. 14.  "Federal Rule of Evidence 403 provides that the court may exclude evidence if its probative value is 'substantially outweighed' by a danger of 'needlessly presenting cumulative evidence.'"  <u>Hulsey v.</u>

HomeTeam Pest Def. LLC, No. 2:10-cv-03265-DCN, 2012 WL 2366385, at *3 (D.S.C. June 21, 2012) (quoting Fed. R. Evid. 403). Skoner and Kennett both address the issue of causation, but that does not make their testimony "needlessly cumulative." The causation issue is a highly contested and critical component of this case. This fact alone is sufficient to dispose of Ford's Rule 403 argument. See id. (denying motion to exclude expert testimony as "needlessly cumulative" were two experts both addressed "highly contentious issues").

More importantly, Skoner and Kennett do not apply the same analysis. As outlined above, Skoner approaches the issue from a medical perspective, deriving her causation opinion from her diagnosis of Wickersham's injuries. See Skoner Dep. 65:11–18 (stating that, based on the available information, her experience, and the available literature, Wickersham's injuries are "very consistent" with an airbag impact). In contrast, Kennett uses an engineering and biomechanical approach. See ECF No. 43-6, Kennett Report 2–6 (deriving causation opinion from accident reconstruction and analysis of the subject vehicle). Thus, Skoner and Kennett's opinions are only "cumulative" in the sense that they offer the same conclusion. Not only is this overlap quite marginal, it actually enhances each opinion's probative value. If multiple modes of inquiry support a particular factual assertion, one can be more confident that one is not being fooled by some flaw in the inquiry. Thus, one can be more confident that the factual assertion is true. Because the issue of causation is so important in this case, the overlap between each expert's testimony is rather small, and each expert's testimony actually enhances the probative value of the other's, the court finds that Skoner's testimony is not "needlessly cumulative" under Rule 403.

## IV.   CONCLUSION

For the foregoing reasons, the court **DENIES** Ford's motion to exclude.

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**September 26, 2016**
**Charleston, South Carolina**