**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION**

| | | |
|---|---|---|
| CRYSTAL L WICKERSHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 9:13-cv-1192-DCN |
| | ) | |
| FORD MOTOR COMPANY | ) | |
| | ) | |
| Defendant. | ) | |
| ————————————————— | ) | |
| CRYSTAL L WICKERSHAM, as Personal | ) | |
| Representative of the Estate of John Harley | ) | |
| Wickersham, Jr., | ) | |
| Plaintiff, | ) | |
| | ) | No. 9:14-cv-0459-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| FORD MOTOR COMPANY | ) | |
| | ) | |
| Defendant. | ) | |
| ————————————————— | ) | |

The following matters are before the court on defendant Ford Motor Company's

("Ford") motion for judgment as a matter of law, ECF No. 131,[1] motion for a new trial,

ECF No. 132, and motion to alter the judgment, ECF No. 130. For the following reasons,

the court denies Ford's motions.

## I.  BACKGROUND

On February 3, 2011, decedent John Harley Wickersham, Jr. ("Wickersham") was

involved in a single-car accident while driving a 2010 Ford Escape (the "Escape").

Wickersham suffered numerous permanent injuries from the crash, which produced

continuous, extreme pain. Wickersham committed suicide on July 21, 2012. Plaintiff

---

[1] All ECF Nos. refer to Case No. 9:14-cv-0459-DCN.

Crystal L. Wickersham ("plaintiff"), acting as the personal representative of Wickersham's estate and in her individual capacity, brought a survival action and wrongful death action against Ford. Plaintiff alleged that Ford was responsible for Wickersham's injuries, and eventual suicide, because of a design defect in the Escape's restraint system, and sought recovery on theories of negligence, strict liability, and breach of warranty.

On August 26, 2016, after a ten-day trial, the jury returned a verdict in plaintiff's favor, finding that the Escape was defective and that this defect was the cause of Wickersham's injuries and eventual suicide. Specifically, the jury found Ford liable under each of plaintiff's theories of recovery, and awarded the following damages with respect to Wickersham's injuries: (1) $1,250,000 to Wickersham's estate for Wickersham's pain and suffering between the time of the accident and the time of his death; and (2) $650,000 to plaintiff, in her individual capacity, for loss of consortium during the same time period. The jury further found that Wickersham suffered an "uncontrollable impulse to commit suicide" and that Ford's wrongful conduct was a proximate cause of that impulse. The jury awarded: (1) $1,375,00 to Wickersham's beneficiaries for his wrongful death; and (2) $1,375,000 to plaintiff, in her individual capacity, for her loss of consortium following Wickersham's wrongful death. Lastly, the jury found that Wickersham was at fault in his use of the Escape's restraint system and that this fault was a proximate cause of his injuries. Having determined that both Ford and Wickersham's actions were proximate causes of Wickersham's injuries, the jury attributed 70% of the fault to Ford, and 30% of the fault to Wickersham.

On September 28, 2016, Ford filed the instant motions for judgment as a matter of law, for a new trial, and to alter the judgment. Plaintiff filed responses to each motion on November 8, 2016, and Ford replied on December 1, 2016. The motions are now ripe for the court's review.

## II.  STANDARD

### A.  Judgment as a Matter of Law Pursuant to Rule 50(b)

A movant is entitled to a judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) "if a reasonable jury could only reach one conclusion based on the evidence or if the verdict in favor of the non-moving party would necessarily be based upon speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005); see also Persinger v. Norfolk & W. Ry. Co., 920 F.2d 1185, 1189 (4th Cir. 1990) ("[Judgment notwithstanding the verdict] should not be granted unless the evidence is so clear that reasonable men could reach no other conclusion than the one suggested by the moving party."). This standard is satisfied "if the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof." Wheatley v. Wicomico Cnty., Md., 390 F.3d 328, 332 (4th Cir. 2004) (quoting Singer v. Dungan, 45 F.3d 823, 827 (4th Cir. 1995))

In evaluating a motion for judgment as a matter of law, "[t]he evidence and all reasonable inferences from it are assessed in the light most favorable to the non-moving party, and the credibility of all evidence favoring the non-moving party is assumed." Crinkley v. Holiday Inns, Inc., 844 F.2d 156, 160 (4th Cir. 1988); see also Konkel v. Bob Evans Farms, Inc., 165 F.3d 275, 279 (4th Cir. 1999) (stating that a Rule 50 motion should be granted "if a district court determines, without weighing the evidence or

considering the credibility of the witnesses, that substantial evidence does not support the jury's findings."). If there is any evidence on which a reasonable jury could return a verdict in favor of the nonmoving party, judgment as a matter of law should not be granted. Price, 93 F.3d at 1249. "If reasonable minds could differ, [the court] must affirm the jury's verdict." Pitrolo v. Cnty. of Buncombe, 407 F. App'x 657, 659 (4th Cir. 2011) (citing Dennis v. Columbia Colleton Med. Ctr., 290 F.3d 639, 645 (4th Cir. 2002)).

**B.**     **New Trial Pursuant to Rule 59(a)**

A motion for a new trial under Federal Rule of Civil Procedure 59(a) may be granted "on all or some of the issues . . . to any party . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." This rule allows a trial court to set aside the verdict and order a new trial only if "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice even though there may be substantial evidence which would prevent the direction of a verdict." Atlas Food Sys. & Servs. Inc. v. Crane Nat'l Vendors, Inc., 99 F.3d 587, 594 (4th Cir. 1996). "[A] Rule 59(a) motion for new trial is a matter "resting in the sound discretion of the trial judge." Eberhardt v. Integrated Design & Constr., Inc., 167 F.3d 861, 869 (4th Cir. 1999).

**C.**     **Alter or Amend Judgment Pursuant to Rule 59(e)**

While Rule 59(e) does not supply a standard to guide the court's exercise of its power to alter or amend, the Fourth Circuit has recognized that a court may grant a Rule 59(e) motion "only in very narrow circumstances: (1) to accommodate an intervening change in controlling law, (2) to account for new evidence not available at trial, or (3) to correct a clear error of law or prevent manifest injustice." Hill v. Braxton, 277 F.3d 701,

708 (4th Cir. 2002). Whether to alter or amend a judgment under Rule 59(e) is within the sound discretion of the district court. Bogart v. Chapell, 396 F.3d 548, 555 (4th Cir. 2005).

### III.  DISCUSSION

Though Ford's motions address a number of different aspects of the trial, there is some overlap. The court begins its analysis with Ford's motion for judgment as a matter of law, which addresses the two primary issues presented by this case:  (1) whether plaintiff provided sufficient proof of a defect in the Escape's restraint system, and (2) whether Ford can be held liable for Wickersham's suicide. Following this discussion, the court will address Ford's motion for a new trial, which identifies a number of alleged errors related to these two broad issues at trial. Finally, the court will address Ford's motion to alter or amend the complaint, which deals with the somewhat different issue of whether contributory negligence is a defense to strict liability and breach of warranty claims.

### A.      Motion for Judgment as a Matter of Law

Ford's motion for judgment as a matter of law argues that (1) plaintiff failed to present sufficient evidence to support a finding of a defect in the Escape's restraint system, and (2) Ford cannot be held liable for damages suffered in connection with Wickersham's suicide because such liability is not recognized under South Carolina law, and even if it were, plaintiff did not present sufficient evidence to support a finding of such liability. The court takes each argument in turn.

# 1.     Proof of a Defect

Ford's initial argument centers on the testimony of plaintiff's design expert, Chris Caruso ("Caruso").  ECF No. 131 at 4–14.  Caruso is a former employee of Delco, a division of General Motors ("GM") that manufactures electronic systems for GM vehicles.  T. 2:317–19.  Caruso worked on the development of airbag systems at Delco from 1986 to 2006.  T. 2:320.  Caruso explained that the Escape's restraint system is governed by a restraints control module ("RCM"), which is a computer that decides when and how to engage different components of the restraint system—i.e., the seatbelt pretensioners[2] and airbags—based on information provided by crash sensors located throughout the vehicle.  T. 2:332–33.  The RCM processes this information through an algorithm that triggers different responses depending on the inputs.  T. 2:336.  Importantly, this algorithm needs to be calibrated based on the structural makeup of the vehicle.  T. 2:338.  Caruso testified that the Escape's airbag should not have deployed at all in the crash that injured Wickersham, and at the very least, it should not have deployed so late into the crash.  T. 2:388, 2:396–99.  Caruso opined that this malfunction was caused by either a defect in the calibration of the algorithm or the design of algorithm itself.  T. 2:389.  Specifically, Caruso opined that the algorithm's calibration did not sufficiently account for the variation in data that would be provided to the RCM in real-world crash conditions, and consequently, the algorithm's trigger thresholds failed to account for certain scenarios.  T. 2:372–73, 2:375.  Based on the algorithm's performance in the Wickersham crash, and his own experience, Caruso also determined

---

[2] Seatbelt pretensioners rapidly tighten the seatbelts during an accident in order to move the occupant into a safe seating position.

that the algorithm "probably" did not utilize a "raised-threshold approach."  T. 2:439.

The raised-threshold approach ensures that whenever the seatbelt pretensioners fire, the

threshold to trigger airbag deployment increases as time goes on.  T. 2:360–61.  This

approach is used to account for the fact that the seatbelt pretensioners will cause the

occupant to move forward into the airbag deployment zone.  Id.  If the airbag is deployed

with the occupant in the deployment zone, it is likely to do more harm than good, unless

the crash is especially severe.  Id.

Ford contends that Caruso failed to identify any actual defect.  In Ford's view,

Caruso simply "insisted that the airbag should not have deployed, and since there was no

manufacturing defect, the deployment must have been due to the algorithm and

calibration."  ECF No. 131 at 9 (emphasis in original).  Ford contends that such testimony

is an impermissible attempt to rely solely on the fact that the product failed to prove the

existence of a defect.  Id. at 8.  Much of this argument appears to be premised on the fact

that Caruso had no way of reviewing the actual algorithm used in the Escape's RCM, and

was therefore forced to look to circumstantial evidence of a defect.  Id. (arguing that

Caruso "acknowledged that because he did not have access to the proprietary algorithm

from Autoliv, he did not have an opinion that the algorithm was defective and did not

know what the algorithm actually did").[3]

It is true that "one cannot draw an inference of a defect from the mere fact a

product failed."  Graves v. CAS Med. Sys., Inc., 735 S.E.2d 650, 658 (S.C. 2012).

However, the court is not convinced that Caruso's testimony infringed on this rule.

Caruso highlighted various pieces of evidence supporting his defect opinion—namely,

_____

[3] The owner of the algorithm refused to provide it to either plaintiff or Ford.

Ford's testing data, T. 2:367, 2:385 (noting data indicating that a 19 mile per hour, angled impact should not cause airbag deployment, and later opining that Wickersham's crash was less severe than a 19 mile per hour, angled impact), and the RCM designers' calibrations, T. 2:372–73 (discussing the tolerances used in the RCM designers' calibration).

Even if this evidence were set to the side, Caruso's opinions derive from his understanding of how an RCM system can be designed and his assessment of how the RCM system actually performed in this case. Using such knowledge, Caruso was able to draw inferences about the algorithm's design. The practice of drawing inferences about a product's design from the way it performed is not the same as "draw[ing] an inference of a defect from the mere fact a product failed." Graves, 735 S.E.2d at 658. In Sunvillas Homeowners Ass'n, Inc. v. Square D Co., for example, the court recognized the rule Ford attempts to enforce here, and applied it where the plaintiff's expert simply opined that there "was some defect in the product," but "could not identify the defect." 391 S.E.2d 868, 870 (S.C. Ct. App. 1990) (emphasis added). The expert even testified that "[t]here is no evidence that I have that [the defendant] manufactured it wrong except for the fact that it didn't work as intended." Id. Here, in contrast, Caruso was able to identify two specific design flaws that could have caused the airbag's late and unnecessary deployment—inadequate calibration and the failure to employ a raised-threshold design approach.

To the extent that Ford objects that Caruso cannot say with certainty whether these defects exist because he has not actually seen the algorithm, it is notable that Caruso did specifically assert that the 6 percent variation used to calibrate the RCM data

was insufficient. T. 2:372. Moreover, while Caruso could not confirm whether the algorithm used the raised-threshold approach, he testified that it "probably" did not. T. 2:439. The court sees nothing wrong with this assertion. It seems to be a rather straightforward use of circumstantial evidence to prove the existence of a defect. There is no question that this is permitted under South Carolina law. See Graves, 735 S.E.2d at 658 (recognizing that a defect may be proven using circumstantial evidence).

Ford also argues that plaintiff failed to present sufficient evidence of a feasible alternative design. ECF No. 131 at 9–14. Ford first argues that its corporate representative, Ram Krishnaswami ("Krishnaswami"), confirmed that the Escape did in fact utilize Caruso's raised-threshold alternative approach, and thus, this alternative should not be considered at all. Id. at 11. But because Krishnaswami did not have access to the algorithm, his testimony was just as circumstantial as Caruso's. Krishnaswami claimed to know that the Escape's algorithm employed such an approach "based on [his] experience" working on other projects and his reading of the calibration report. T. 7:1413–14. The fact that two experts reached conflicting conclusions relying on circumstantial data strikes the court as unremarkable. Certainly, the court cannot find that Krishmaswami held the only reasonable view of the evidence. Therefore, despite Krishnaswami's testimony, there was evidence that the algorithm did not utilize the raised threshold approach.

Ford also argues that Caruso's proposed alternatives are unduly speculative and failed to account for potential adverse consequences of the design. ECF No. 131 at 11– 13. To prove a design defect under South Carolina law, a plaintiff must "point to a design flaw in the product and show how his alternative design would have prevented the

product from being unreasonably dangerous.  This presentation of an alternative design must include consideration of the costs, safety and functionality associated with the alternative design." <u>Branham v. Ford Motor Co.</u>, 701 S.E.2d 5, 16 (S.C. 2010).  An alternative design must be more than merely "conceptual." <u>Holland ex rel. Knox v. Morbark, Inc.</u>, 754 S.E.2d 714, 720 (S.C. Ct. App. 2014).

Here, Caruso testified that he had used both of his alternative designs, the raised-threshold approach and increased variability-based calibration, in his work at Delco.  T. 2:389, 2:401.  Such testimony indicates that these approaches were certainly feasible, since they have been employed by manufacturers in the past.  Moreover, Caruso specifically acknowledged that increasing the variability built into the algorithm's calibration might require changes to the actual algorithm's design, T. 2:394, and stated that:  (1) he had been able to design algorithms that could be calibrated to account for such variability in the past, and (2) there was no reason to believe the same thing could not be done for the Escape.  T. 2:401.  Caruso also specifically testified that his Delco designs prevent the types of injuries that occurred in this case.  T. 2:361.  Ford argues that Caruso's past experience is insufficient to support a finding of feasibility in this case because he left Delco in 2006, and therefore had no way of knowing what designs other manufacturers were using when the Escape was manufactured in 2010.  ECF No. 131 at 12.  The court does not find that this 4-year[4] gap in time is enough to render Caruso unqualified to testify about the practices of other manufacturers in 2010.  Caruso actually testified that some of the design elements he developed are used in today's GM vehicles.

_____

[4] Caruso testified that he left Delco in August, 2006.  T. 2:410.  The 2010 Ford Escape was presumably developed in 2009, so the elapsed time between Caruso's departure from Delphi and the design of the Escape's algorithm may be closer to 3 years.

T. 2:324.  Given this evidence that other manufacturers utilized Caruso's alternative designs, the court finds that there was evidence that the designs were feasible in light of costs, safety, and functionality.

Therefore, the court finds that plaintiff presented sufficient evidence of a design defect.

### 2.    Wickersham's Suicide

Ford next argues that it cannot be held liable for Wickersham's suicide.  The bulk of Ford's argument consists of its disagreement with the court's legal determination that a defendant may be held liable for a decedent's wrongful death by suicide when the decedent suffered an uncontrollable impulse that was proximately caused by the defendant's wrongful conduct.  ECF No. 131 at 14–24.  Because these arguments do not appear to be any different than the arguments Ford raised at the summary judgment stage, it is sufficient to simply refer to the court's order denying summary judgment.  ECF No. 65.

Ford also argues that, even under the court's "uncontrollable impulse" standard, plaintiff failed to present sufficient evidence to support a finding of liability.  ECF No. 131 at 23–24.  This argument focuses on the testimony of Dr. Donna Schwartz-Maddox ("Dr. Maddox"), plaintiff's expert in psychiatry and forensic psychiatry.  Id.  Dr. Maddox reviewed Wickersham's metal and psychiatric history following the accident and concluded that "[Wickersham's] suicide was a result of chronic pain and depression, . . . and that the pain . . . that led to his suicide was directly a product of his car accident."  T. 4:773–74.  Ford highlights Dr. Maddox's admission that Wickersham knew what he was doing when he committed suicide to argue that he could not have been under an

"uncontrollable impulse." ECF No. 131 at 24. However, under the uncontrollable impulse test, it does not matter that the decedent intended the consequences of his actions because intent does not necessarily constitute "control" within the meaning of the rule. See Fuller v. Preis, 322 N.E.2d 263, 268 (N.Y. 1974) (explaining that "[i]n tort law, . . . there is recognition that one may retain the power to intend, to know, and yet to have an irresistible impulse to act and therefore be incapable of voluntary conduct," and that "[a]n irresistible impulse does not necessarily mean a 'sudden' impulse"); Tate v. Canonica, 5 Cal. Rptr. 28, 40 (Cal. Dist. Ct. App. 1960) ("It should not make any difference that the decedent 'knew what he was doing'. If defendant is to avoid liability, the decedent's act must be voluntary, not in that sense but in the sense that he could, in spite of his mental illness, have decided against suicide and refrained from killing himself."). Therefore, the fact that Wickersham knew he what he was doing and implemented a plan to kill himself does not preclude a finding that he was under an "uncontrollable impulse."

Ford also highlights Dr. Maddox's statement that she did not know whether Wickersham "could totally control" his suicidal impulse, and argues that if Dr. Maddox was unsure on this point, she could not competently testify as to whether Wickersham's impulse was "uncontrollable." ECF No. 131 at 24–25. This argument is based on the following exchange:

> Q. Did he -- I think you answered this, but did he have the capacity on that day to control this impulse?
>
> A. No. In my opinion his capacity was severely diminished. Whether he could totally control it, I don't know, but it was — obviously in my opinion, it was diminished.

T. 4:832. When read in full, and in the light most favorable to the plaintiff, the court finds that Dr. Maddox's equivocation on this point simply reflects the basic fact that she

could never fully confirm the degree to which Wickersham could control his impulse. This finding is consistent with the answer she offered to a similar question shortly before the disputed testimony:

> Q. On that day, in your opinion, did Mr. Wickersham have the capacity to resist th[e] impulse [to commit suicide]?
>
> [ . . . ]
>
> THE WITNESS: In my opinion he did not. It was severely impaired. He had some capacity -- again, keeping in mind in answering these questions, I was not there. None of us were there. He's not alive for us to ask. And what we do in forensic psychiatry, we go back in time. We look at illnesses. I know he had had a history of depression. I know that he had a history of developing suicidal ideation when he was in chronic pain. We know that he remained in pain. He was trying to explore alternatives to get his pain treated. He was running out of resources in terms of financial resources to fund that treatment. We know that very shortly before his suicide, he had gone with family and abruptly cut a vacation short. We know that he was decompensating. So the best that we are able to do is to say because of that pain and some of his depression, that on that day that decision to kill himself was not the normal judgment he used. It impaired his judgment severely.

T. 4:831–32. Considering all of this testimony together, the court concludes a reasonable juror could have found that Wickersham's capacity to resist his suicidal impulse was so severely impaired that he lacked the ability to control that impulse. Dr. Maddox's recognition that she could not conclusively prove Wickersham's level of control does not render her opinion insufficient to support the verdict.

Therefore, the court finds that plaintiff presented sufficient evidence for a reasonable juror to find Ford liable for Wickersham's wrongful death.

### B.     Motion for a New Trial

Ford moves for a new trial, arguing that the court erred in the following ways:

(1)     By admitting evidence of the amounts paid to Ford's experts and their companies in other cases;

(2)     By admitting evidence concerning over one hundred other cases;

(3)      By allowing plaintiff to engage in improper, harmful, and unfairly prejudicial closing arguments;

(4)      By allowing Wickersham's treating physician to offer injury causation opinions;

(5)      By allowing plaintiff to offer rebuttal testimony;

(6)      By admitting evidence of Wickersham's suicide;

(7)      By instructing the jury that Ford could be held liable for Wickersham's suicide; and

(8)      By instructing the jury on the aggravation of a pre-existing condition.

The court addresses each argument in turn.

### 1.      Experts' Compensation

Ford takes issue with the court's decision to allow plaintiff to elicit testimony from two of its experts, Jeffrey Pearson ("Pearson") and Dr. Mike Scott ("Dr. Scott"), regarding amounts paid by Ford to their companies in other cases dating back to 16 years before trial. T. 8:1609 (asking Pearson whether his company had been paid $6 million over the last 10 years for work in litigation from Ford); T. 8:1711 (discussing $30 million in payments from Ford to Dr. Scott's company since 1999). Plaintiff contends that such evidence was relevant to show that the experts were biased, while Ford argues that the scope of such testimony was entirely irrelevant to any issue in the case. ECF No. 132 at 4–6.

Evidentiary rulings are committed to the sound discretion of the district court. Minter v. Wells Fargo Bank, N.A., 762 F.3d 339, 345 (4th Cir. 2014). "To be admissible, evidence must be relevant—a 'low barrier' requiring only that evidence be 'worth consideration by the jury . . . .'" Id. (quoting United States v. Leftenant, 341 F.3d 338, 346 (4th Cir. 2003)). "Relevant" evidence is defined in the Federal Rules of Evidence as

evidence that "has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed. R. Evid. 401(a)–(b). Rule 403 provides that the court may "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, . . . or needlessly presenting cumulative evidence."

Ford contends that the court should not have admitted evidence of earnings for work performed by other experts employed by Pearson and Dr. Scott's firms. ECF No. 132 at 5. As the court explained at trial, it allowed plaintiffs to impeach Pearson and Dr. Scott using evidence of earnings related to work performed by their firms in other cases because they were each owners of their respective firms. T. 8:1630 ("If he was an owner of the firm, he could testify to what the firm billed, because they have an interest in it."). The court stands by this ruling. An owner's interest in his firm would be stronger than an ordinary employee, and thus, the owner's bias would be affected more by the overall relationship between his firm and the client—not just what the client was paying in the specific case at hand. This reasoning is consistent with the Fifth Circuit's thinking in Collins v. Wayne Corp., which held that "[a] showing of a pattern of compensation in past cases raises an inference of the possibility that the witness has slanted his testimony in those cases so he would be hired to testify in future cases." 621 F.2d 777, 784 (5th Cir. 1980); see also Behler v. Hanlon, 199 F.R.D. 553, 557 (D. Md. 2001) ("[T]he fact that an expert witness may have a 20 year history of earning significant income testifying primarily as a witness for defendants, and an ongoing economic relationship with certain insurance companies, certainly fits within recognized examples of bias/prejudice impeachment."). If the focus is on the experts' interest in their firms' relationships with

Ford, it does not matter that they were not specifically involved in the prior engagements because their employees' work benefits that relationship just as much as their own.

The same basic rationale explains why the court did not limit impeachment evidence to earnings from this case. Ford highlights the Ash v. Ford decision out of the Northern District of Mississippi, in which the court limited evidence of expert compensation to compensation earned in that case. The court notes that this decision was made from the bench and the underlying rationale was never explained. ECF No. 82-1, Ash v. Ford Transcript. As outlined above, other courts have allowed evidence of earnings from previous cases to establish a "pattern of compensation," Collins, 621 F.2d at 784, or "an ongoing economic relationship." Behler v. Hanlon, 199 F.R.D. at 557. The court follows these decisions and finds that evidence of payments from Ford to Pearson and Dr. Scott's firms in other cases was certainly relevant to their bias.[5]

The next question is whether the probative value of such evidence is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Fed. R. Evid. 403. Ford provides very little argument as to why evidence of amounts earned in other cases by other experts is prejudicial or otherwise problematic. To the extent Ford suggests that plaintiff used such information to "inject" evidence of other incidents into this case without a showing of substantial similarity, the court addresses that argument in

---

[5] Ford also claims that when the issue was first raised the court limited evidence of earnings from prior cases to a 10 year period. ECF No. 132 at 6. It is true that the court recognized that there "probably ought to be some kind of limitation and initially set that limitation at 10 years. T 8:1635. However, after plaintiff's counsel informed the court that he was not able to break down the information he had into the last 10 years, the court decided to allow plaintiff to bring everything in, reasoning that defendant should have sought to a time limitation sooner.

part III.B.2.  Once this argument is set aside, there is little to support Ford's argument that the admission of such evidence violated Rule 403.

Therefore, the court finds that it did not err in allowing the plaintiff to introduce evidence regarding amounts paid to Ford's experts and their companies in other cases.

### 2.      Other Incident Evidence

In cross-examining Ford's witnesses, plaintiff discussed their testimony on behalf of Ford in other cases involving defective airbag allegations.  For instance, plaintiff pointed out that Pearson had previously testified on Ford's behalf that occupants were out of position.  T. 8:1601–07.  Plaintiff also highlighted prior testimony from Dr. Scott, noting that he also frequently testified that the occupant was out of position.[6]  T. 8:1703–08.  Ford argues that plaintiff's discussion of Pearson and Dr. Scott's testimony in prior cases improperly suggested that the Escape was defective by highlighting the existence of other lawsuits without establishing that the incidents underlying those lawsuits were substantially similar to the incident at issue in this case.  ECF No. 132 at 12.

When a proponent seeks to introduce evidence of prior incidents to prove a defect, the proponent must establish that such incidents were "'substantially similar' to the accident at issue."  Mirchandani v. Home Depot U.S.A., Inc., 470 F. Supp. 2d 579, 583 (D. Md. 2007) ("Where a party seeks to introduce evidence of other accidents, he 'must

---

[6] Ford also highlights certain testimony of Krishnaswami, where plaintiff asked,

> Even when you knew that those airbags were causing injuries when plaintiffs [] injured us[ing] those vehicles were complaining about those injuries, Ford Motor Company was hiring Mr. Scott -- Dr. Scott and Mr. Pearson to come in and testify that those folks were out of position?

T. 7:1419.  However, when read in context, it is clear that this question related to incidents involving over-powered, pre-1997 airbags.  Id.  There was no risk that the jury would regard such incidents as bearing on the defect issue in this case.

present a factual foundation for the court to determine that the other accidents were substantially similar to the accident at issue.'" (quoting Buckman v. Bombardier Corp., 893 F. Supp. 547, 552 (E.D.N.C. 1995))). Ford argues that this "substantial similarity" requirement extends to situations when the evidence relating to prior incidents is not offered to prove the existence of a defect. ECF No. 152 at 5. However, Ford makes this argument under South Carolina law, not federal law—which governs the evidentiary issues in this case.

The federal case law on the issue indicates that the substantial similarity requirement is tied to the purpose for which the evidence is admitted. See Hershberger v. Ethicon Endo-Surgery, Inc., 2012 WL 1113955, at *2 (S.D.W. Va. Mar. 30, 2012) (recognizing that "evidence of similar incidents may be relevant as direct proof of negligence, a design defect, notice of a defect, or causation," but holding that such evidence should not be admitted unless the court finds that "the other incidents were 'substantially similar' to the allegations at issue"); Musick v. Dorel Juvenile Grp., Inc., 2011 WL 5110404, at *1 (W.D. Va. Oct. 22, 2011) ("When prior incidents or injuries are admitted to prove notice, the required similarity of the prior accidents is more relaxed than when prior incidents are admitted to prove negligence."). Here, Pearson and Dr. Scott's prior opinions were offered to prove bias by illustrating a pattern of consistently offering favorable opinions in Ford cases. Indeed, the court is not certain whether plaintiff's questioning on this issue should be considered "prior incident" evidence at all. The comparison that was relevant was the content of the witness's prior opinions, not the nature of the incidents underlying the litigation in which those opinions were offered. In this regard, it would have been to plaintiff's benefit to show that incidents underlying

Pearson and Dr. Scott's previous testimony were <u>not</u> similar to the incident in this case. The ultimate point of the exercise was to suggest that Pearson and Dr. Scott's conclusions were not a reflection of their genuine analysis, but instead, a reflection of their relationship with Ford or their bias against plaintiffs in airbag cases. Showing that the actual incidents varied, while Pearson and Dr. Scott's testimony remained the same, would only strengthen this argument.

Nevertheless, the court recognizes that plaintiff did elicit testimony that referenced other airbag cases. Courts treat similar incident evidence as "highly prejudicial" under Rule 403. <u>Hershberger</u>, 2012 WL 1113955, at *2; <u>Blevins v. New Holland N. Am., Inc.</u>, 128 F. Supp. 2d 952, 961 (W.D. Va. 2001) ("Proof of prior accidents is not easily admitted into evidence because it often results in unfair prejudice, consumption of time, and distraction of the jury to collateral matters."). Thus, it is fair to worry that such testimony might have been used for a purpose other than impeachment. However, when the testimony is read in full, it is clear that the focus was on the experts' biases, not the Escape at issue in this case. Plaintiff's counsel repeatedly asked Pearson and Dr. Scott to recall the testimony they offered. Plaintiff's counsel did not spend a great deal of time recounting the facts of each case, much less discuss the particular nature of the defect alleged in each case. T. 8:1601–07, 8:1703–08. Given the nature of the testimony, the court concludes that the risk of the jury prejudicially misapprehending the point of the questioning was minimal.

Therefore, the court finds that it was not error to allow plaintiff to question Ford's witness on their testimony in prior engagements.

### 3. Plaintiff's Closing Argument

Ford next argues that plaintiff's closing argument was improper, harmful, and unfairly prejudicial because it relied on the aforementioned evidence of Ford's experts earnings and testimony in other cases to suggest that Ford's experts were not offering genuine opinions, and were essentially lying to the jury. ECF No. 132 at 14. Plaintiff argues that it was not error to allow her closing arguments to draw such inferences, and in any event, Ford failed to object when the closing arguments were made. ECF No. 147 at 18.

As an initial matter, for the reasons discussed in the preceding sections, it was not error to allow plaintiff to argue that Ford's experts were not credible based on their long-standing, economic ties to Ford, and their history of offering the same basic opinion in other airbag-related litigation. While it is true that plaintiff's counsel may have used somewhat colorful language, the entire purpose of impeachment is to show that, for one reason or another, the opponent's witness should not be believed. If it is not "unfairly prejudicial" to present evidence of expert compensation, the court fails to see why it would be unacceptable to present the type of arguments contained in plaintiff's closing argument—both methods suggest that the expert's pecuniary interests have overcome their interest in the truth.

In any event, supposing plaintiff's closing argument was improper, Ford must still overcome its failure to object. "A motion for a new trial should not be granted [] where the moving party has failed to timely object to the alleged impropriety giving rise to the motion." Dennis v. Gen. Elec. Corp., 762 F.2d 365, 367 (4th Cir. 1985). "The failure to object at the proper time will be overlooked on appeal only if exceptional circumstances

exist such as when the error is so obvious or so serious that the public reputation and integrity of the judicial proceeding is impaired." Id. Ford never clarifies how it can meet this standard, and for the reasons outlined above, the court is not convinced that plaintiff's closing arguments were even improper. Certainly, the court does not believe that it erred in such an obvious or serious manner "that the public reputation and integrity of the [] proceeding [was] impaired." Id.

Therefore, the court finds that plaintiff's closing arguments do not warrant a new trial.

### 4. Dr. Skoner's Testimony

Ford next argues that the court erred in permitting Dr. Judith Skoner ("Dr. Skoner"), Wickersham's treating otolaryngologist, to offer injury causation opinions. ECF No. 132 at 15–22. Apart from citations to Dr. Skoner's trial testimony and a brief discussion of how such testimony was harmful error, Ford's arguments are nearly identical to the arguments it advanced in its motion in limine on the same issue. ECF No. 81. The court issued an order explaining its ruling on that motion. ECF No. 129. In short, the court held that (1) plaintiffs were not required to provide a Rule 26(a)(2)(B) report disclosing Dr. Skoner's opinions because those opinions were arrived at through the ordinary course of Wickersham's treatment, (2) plaintiff's failure to provide a summary of Dr. Skoner's opinions under Rule 26(a)(2)(C) was substantially justified or harmless, (3) Dr. Skoner was qualified as an otolaryngologist, and (4) Dr. Skoner reliably applied principles of otolaryngology in reaching her conclusion that Wickersham's injuries were caused by the airbag. Id.

Ford's basic argument is that Dr. Skoner could not possibly have been qualified to offer causation opinions, or her opinions could not possibly have been reliable, because she is an otolaryngologist, not a biomechanical engineer. The court stands by its finding that Daubert does not require experts to be qualified in any particular field, the question is whether the expert's qualifications and methodology can be reliably applied to address the issue for which testimony is offered. While otolaryngologists may not be relied on to conduct open-ended investigations into causation under ordinary circumstances, this case was not ordinary. Here, the universe of possible causes was quite limited, and Dr. Skoner was able to draw on her knowledge of Wickersham's injuries to undermine Ford's theory that the impact came from the gear shift hitting the side of Wickersham's face. T. 2:275 ("You could see it on the scan. . . . His -- his upper jaw is behind his lower. . . . it was pushed back. Again, like it just makes sense. It's pushed back. Something hit it from the front.").

Therefore, the court finds that it did not err in admitting Dr. Skoner's causation opinions. To the extent further explanation is necessary, the court refers to its order on Ford's motion in limine. ECF No. 129.

### 5. Rebuttal

Ford next argues that the court erred in permitting plaintiff's biomechanical and accident reconstruction expert, Kelly Kennett ("Kennett"), to provide a rebuttal to Pearson and Dr. Dan Toomey's ("Dr. Toomey") testimony. ECF No. 132 at 22–25. Ford contends that Kennett had ample opportunity to present his critique of Pearson and Dr. Toomey's opinions on direct examination, and argues that rebuttal testimony is only permissible to address "new" facts or evidence that causes unfair surprise. Id. Plaintiff

argues that Kennett's rebuttal testimony is permissible under Federal Rule of Evidence 611(a). ECF No. 147 at 23.

Ford relies on the Fourth Circuit's decision in <u>Allen v. Prince George's Cty., Md.</u>, which explained that

> [o]rdinarily, rebuttal evidence may be introduced only to counter new facts presented in the defendant's case in chief. Such new facts might include "surprise" evidence presented by the defendants. Permissible rebuttal evidence also includes evidence unavailable earlier through no fault of the plaintiff.

737 F.2d 1299, 1305 (4th Cir. 1984). The <u>Allen</u> court upheld the district court's refusal to allow the plaintiffs to introduce new data to support their claims on rebuttal. <u>Id.</u> ("When the district court rejected the appellants' statistics including pre-1972 hires, and accepted the county's statistics excluding pre-1972 hires, the appellants wanted to introduce a 'new' set of statistics which excluded also employees hired prior to 1972."). The court reasoned that this data was available before the rebuttal stage, and therefore, rebuttal was inappropriate. <u>Id.</u> at 1306 ("Rebuttal was too late for the appellants to come up with this data. Had they wanted to introduce such statistics, the time to do so was when they presented their case.").

Though the <u>Allen</u> case can be read to suggest that rebuttal is limited to "new" or "surprise" evidence, the court notes that the rationale underlying that decision does not fully translate to this case. Technically, it is true that Kennett could have outlined his criticisms of Pearson and Dr. Toomey's opinions before Pearson and Dr. Toomey even testified, but Kennett's rebuttal testimony was not used to establish any of the facts plaintiff was required to prove her prima facie case. Instead, it was simply used to defend plaintiff's case against Pearson and Dr. Toomey's attacks. The court finds this situation

factually distinguishable from <u>Allen</u>, where the appellants simply sought to introduce evidence to provide direct support for their claims.

Beyond this factual distinction, <u>Allen</u> is also distinguishable on its procedural posture.  In <u>Allen</u>, the court was affirming the district court's refusal to allow rebuttal evidence, not deciding whether it was improper to allow rebuttal.  As the Fourth Circuit later explained in <u>Pugh v. Louisville Ladder, Inc.</u>, "the fact that we have previously held it within a district court's <u>discretion</u> to limit rebuttal to surprise evidence does not equate with a requirement that rebuttal must always be limited in such manner."  361 F. App'x 448, 459 (4th Cir. 2010).  In <u>Pugh</u> the court looked to Federal Rule of Evidence 611(a) to determine whether a district court's decision to allow rebuttal testimony was in error.  Concededly, the <u>Pugh</u> decision is unpublished, but this court finds its interpretation of the <u>Allen</u> decision and reliance on Rule 611(a) instructive.  For one thing, Rule 611(a) directly addresses "the mode and order of examining witnesses," a topic which naturally encompasses the question of rebuttal testimony.  Fed. R. Evid. 611(a) ("The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence.").  Moreover, other district courts have cited to Rule 611(a) in deciding whether to allow rebuttal testimony.  <u>Kartman v. Markle</u>, 2015 WL 3952639, at *3 (N.D.W. Va. June 29, 2015); <u>United States v. Moore</u>, 2012 WL 4404082, at *1 (W.D. Va. Sept. 25, 2012), <u>aff'd</u>, 532 F. App'x 336 (4th Cir. 2013).  Therefore, the court finds it appropriate to look to Rule 611(a) to determine the propriety of Kennett's rebuttal.

Rule 611(a) provides that "the court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to:  (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect

witnesses from harassment or undue embarrassment." When Ford objected to Kennett's rebuttal at trial, the court based its ruling on the second factor, finding that it would have been wasteful to require plaintiff to rebut Ford's experts before they even testified, given the risk that such rebuttal may have turned out to be unnecessary. T. 9:1882 ("What it seems that Ford wants Mr. Crosby to have to do is to present his full theories, and then rebut Ford's theories before Ford puts its theories in court, which is, number one, a waste of time."). This is reason enough to find that it was not error to allow Kennett's rebuttal. An additional reason to avoid the sort "pre-rebuttal" procedure Ford advocates is the avoidance of confusion. It would likely be very difficult for jurors to evaluate Kennett's criticism of Pearson and Dr. Toomey's testimony, if they were forced to hear that criticism before knowing what Pearson and Dr. Toomey's testimony actually was. Thus, allowing Kennett's rebuttal facilitated a more linear inquiry, and in this court's view, a more effective procedure for determining the truth.

Therefore, the court finds that is was not error to allow Kennett's rebuttal.

### 6.    Evidence of Suicide

Ford next argues that the evidence of Wickersham's suicide was unfairly prejudicial. This argument is based on Ford's argument that it cannot be held liable for Wickersham's wrongful death because Wickersham's suicide operates as an intervening act that breaks the chain of causation. ECF No. 132 at 25–26. Ford contends that, if the court agrees to grant its motion for judgment as a matter of law on plaintiff's wrongful death claims, then it is at least entitled to a new trial on the survival claims because of the prejudicial effect of the suicide evidence. Of course, the court does not believe Ford is entitled to judgment as a matter of law on plaintiff's wrongful death claims for the

reasons noted in part III.A.2. and more fully discussed in the court's order denying Ford's motion for summary judgment. ECF No. 65. Therefore, Ford is not entitled to a new trial on the survival claims.

### 7. Instruction on Proximate Cause and Suicide

Ford reiterates its disagreement with the standard used to judge its liability for plaintiff's wrongful death claims. Ford argues that Wickersham's suicide, as a matter of law, broke the causal chain between Ford's conduct and his death. ECF No. 132 at 27. Even if there is an exception to this rule, Ford contends that it requires a showing of "insanity." Id. Because the court's jury instructions utilized the "uncontrollable impulse" standard outlined in its order denying Ford's motion for summary judgment, Ford argues that those instructions were in error. Again, the court stands by its adoption of the "uncontrollable impulse" standard and refers to the analysis outlined in the summary judgment order. ECF No. 65.

### 8. Instruction on Pre-existing Condition

Ford last argues that the court erred in instructing the jury as to the aggravation of a preexisting condition. ECF No. 132 at 28–30. The court instructed the jury as follows:

> When a plaintiff's pre-existing physical or mental condition is aggravated or activated by a subsequent act, the defendant is liable to the extent that his wrongful act proximately and naturally aggravated or activated plaintiff's preexisting condition. The plaintiff can recover for pre-existing injuries only to the extent they were aggravated by the defendant's actions.

ECF No. 132-2. Ford objects to this charge on two grounds: (1) it dids not specify which preexisting condition it was referring to, inviting the jury to "speculate impermissibly," and (2) it allowed the jury find Ford liable for Wickersham's suicide without proving Ford proximately caused Wickersham's suicide. ECF No. 132 at 28–30.

The court is somewhat confused by Ford's first objection. There were a number of pre-existing conditions at issue in this case—Wickersham's history of vision problems, bi-polar disorder, depression, suicidal ideation, etc. To the extent there was evidence that the accident aggravated any of these conditions, it was appropriate for consideration by the jury. Put differently, the instruction was intended to be generally applicable to whatever pre-existing conditions the jury found evidence to apply it to. The court does not regard this as "impermissible speculation," and Ford has not explained why it would be.[7]

Ford next argues that the preexisting condition instruction conflicts with the court's instruction that Ford could be held liable for Wickersham's suicide only if the jury found that Wickersham's suicide was the result of an "uncontrollable impulse" and that "uncontrollable impulse was proximately caused by [Ford's] actions." Id. at 29. As an initial matter, jury instructions should not be read in isolation. United States v. Rahman, 83 F.3d 89, 92 (4th Cir. 1996) ("[I]n reviewing the propriety of jury instructions, we do not view a single instruction in isolation; rather we consider whether taken as a whole and in the context of the entire charge, the instructions accurately and fairly state the controlling law."); CSX Transp., Inc. v. Peirce, 974 F. Supp. 2d 927, 941 (N.D.W. Va. 2013) ("[J]ury instructions must be taken as a whole, and no single instruction should be judged in isolation."). Here, the court placed considerable emphasis on the "uncontrollable impulse" requirement, going so far as to provide a separate, two-

---

[7] In its reply, Ford appears to argue that this instruction should not have been applied to Wickersham's preexisting mental conditions, but does not explain why. ECF No. 152 at 13. To the extent this argument is based on Ford's disagreement with the "uncontrollable impulse" standard, the court again refers to its order denying summary judgment. ECF No. 65.

page instruction on when a defendant may be found liable for a person's suicide. That instruction reads, in full:

> FORD CLAIMS THAT, EVEN IF IT IS LIABLE FOR JOHN WICKERSHAM'S INJURIES, IT IS NOT LIABLE FOR JOHN WICKERSHAM'S DEATH BECAUSE ITS ACTIONS DID NOT PROXIMATELY CAUSE JOHN WICKERSHAM'S DEATH. SPECIFICALLY, FORD CLAIMS THAT JOHN WICKERSHAM'S SUICIDE WAS AN INTERVENING CAUSE OF HIS DEATH, FOR WHICH FORD IS NOT LIABLE. AN INTERVENING CAUSE IS AN INDEPENDENT EVENT WHICH INTERVENES BETWEEN THE ORIGINAL WRONGFUL ACT OR OMISSION AND THE INJURY, TURNS ASIDE THE NATURAL SEQUENCE OF EVENTS, AND PRODUCES A RESULT WHICH WOULD NOT OTHERWISE HAVE FOLLOWED AND WHICH COULD NOT HAVE BEEN REASONABLY ANTICIPATED.
>
> AS A GENERAL RULE, A PERSON'S SUICIDE WILL CONSTITUTE AN INDEPENDENT AND INTERVENING EVENT WHICH BREAKS THE LINE OF CAUSATION BETWEEN THE DEFENDANT'S ACTIONS AND THE PERSON'S DEATH. HOWEVER, WHEN A PERSON'S SUICIDE IS THE RESULT OF AN "UNCONTROLLABLE IMPULSE" AND THE UNCONTROLLABLE IMPULSE WAS PROXIMATELY CAUSED BY THE DEFENDANT'S ACTIONS, THE DEFENDANT MAY BE LIABLE FOR THE PERSON'S SUICIDE. AN UNCONTROLLABLE IMPULSE IS A FORCE ARISING WITHIN A PERSON OF SUCH FORCE THAT THE PERSON COULD NOT CONTROL THAT FORCE. PUT DIFFERENTLY, A PLAINTIFF MAY RECOVER FOR THE WRONGFUL DEATH WHEN THE DEFENDANT'S ACTIONS MADE THE PERSON INCAPABLE OF CONTROLLING HIS OR HER OWN ACTIONS. THE CRUCIAL QUESTION IS WHETHER MR. WICKERSHAM HAD THE ABILITY TO CONTROL HIS ACTIONS. IN DETERMINING WHETHER HE EXPERIENCED AN UNCONTROLLABLE IMPULSE, YOU MAY CONSIDER (1) HIS MENTAL CONDITION PRIOR TO THE ACCIDENT, (2) THE DURATION OF TIME BETWEEN THE ACCIDENT AND SUICIDE, AND (3) THE INFLUENCE OTHER FACTORS MAY HAVE HAD ON HIS ACTIONS IN COMMITTING SUICIDE. HOWEVER, NONE OF THESE FACTORS ARE DISPOSITIVE OF THE ISSUE. IT IS POSSIBLE FOR A PERSON TO SUFFER FROM AN UNCONTROLLABLE IMPULSE, EVEN IF HE UNDERSTANDS HE IS COMMITTING SUICIDE AND/OR INTENDS TO COMMIT SUICIDE. IT IS ALSO POSSIBLE FOR A PERSON TO SUFFER FROM AN UNCONTROLLABLE IMPULSE, EVEN IF HE DOES NOT SUFFER FROM ANY FORM OF INSANITY, DELIRIUM, PSYCHOSIS, OR OTHER SPECIFIC MENTAL DISORDER. IT IS

ALSO POSSIBLE FOR A PERSON TO SUFFER FROM AN UNCONTROLLABLE IMPULSE, EVEN IF IT IS NOT A SUDDEN IMPULSE AND THE PERSON MAKES THE DECISION TO COMMIT SUICIDE OVER A LONG PERIOD OF TIME. THE ULTIMATE QUESTION IS WHETHER MR. WICKERSHAM HAD THE ABILITY TO CONTROL HIS ACTIONS.

PLAINTIFF BEARS THE BURDEN OF PROVING AN UNCONTROLLABLE IMPULSE BY A PREPONDERANCE OF THE EVIDENCE.

ECF No. 132-2. In light of this instruction, the court finds that it was sufficiently clear to the jury that they needed to find that Wickersham's suicide was the result of an uncontrollable impulse and that Ford's actions were a proximate cause of that uncontrollable impulse, before imposing any liability on Ford with respect to Wickersham's suicide. Moreover, the verdict form specifically asked whether plaintiff proved, by a preponderance of the evidence, that Wickersham "suffered from an uncontrollable impulse to commit suicide, and that [Ford's] wrongful conduct was a proximate cause of [Wickersham's] uncontrollable impulse to commit suicide." ECF No. 124. Thus, the verdict form shows that the jury did, in fact, make the very factual finding that Ford fears they may have inadvertently circumvented.

Therefore, the court finds that the preexisting conditions instruction was not in error.

## C. Motion to Alter or Amend the Judgment

Ford moves to alter or amend the judgment to account for the jury's finding of comparative fault. ECF No. 130. As noted above, the jury found that both Ford and Wickersham's actions were proximate causes of Wickersham's injuries, attributing 70% of the fault to Ford and 30% of the fault to Wickersham. The jury also found that Wickersham's <u>total</u> damages amounted to $4.65 million. Ford argues that this amount

must be reduced by 30% to reflect the jury's finding with respect to Wickersham's comparative fault. Plaintiffs contend that the damages should not be reduced to account for Wickersham's comparative fault because comparative fault is not a defense to claims for strict liability or breach of warranty.

Ford first argues that the court need not decide the issue on the merits because plaintiff somehow waived the position she asserts now. ECF No. 130 at 4–5; ECF No. 150 at 4. Ford appears to suggest that, because plaintiff did not specifically discuss what would happen if the jury found Ford liable for both negligence <u>and</u> non-negligence claims, she implicitly acknowledged that all damages arising from such claims would be reduced. Ford explains:

> Plaintiff never argued, nor did the Court determine, that if the jury answered 'yes' to negligence, and also answered 'yes' to strict liability and/or breach of warranty, then the Court would not give effect to the comparative-fault finding. Rather, by her own admission, Plaintiff 'requested the jury apportion comparative negligence only if it found she proved the negligence cause of action,' which the jury did. Thus, Plaintiff should not now be heard to argue what she was silent on previously—that a finding of strict liability or breach of warranty would negate the jury's comparative-fault finding.

ECF No. 150 at 4. However, it is clear that plaintiff has always maintained that comparative fault is not a defense to strict liability or breach of warranty. T. 9:1885 ("[W]e don't think comparative negligence applies to either [strict liability or breach of warranty]."). It follows from this position that plaintiff's damages should not be reduced because the strict liability and breach of warranty claims are sufficient to support the judgment, even if the negligence claim is not. Thus, the court is not convinced that plaintiff has waived her arguments on this issue.

Turning to the merits question, the parties offer a variety of arguments as to whether the court should apply comparative fault to plaintiff's strict liability and breach

of warranty claims. Ford argues that, because the elements required to prove strict liability are included in the elements of a negligence claim, failing to apply comparative fault to strict liability claims would effectively remove the comparative fault defense from products liability actions. ECF No. 150 at 7. Ford also argues that, even if a product liability defendant could be found liable in negligence but not strict liability, the rule would produce a curious result, allowing the more culpable, negligent defendants an opportunity to reduce their liability while prohibiting the less culpable, strict-liability defendant from doing the same.[8] Id. Ford cites a number of courts that have recognized comparative fault as a defense to strict liability claims. E.g., JCW Elecs., Inc. v. Garza, 257 S.W.3d 701, 707 (Tex. 2008); Whitehead v. Toyota Motor Corp., 897 S.W.2d 684, 691 (Tenn. 1995); Daly v. General Motors Corp., 575 P.2d 1162, 1166 (Cal. 1978).

Plaintiff maintains that comparative fault is not a defense to strict liability or breach of warranty. ECF No. 145. Plaintiff cites to South Carolina caselaw, which has held that "contributory negligence . . . has no application to an action based on breach of warranty or liability for a defective product." Wallace v. Owens-Illinois, Inc., 389 S.E.2d 155, 157–58 (S.C. Ct. App. 1989) (emphasis added). Plaintiff emphasizes that strict

---

[8] The court notes that this argument is somewhat inconsistent with Ford's previous argument that—as a practical matter—a failure to apply comparative fault in strict liability cases would eliminate the defense in the product liability context. The underlying assumption of the latter argument is that whenever a product liability defendant is liable in negligence, it would also be liable in strict liability. But if this is true—and, under South Carolina law, it may well be—then no product liability defendants would be receiving the benefit of the comparative fault doctrine, and—as a practical matter—the incongruous result of allowing more culpable, negligence defendants to reduce their liability while refusing to extend that benefit to less culpable, strict-liability defendants would never occur.

liability and breach of warranty, unlike negligence, are not fault-based doctrines.  ECF No. 145 at 7–10.

In the time since this matter was argued, the Supreme Court of South Carolina ruled on a closely-related issue in <u>Donze v. General Motors, LLC</u>, 800 S.E.2d 479 (S.C. 2017).  Though <u>Donze</u> is distinguishable from this case in one significant way, the court is convinced that the <u>Donze</u> decision offers the best window into how the Supreme Court of South Carolina would approach the question at issue here.[9]

The <u>Donze</u> case, like this case, involved product liability claims against a vehicle manufacturer, alleging that defects in the vehicle's design made the vehicle unreasonably unsafe in a crash.  800 S.E.2d at 480.  The plaintiff in <u>Donze</u> was riding in a 1987 Chevrolet pickup truck, when the driver—who had been smoking synthetic marijuana— pulled out in front of a Ford F-350 towing a horse-trailer.[10]  The Ford F-350 struck the plaintiff's truck, which burst into flames, causing the plaintiff to suffer severe burns.  The plaintiff then filed a "crashworthiness action" against GM, "alleging a defect in the truck's design—specifically, the placement of the gas tank outside of the truck's frame— caused the fire, and seeking damages only for his enhanced burn injuries."  <u>Id.</u>  Thus, the <u>Donze</u> plaintiff sought only those damages that could be attributed to the manufacturer's failure to design a vehicle that would be safe in a foreseeable collision, not the damages that he would have suffered in such a collision, regardless of the vehicle's design.  This is what characterized <u>Donze</u> as a crashworthiness case.

---

[9] Though the court has considered the parties' pre-<u>Donze</u> arguments, it finds them inconclusive.

[10] The <u>Donze</u> court assumed, for the sake of argument, that the driver's negligence could be imparted to the plaintiff.

The District Court for the District of South Carolina certified the following

question in Donze to the Supreme Court of South Carolina:[11]

> Does comparative negligence[12] in causing an accident apply in a
> crashworthiness case when the plaintiff alleges claims of strict liability and
> breach of warranty and is seeking damages related only to the plaintiff's
> enhanced injuries?

Id.  The court answered that question in the negative.  Id. at 480–85.  While the Donze

court's analysis provides insight on how to decide the issue presented in this case, it is

important to recognize that Donze is not directly on point.  Here, as in Donze, plaintiff is

seeking damages based on defects that made the vehicle unreasonably dangerous in the

event of a crash.  Thus, this case is—technically speaking—a crashworthiness case.  But

here, unlike in Donze, Wickersham's negligence was not a partial cause the crash, it was

a partial cause of the enhanced injuries that were also caused by the defective RCM.  Put

differently, this case is distinguishable from Donze on the fact that Wickersham's

negligence had the same type of causal relationship with his injuries as the defective

RCM.

The Donze court made clear that its holding did not extent to such facts in

footnote 4 of the opinion, which stated:

> Our ruling today is limited to the certified questions before us which
> concern only the applicability of comparative negligence to a plaintiff in
> causing the collision in a crashworthiness case.  We note, as did the district
> court in Jimenez I, that "[c]omparative negligence related to the [defective

---

[11] The district court also certified the question of whether "South Carolina's
public policy bar[s] impaired drivers from recovering damages in a crashworthiness case
when the plaintiff alleges claims of strict liability and breach of warranty."  Donze, 800
S.E.2d at 480.  This question does not bear on the instant matter.

[12] The Donze court used the term "comparative negligence."  This court uses the
term "comparative fault," when possible.  However, the court regards the terms as
interchangeable.

component] itself—tying [a door] shut for example—could still be a defense, if a factual basis existed . . . .”

Id. at 485 n. 4 (alterations in original) (quoting Jimenez v. Chrysler Corp., 74 F. Supp. 2d 548, 566 (D.S.C. 1999)).  For context, Jimenez I was a crashworthiness case about a defective door latch that allowed a passenger to fly out of the vehicle during a crash.  74 F. Supp. 2d 548.  Thus, the Donze footnote is targeted at the exact situation presented in this case.  The first question, then, is whether this footnote conclusively recognizes that comparative fault would apply under such facts, or if it was simply meant to hold that question open.

The court is convinced of the latter position.  As an initial matter, the footnote addresses matters that are expressly outside the scope of the certified question.  The entire point of the footnote was to acknowledge a set of facts that fell outside of the controversy at issue.  It would be odd to find that the Supreme Court of South Carolina intended to conclusively answer questions that it recognized fell outside the scope of its holding.  Moreover, much of the reasoning in Donze could be extended beyond the factual parameters of its holding.  The court recognized that “both strict liability and breach of warranty are statutory constructs as are the available defenses to these causes of action,” and reasoned that the General Assembly’s failure to amend the statutory scheme to recognize comparative fault as a defense to either cause of action was indicative of the legislature’s intent on the issue.  Donze, 800 S.E.2d at 485 (citing S.C. Code §§ 15-73-10, 15-73-20, 36-2-314, & 36-2-711).  The court also observed that applying the defense of “comparative negligence in crashworthiness actions brought under strict liability and breach of warranty theories would conflate those two distinct doctrines with ordinary negligence,” and cited the Supreme Court of South Dakota’s observation in Smith v.

34

Smith, 278 N.W.2d 155, 160 (S.D. 1979)—which, notably, was not a crashworthiness case—that "it would be inconsistent to hold that the user's negligence is material when the seller's is not."  Donze, 800 S.E.2d at 485 (internal quotation marks omitted).  Neither of these rationales are limited to the context of the Donze case, or even to the context of crashworthiness cases, generally.  Thus, the court is convinced that it is best to read Donze's statement that "[c]omparative negligence related to the [defective component] itself . . . could still be a defense," id. at 485 n. 4 (emphasis added), as a recognition of the limited scope of the question presented in that case, not an attempt to forecast the court's view of hypothetical facts.

For the same reasons, the court is also convinced that, if the Supreme Court of South Carolina were faced with the question presented here and alluded to in footnote 4 of the Donze decision, it would ultimately decide that comparative fault is not a defense to strict liability and breach of warranty claims in a crashworthiness action, even when the user was negligent in his use of the defective component.  As outlined above, various aspects of the court's reasoning would necessarily extend to this factual context.  Certainly, there are other portions of the Donze decision that would not apply here— namely, the court's adoption of the holding in Jimenez I, that a plaintiff's negligence in causing the crash is "entirely irrelevant" in a crashworthiness case.  Id.  But the limited scope of this reasoning does nothing to undermine the application of Donze's other rationales to this case.  The fact remains that strict liability and breach of warranty claims are "statutory constructs," and as the Donze court recognized, the General Assembly has not added comparative fault as a defense under either statutory scheme.  Id. at 485.  Similarly, it would be just as "inconsistent" in this case to look to the plaintiff's fault,

while ignoring the manufacturer's fault, as it would in any other. Thus, the court concludes that the Supreme Court of South Carolina would not recognize comparative fault as a defense to strict liability or breach of warranty.

Therefore, Ford's motion to alter or amend the judgment must be denied.

## IV.   CONCLUSION

For the foregoing reasons, the court **DENIES** Ford's motions.

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**August 30, 2017**
**Charleston, South Carolina**